UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------
In the Matter of Arbitration between,             :
                                                  :
ALEXIS BERGER,                                    :          CV-174288
                                                  :
                                                  :          ECF CASE
                                    Petitioner,   :
                                                  :
                                                  :   Petition for Confirmation of
                 — and —                          :   Arbitration Award Finding
                                                  :   Gender Discrimination,
KARGO GLOBAL, INC.,                               :   Equal Pay Violation,
                                                  :   Retaliation, Violation of
                                                  :   Wage Law and Breach of
                                    Respondent. : Contract
                                                  :
                                                  :
------------------------------------------------------------------
```

## I.  INTRODUCTION

Petitioner Alexis Berger seeks confirmation of the Arbitrator's award dated May 31, 2017 In The Matter of An Arbitration Between Alexis Berger (Claimant) and Kargo Global, Inc. (Respondent), American Arbitration Association Case No. 01-16-0002-1175) (the "Award").  A true and correct copy of the Award is attached as Exhibit A to the Declaration of Seth Rafkin, undersigned counsel for Ms. Berger, submitted herewith.  The Award was rendered by the duly appointed Arbitrator, the Honorable Billie Colombaro (ret.) (the "Arbitrator"), with the consent of the parties.  The Award represents a full determination of all claims and counterclaims submitted to arbitration by Petitioner and Respondent.

The Court has authority to confirm this arbitration award pursuant to the Federal Arbitration Act, 9 U.S.C. § 9.  As set forth below, this Court has independent jurisdiction over the parties and this matter; the parties agreed to litigate their claims through arbitration; the parties did

in fact arbitrate; the arbitrator issued an award in Petitioner's favor; and the parties agreed that "judgment upon the award may be entered in any court having jurisdiction thereof." Rafkin Decl. Ex. B § 8.12.

Confirmation of the Award is proper in this case. "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *E.g. Rai v. Barclays Capital Inc.*, 739 F.Supp.2d 364, 370 (S.D.N.Y. 2010), *citing Willemijn Houdstermaatschappij, BV v. Standard Microsystems*, 103 F.3d 9, 12 (2d Cir.1997); *see also, Local 1199, Drug, Hosp. & Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 24 (2d Cir.1992) ("*Local 1199*").

Indeed, so strong is the public policy interest in confirming arbitration awards, the Court of Appeals for the Second Circuit "adhere[s] firmly to the proposition ... that an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a '*barely colorable justification for the outcome reached.*'" *Landy Michaels Realty Corp. v. Local 32B-32J*, 954 F.2d 794, 797 (2d Cir.1992); *see also, Local 1199*, 956 F.2d at 25 ("[T]he court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong.") (Internal quotations omitted).

There is no doubt that the Award here far exceeds this standard. As demonstrated herein, the Arbitrator was duly appointed by the American Arbitration Association ("AAA") with the parties' consent. The Arbitrator provided ample discovery, an extended evidentiary hearing, extensive post-hearing briefing followed by extensive oral argument. The Arbitrator applied the law to the facts and rendered her award against Kargo accordingly.

As the Award reflects, Petitioner was a highly compensated employee of Respondent Kargo Global, Inc. ("Kargo"), earning in excess of $1,000,000 per year in salary plus commissions

prior to her unlawful termination.  She also held an equity interest worth nearly $9,000,000 in the company she helped build into a powerhouse with annual revenues in excess of $125,000,000.

The damages provided for in the Award are the consequence of a lengthy, manipulative, intentional and despicable course of conduct engaged in by Kargo and its highest-level officers, including, its President and Chief Operating Officer, Ryan McConville, its Chief Strategy Officer Doug Rohrer, its Vice President of Human Resources, Joy Sybesma, and its majority shareholder and Chief Executive Officer Harry Kargman.

Practically, it was a campaign designed to break a woman financially, emotionally and, in the process, try to claw back for itself (to the direct benefit of three highest-level officers) the substantial equity interest Petitioner had earned over the course of four years of hard work.  Hard work that Kargo repeatedly acknowledged was responsible for building its sales force and bringing in $80 million dollars in annual revenue to Kargo's coffers.

Legally, it was a campaign of gender discrimination, retaliation, violation of equal pay and wage laws.  The Arbitrator, an experienced jurist, summed up her findings as follows:

> "The evidence is overwhelming that Kargo violated Title VII, NYHRL, and NYCHRL.  Additionally, Kargo breached its implied obligation to act in good faith and fair dealing in the Employment Agreement by manufacturing reasons to label her termination as a "for cause" termination.  The evidence exposed that Kargo labored under a double standard, treating Ms. Berger differently from its male managers, who were never even written up, reprimanded, or disciplined in any way for similar or worse behaviors it used to discredit her.  They criticized behavior from her that they would accept from a man to run her out of the company.  It is clear from Kargo's actions and collective attitude that a woman is not permitted to act like a man."

Award, pp., 42-43

The Award also makes clear, Kargo's reprehensible conduct did not stop with the onset of litigation.  Instead, Kargo doubled down.  As the Arbitrator found:

- Kargo intentionally withheld documents responsive to the most basic discovery requests.  Award, pp. 36-37.

- It refused to answer the most straightforward of interrogatories, despite two orders from the Arbitrator to do so.  Award, pp. 34-35.

- Its in-house counsel misrepresented himself as having represented witnesses he finally admitted under oath that he never did as part of an attempt to prevent inquiry into his four-hour deposition "prep" sessions with key Kargo witnesses.  Award, p. 34.

- Kargo even went so far as to seek to prevent a third-party witness from testifying by first telling her that she was not allowed to testify because of her separation agreement with Kargo and then within hours of the Arbitrator issuing a subpoena to appear at the hearing, warning the witness that service of a subpoena would be attempted.  Award, pp. 37-39.

- Kargo and its counsel repeatedly represented to the Arbitrator that this witness "wanted nothing to do with the case."  But when her appearance was finally secured by the subpoena, she testified that, in fact, she did want to testify but was led to believe by Kargo, including its head of Human Resources and its counsel, that she would be in breach of her separation agreement with Kargo if she did.  Award, p. 39.

The damages awarded, $40,925,284.20, are the product of straightforward application of the law.  As noted, Petitioner was a very high wage earner and held an equity stake valued at nearly $9,000,000.  (A valuation made by Respondent's own retained consultant.)  Under the applicable statutes, the Arbitrator was required to impose liquidated damages for equal pay violations (up to 300%).  That statutory mandate combined with the value of the equity itself alone resulted in damages of more than $36,000,000.  The remaining portion of the Award is composed primarily of $305,000 in earned but unpaid commissions and an equal amount under the liquidated damages provision of New York's Labor Law, an award of back pay and front pay under federal and state law, and awards for punitive damages ($300,000) and emotional distress ($60,000).

Kargo insisted on arbitration.  It drafted the agreement containing the arbitration provision.  That provision states: "The parties agree that any award rendered by the arbitrator *shall be final and binding*, and that judgment upon the award may be entered in any court having jurisdiction thereof."  Rafkin Decl. Ex. B (emphasis added).  Kargo has had the arbitration it insisted upon.  It

was permitted extensive discovery, an extended arbitration hearing, extensive post-hearing briefing and oral argument. The Award was rendered by the Arbitrator duly appointed pursuant to the AAA procedure Kargo designated in its arbitration provision and in concert with the applicable law.

In short, the Federal Arbitration Act requires that the Award be confirmed.

## II.   THE COURT HAS JURISDICTION AND VENUE IS APPROPRIATE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).  Petitioner alleged, and at arbitration established, gender discrimination and retaliation claims in violation of, among other laws, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e) and equal pay violations pursuant to the Equal Pay Act of 1963 (29 U.S.C. § 206(d)) and Title VII.  Award, pp. 13 – 14, 42 – 54, 59.  Because the claims underlying the arbitration arise under federal law and could have been originally brought in a federal court (absent the arbitration clause), this Court has federal question jurisdiction over this petition.  *See generally*, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983).  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Petitioner's gender discrimination, retaliation and equal pay claims brought under New York law, as well as Petitioner's breach of contract and breach of the covenant of good faith and fair dealing claims, as all of these claims arise out of the same set of facts as the federal claims.  In particular, the state law claims arise out of Respondent's campaign to push Petitioner out of her job and subsequent termination and treatment of her and her compensation.  Award, pp. 13 – 14, 42 – 54, 59, 60 – 62.

Alternatively, diversity jurisdiction exists pursuant to 28 U.S.C. § 1331 because Petitioner and Respondent are citizens of different states and the amount in controversy exceeds $75,000. Petitioner was at the time the arbitration demand was filed, and at the time of the filing of this

Petition is, a citizen of the State of Illinois.  Rafkin Decl. ¶ 1.  Respondent is incorporated under the laws of Delaware and maintains its headquarters and principal place of business in New York City.  Rafkin Decl. Ex. ¶ 11, Ex. G.  Petitioner seeks to confirm an arbitration award well in excess of $75,000.  Award, pp. 82-83.  Accordingly, diversity jurisdiction exists.

Venue is proper and personal jurisdiction exists because Respondent agreed to arbitrate in New York City.  Rafkin Decl. Ex. B § 8.12; *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) ("A party who agrees to arbitrate in a particular jurisdiction consents not only to personal jurisdiction but also to venue of the courts within that jurisdiction.").  Independently, venue is also proper because the Award was rendered in New York City, and pursuant to 28 U.S.C. § 1391(b) because Respondent, the sole defendant, is headquartered in New York City and a substantial part of the events giving rise to the Award occurred in New York City.  Rafkin Decl. Ex. ¶ 11, Ex. G.; *see Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co*., 529 U.S. 193, 197-204 (2000).

The Court is authorized to confirm this arbitration Award pursuant to the Federal Arbitration Act 9 U.S.C. § 9.  Section 9 provides that a "[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award." 9 U.S.C. § 9.

Here, Petitioner and Respondent are parties to an Employment Agreement containing an agreement to arbitrate.  The Employment Agreement provides in pertinent part:

> 8.12 The parties agree that, except as discussed in this Agreement, any controversy, claim or dispute arising out of or relating to this agreement or the breach thereof, or arising out of or relating to the employment of the Employee, or the termination thereof, including any statutory or common law claims under federal, state or local law, including all laws prohibiting discrimination in the workplace, shall be resolved by arbitration before a single arbitrator in New York City, New York, in

accordance with the Employment Dispute Resolution Rules of the American Arbitration Association.  The parties agree that any award rendered by the arbitrator shall be final and binding and that judgment upon the award may be entered in any court having jurisdiction thereof.

Rafkin Decl. Ex. B.

The parties indeed arbitrated their claims in a seven-day hearing held in New York City. Rafkin Decl. ¶ 7.  Thereafter, the Arbitrator issued the Award.  Rafkin Decl. Ex. A.  Further, the parties agreed that any award "shall be final and binding and that judgment upon the award may be entered in any court having jurisdiction thereof."  *Id.* Ex. B.  The parties also expressly incorporated the rules of the AAA into their arbitration agreement, which provide that judgment may be entered in any court having jurisdiction thereof.  *See* American Arbitration Association, Employment Arbitration Rules and Mediation Procedures R-42(c) (July 1, 2016).  As set forth above, this Court has jurisdiction over the parties and this controversy and may confirm the award and enter judgment. 9 U.S.C. § 9; *Dev. Specialists, Inc. v. Li (In re Coudert Bros.)*, 2017 BL 156345, 4- 5 (S.D.N.Y. May 09, 2017).

## III.   STANDARD OF REVIEW

The review of arbitration awards is governed by the Federal Arbitration Act.  *See Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 201 (2d Cir.1998), *cert. denied*, 526 U.S. 1034 (1999). Pursuant to 9 U.S.C. § 9, any party to an arbitration may apply to a federal court for an order confirming the award resulting from the arbitration.  The court "must grant ... an order [confirming the arbitration award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9; *see First Interregional Equity Corp. v. Haughton*, 842 F.Supp. 105, 108 (S.D.N.Y. 1994).

"Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive

litigation." *Rai*, 739 F.Supp.2d at 370, *citing Willemijn Houdstermaatschappij, BV*, 103 F.3d at 12; *see also, Local 1199*, 956 F.2d at 24.

Understandably, determinations of fact may not be revisited. *Wallace v. Buttar*, 378 F.3d 182, 193 (2d. Cir. 2004); *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 213 (2002); *accord ConnTech Dev. Co. v. University of Conn. Educ. Props., Inc.,* 102 F.3d 677, 687 (2d Cir.1996) ("holding that an erroneous factual determination is not a ground for vacating an arbitration award").

Indeed, so strong is the public policy interest in confirming arbitration awards, the Court of Appeals for the Second Circuit "adhere[s] firmly to the proposition ... that an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a '*barely colorable justification for the outcome reached.*'" *Landy Michaels Realty Corp.*, 954 F.2d at 797 (citation omitted); *see also Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir.1991); *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir.1988).

There is no question that the Arbitrator's 83-page award detailing her determinations of fact, law and damages easily satisfies this standard.

## IV.   THE AWARD SHOULD BE CONFIRMED

### A.    The Arbitrator Was Duly Appointed

As prescribed by Kargo's arbitration provision, the Arbitrator was appointed pursuant to AAA's appointment process.  The Arbitrator, Hon. Billie Colombaro (ret.), was among the list of potential arbitrators submitted to both parties.  Each side had the opportunity to strike names from the list.  Neither side struck Judge Colombaro and she was duly appointed by AAA.  Rafkin Decl. ¶ 4, Ex. C.

**B.      The Arbitrator Permitted Full Discovery and Dispositve Motions**

On August 1, 2016, the Arbitrator held an Arbitration Management Conference and by agreement of the parties and direction of the Arbitrator, a Scheduling Order of the same date issued. The Scheduling Order permitted each side to avail itself of document requests, interrogatories and depositions.  The Scheduling Order also permitted each side to bring dispositive, in limine or other motions.   Rafkin Decl. ¶ 5, Ex. D.  The Scheduling Order also set an evidentiary hearing date of December 1, 2016.  Kargo was also offered the opportunity to have a court reporter present for the arbitration hearing.  It declined to do so.  Rafkin Decl. ¶ 6.

Both Kargo and Ms. Berger availed themselves of all forms of permitted discovery.  Kargo did not submit any dispositive or in limine motions.  *Id.*

**C.      The Arbitrator Extended the Hearing to Allow for All Evidence to Be Presented and Allowed Kargo To Present Witnesses by Phone and Video**

The Scheduling Order set a five-day evidentiary hearing to take place in New York City. After the hearing commenced, the Arbitrator extended the hearing for an additional two days to enable Kargo to put on all evidence it wished to offer.  Rafkin Decl. ¶ 7.  The Arbitrator also allowed Kargo to present witnesses via video and/or telephone.  Scheduling Order ¶ 11; Award p. 68.

**D.      The Arbitrator Issued Subpoenas During the Hearing to Ensure Appearance of Witnesses for Both Sides**

After the evidentiary hearing commenced, the Arbitrator issued two subpoenas.  One was to assist Kargo in securing the appearance of a witness it wished to offer in support of its counter-claims.  The other subpoena was issued to enable Ms. Berger to secure the appearance of a witness in support of her claims.  Award, p. 38.

### E.      The Arbitrator Allowed for Extensive Post-Hearing Briefing

The Arbitrator directed the parties to provide post-hearing briefing, which Kargo had requested.  The Arbitrator permitted the parties to agree upon a schedule and set no limits on the length or extent of such briefing.  The evidentiary hearing concluded on December 13, 2016.  The post-hearing briefing schedule allowed Kargo through and including February 13, 2017 to complete its post-trial briefing.   Kargo's post-hearing briefing (excluding exhibits) totaled approximately 130 pages.  Rafkin Decl. ¶ 9.

### F.      The Arbitrator Held Extensive Oral Argument Following the Post-Hearing Briefing

Following submission of the post-hearing brief, the Arbitrator then held a two-hour oral argument on March 29, 2017.  Rafkin Decl. ¶ 10, Ex. F.

### G.      The Arbitrator's Award Is Thorough in Its Analysis of Both Law and Fact and Detailed in Its Findings

The 83-page Award rendered by Judge Colombaro, an experienced jurist, obviously exceeds by leaps and bounds the standard that "an arbitration award should be enforced … if there is a 'barely colorable justification for the outcome reached.'"  *Landy Michaels Realty Corp.*, 954 F.2d at 797.  The Award carefully analyzes the law and the evidence.  Judge Colombaro provides equally detailed analysis and foundation for the damages awarded.

The Award is replete with evidentiary findings supporting Ms. Berger's claims, including gender discrimination and equal pay violations:

- "Obviously, being a 'pitbull' – having a 'personality trait of aggressiveness' – was, not only, considered to be a positive approach and an expectation, it was also part of Kargo's culture for men.  Ms. Berger was the only one faulted for it."  Award, p. 21.

- "The use of profanity and inappropriately suggestive language was no less part of the men's culture at Kargo than was politically incorrect and potentially offensive language.  Their use of profane and inappropriately suggestive language was prolific – the lead coming from the top – starting with Kargo's founder and CEO,

10

Mr. Kargman, and continuing throughout the company. No one found it a problem, except when Ms. Berger used it – more evidence of a double standard." Award, p. 23-24.

- "Examples are too numerous. Just a few come from Mr. Kargman. In [an] advertisement, he had placed on the cover of a major advertising magazine – 'Advertising Age' a picture of a used condom wrapper having Kargo's name on it…. Another example involves a video he filmed for a national sales conference. Essentially, he promised employees that if they met their goals, he would 'shave his balls.' Ultimately, this comment was not used because *Ms. Berger* advised against it." … Mr. Kargman admitted that his language is so bad he is now paying a coach to help him 'kick the habit.'" … These are the three leaders of the company, using the same type of language and 'humor' for which they fault Ms. Berger." Award, p. 23-24.

- "Kargo witnesses … admitted that Mr. McConville [Kargo's President and Chief Operating Officer, Ryan McConville] is, essentially, 'hostile' in his communications: 'hot headed,' 'testy,' 'impatient,' has a 'temper' and 'shuts down' when angry or his ideas are challenged. Notwithstanding, these emotional erratic behaviors were acceptable. … even though it has a detrimental effect on the process, on the other employees and their ability to express opposing views. Yet, he is not considered to be 'too emotional.' He is not faulted or disciplined while Ms. Berger is." Award, p. 25.

- "These leaders were not the only ones with behavioral/managerial issues. Evidence was presented that there were numerous complaints from various women faulting [Ms. Berger's peer] Mr. Canty's behavior, his style of communication, and his management as being offensive and sexist, but he, too, was never reprimanded, disciplined or even written up. Rather, these complaints were ignored because, as Ms. Sybesma [Vice President of Human Resources] said, 'he was just being a boy.'" Award, p. 27.

- "At retreats, [Canty] would comment on [Berger's] sexuality and talk about 'flipping her back.' (She is gay.) He also asked her and her partner in Cannes to have 'a threesome with him.'" Award, p. 27.

- "[T]he evidence presented highlights the diverse way in which Kargo treated Ms. Berger versus her male counterparts regarding wages. It did not cut the base compensation or commissions of any other male executive at the company in 2016. These men behaved in the same or worse manner as that for which Kargo disciplined Ms. Berger. It did not even cut Mr. Canty's pay. He held the same position as Ms. Berger and numerous sexual harassment complaints had been lodged against him." Award, p. 54.

- "Regarding options, a difference in treatment is also blatantly apparent; namely, Kargo permitted its Vice President, Mr. McConville, to work for Emogi in an advisory position and to receive equity compensation without penalizing him by

taking away his Kargo options, *inter alia*.  On the other hand, when Ms. Berger simply applied to Emogi for a job, she was terminated with Kargo avowing bogus reasons 'for cause,' depriving her of her vested options.  Mr. McConville was bound by the same restrictive covenants Kargo relied on to terminate Ms. Berger and to 'strip' her of her options."  Award, p. 55.

Further, the Award is detailed in its findings regarding Kargo's intent and credibility.  For example:

- "More credibility problems for Kargo surfaced when Ms. Berger was about to call Ms. McCallum at the Hearing. … Ms. McCallum was no longer at Kargo.  Kargo had terminated her. … Kargo prepared [Ms. McCallum's] separation agreement during this litigation. … While the agreement did not contain the usual exclusion of being able to testify in legal proceedings, it did include provisions that Ms. McCallum had an obligation to cooperate with Kargo and testify if necessary and could not disparage Kargo. … [Vice President of Human Resources] Ms. Sybesma testified that she had worked on many separation agreements and that they all included the familiar widespread clause that makes clear to an employee that nothing in a separation agreement can prevent him or from testifying in a legal process."  Award, pp. 38-39.

- "To dissuade this Arbitrator from signing [the subpoena], Kargo's counsel repeatedly and adamantly represented to this Arbitrator that 'she [Ms. McCallum] does not want to testify/that she does not want to have anything to do with this.'  This Arbitrator signed the subpoena.  Knowing, now, the difficulty in securing Ms. McCallum's presence, shortly after the subpoena was issued, Kargo's counsel called [Ms. McCallum] and alerted her that Ms. Berger was attempting to serve a subpoena on her. … When [Ms. McCallum] testified she stated … that Kargo's counsel's representation to this Arbitrator was not the truth.  It was not that she did not *want* to testify, rather, based on her conversations with Kargo personnel, she *understood she was prohibited* from testifying against Kargo and was required, instead, to *assist it*.  Award, pp. 38-39.

- "At her deposition, [Kargo witness] Ms. Biegel testified that *none* of the lawyers [present for Kargo at the deposition] represented her.  When Ms. Berger's counsel wanted to examine her about the contents of Kargo's counsel's four-hour preparation of her for the deposition, Kargo's counsel maintained that they *did* represent her. … [At the depositions] Mr. Greco [Kargo in-house counsel] stated that he represented Kargo *and* the witnesses when, in fact, he admitted at the Hearing that he never sought to represent these witnesses, never told them he represented them, and never believed he represented them."  Award, pp. 33-34.

- "Other credibility issues regarding Kargo related to its refusal to answer one of Ms. Berger's Interrogatories which was pivotal to the issue of discrimination in the case.  Ms. Berger's interrogatory was unambiguous – 'Identify all instances in which a complaint was made about a male executive or manager at Kargo.'  Kargo

responded that 'no formal complaints had been filed.' Obviously, Ms. Berger had not limited her inquiry to "formal complaints." [T]his Arbitrator issued an Order, compelling Kargo to answer the question, providing information as to any complaint – formal or informal. Kargo refused to comply and repeated its previous answer along with 14 objections it had not previously asserted. Again, pursuant to Ms. Berger's Motion, this Arbitrator entered a second Order, compelling Kargo to answer the question asked. Again, Kargo refused to comply with the order and restated its previous answer in reverse order. Contrary to Kargo's representation regarding complaints, at the Hearing, Ms. Berger presented evidence of numerous complaints, suggesting sexual discrimination, against male managers." Award, pp. 34-35.

- "Next, we examine the reason Mr. Kargman ordered that Ms. Berger not be paid her earned Q1 commissions when he approved the payment of everyone else's commission. His testimony in his deposition and at the Hearing differ. At his deposition, he had no answer other than it is part of the dispute in the litigation. At the Hearing, he maintained that his decision was because her termination for cause contractually forfeited her commissions. This, like so many of Kargo's assertions, compounds the damage to his and to Kargo's witnesses' credibility because his account cannot be true physically. [E]veryone else was paid their Q1 commissions on May 30, 2016. The evidence reveals that **none** of the contractual bases Kargo cites to support its purported "for cause" termination existed *as of May 30, 2016* or even as of July 22, 2016 when Mr. Kargman terminated her… The fact is that Mr. Kargman decided not to pay her commissions before he decided to terminate her and did so without valid cause. Award, p. 52.

- "Notwithstanding this positive feedback … Mr. McConville decided not accept any of it. He went to Chicago -- Ms. Berger's base of operations – to interview four employees he knew to be averse to her, two of whom HR had already questioned – Ms. Biegel and Ms. Gossman. One of the other two he spoke with did not work for Ms. Berger and the fourth was new. [McConville] does not give these "interviewees" an opportunity to review his notes of their conversations to verify the correctness of his recordings. He does not speak with Ms. Berger to get her side of the story. He does not interview anyone who would be in Ms. Berger's favor, even though she supervised approximately 30 employees and there were employees with a dramatically different view of her and her management…. As with [Vice President of Human Resources] Ms. Sybesma's 'investigation,' his intention appears to be to build a case against Ms. Berger, not to seek the truth. Award, p. 9-11.

- "[McConville] testified at the Hearing that Ms. Abney identified some positive things about Ms. Berger, but he did not include those in his 'report.' Moreover, testimony at the Hearing revealed that some of the most pejorative and harmful information he used to get Ms. Berger out of Kargo is inaccurate. … Ms. Biegel testified that there are numerous other points in Mr. McConville's notes of her comments that are wrong or that she did not recall saying. … Despite Mr. McConville's representations, Ms. Katz (Human Resources Director) testified that

13

no new issues had come up. … Much of what [McConville] gathered is not only inaccurate but also unsubstantiated, third-hand 'information' – what he is told somebody told somebody. He also exaggerated. Nevertheless, her announced it as fact to the rest of management and HR and used it to have Ms. Berger removed." Award, p. 9-11.

The Award takes the same detailed approach with respect to damages. The Arbitrator considered and rejected Kargo's attempt to contradict its own retained valuation consultant, who *prior to the litigation* opined that the value of Kargo was in the $400 million range. Kargo then hired litigation experts to argue that somehow the value was really less than $100 million. Award, p. 66. The Arbitrator specifically found that Kargo's retained litigation expert failed even to make an effort to locate comparable market data that the expert admitted would be directly relevant to the question of valuation. That data was provided by Petitioner's expert and confirmed that the opinion of Kargo's own *pre-litigation* valuation expert was in line with market data, i.e. a fair valuation of Kargo would be $400 million. *Id.* pp. 67-69. When applied to the substantial equity that the Arbitrator held was unlawfully stripped from Petitioner, this resulted in a loss of $8,862,000. *Id.* p. 69.

The amount of the damages awarded is the outgrowth of unlawfully discriminating against, retaliating against, and breaching express and implied covenants with an employee whose hard work and determination over a span of four years resulted in earnings of more than $1,000,000 per year (including $300,000 in unpaid commission for 2016) and an equity stake totaling nearly $9,000,000 in the company she helped build. Once liability attaches and a willful violation found (as the Arbitrator did, *see* Award, p. 74), the damages awarded are driven from these established figures to determine back pay, front pay, and liquidated damages.

For example, once a willful violation of New York and federal equal pay act claims is established, the law mandates liquidated damages, of up to 300% of the underlying damages. Here, the equity stripped from Petitioner was valued at $8,862,000. Combined with the statutory tripling,

the result is $36,363,399.  Similarly, the Arbitrator found liability for failing to pay earned commissions in the amount of $305,133.15.  Under New York Labor Law 198 § (1-A), an equal amount in liquidated damages is imposed.

The Arbitrator took a similar approach in awarding back pay and front pay and offsetting for mitigation of Petitioner's new employment.  Back pay through the date of Award is mandatory. With respect to front pay, Petitioner is a 32-year-old very successful executive who was employed at a company that, by its own admission, paid "above market."  Award p. 72.  The Arbitrator considered that it took her four years to reach her level of compensation at Kargo, and Kargo's experts were unable to identify any data showing comparable jobs with comparable compensation available to Petitioner.  Award p. 72.

Petitioner requested and the Arbitrator awarded five years of front pay mitigated by her estimated compensation at her new employer and reduced to current value, finding the five-year time period "more than reasonable under these facts" and in comparison to far greater front pay awards approved by various courts.  Award, p. 72.  The total mitigated back pay and front pay damages results in a present value award of $3,571,622.54.

Additionally, the Arbitrator analyzed and found Petitioner had established the right to both punitive and emotional distress damages.  Award, pp. 75-82.  Mindful of the damages awarded in the categories above, the Arbitrator awarded the conservative sums of $300,000 for punitive damages and $60,000 for emotional distress.

***

The excerpts above are but a sampling of the detailed findings made by the Arbitrator in the Award.  In short, there can be no doubt that the Award meets the standard for confirmation.

## V.    CONCLUSION

For the reasons set forth above, Petitioner respectfully requests that this Court confirm that Award pursuant to the Federal Arbitration Act, 9 U.S.C. § 9.

June 7, 2017                                                        RAFKIN ESQ., PLLC

*Seth R*

Seth A. Rafkin
Attorneys for Petitioner Alexis Berger
1201 Sussex Turnpike, Suite 102
Randolph, NJ  07869
(973) 891-3370
srafkin@rafkinesq.com

16