EXHIBIT A-1



Northeast Case Management Center
Heather Santo
Assistant Vice President
950 Warren Avenue
East Providence, RI 02914
Telephone: (866)293-4053
Fax: (866)644-0234

May 31, 2017

Seth Rafkin, Esq.
Rafkin, Esq. PLLC
1201 Sussex Turnpike, Ste 102
Randolph, NJ 07869
Via Email to: srafkin@rafkinesq.com

Christopher Turcotte
The Law Office of Christopher B. Turcotte, P.C.
575 Madison Avenue, Suite 1006
New York, NY 10022
Via Email to: cturcotte@cbtlaw.com

Case Number: 01-16-0002-1175

Alexis Berger
-vs-
Kargo Global, Inc.

Dear Parties:

By direction of the Arbitrator we herewith transmit to you the duly executed Partial Award in the above matter. This serves as a reminder that there is to be no direct communication with the Arbitrator. All communication shall be directed to the American Arbitration Association.

Thank you,

Michele Gomez
Manager of ADR Services
Direct Dial: (401) 431-4848
Email: MicheleGomez@adr.org

cc :   Jennifer Bogue, Esq.
       Hon. Billie Colombaro

IN THE MATTER OF AN ARBITRATION

(Case No: 01-16-0002-1175)

BETWEEN

**ALEXIS BERGER**
(Claimant)

-and-

**KARGO GLOBAL, INC.**
(Respondent)

## PARTIAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement, dated August 21, 2012, entered into between the above-named parties and having been duly sworn; having duly heard the proofs and allegations of the parties; and having rendered a Final Award on May 31, 2017, do hereby, AWARD, as follows:

### Introduction

On or about August 21, 2012, Kargo Global (Kargo) hired Alexis Berger as the Vice President of Sales, covering the Midwest Territory. This consisted of Illinois, Indiana, Michigan,

Texas, Minnesota, Wisconsin, Ohio, and Missouri. She was part of the "start-up" of the company.[1]

She enjoyed various benefits which included commissions, stock options, and a bonus. As Head of Sales, she recruited, hired, and managed a team. Both, the team and she derived a commission from their sales. The better she managed her team, the more money they and she made. She obtained excellent results, making her the highest paid employee at Kargo. She was so successful that the founder and CEO of the company, Harry Kargman, asked her to take over the failing West Coast territory. She did. Again, she was very successful, turning the territory's bottom line around. She managed both territories simultaneously, comprising of approximately 30 employees.

Ms. Berger reported directly to Mr. Kargman and was part of the upper management team. Mr. Kargman and Ms. Berger enjoyed a very close, synergistic relationship, personally and professionally, based on mutual respect, business values, and trust. He considered himself to be her "work husband."[2] The rapport the two shared was looked upon with much disfavor by Mr. Rohrer, Chief Strategy Officer, and Mr. McConville, President and Chief Operating Officer, resulting in considerable derision between them and Ms. Berger.

Mr. Kargman testified that "my peers said they wished I didn't always have Berger's back – that I'm was too close to her and that's why they kept things from me; I give her the benefit of the doubt more than I should. Ryan (Mr. McConville) said he was unhappy I was always taking sales' side (of which Ms. Berger was a part)."

In addition to being unhappy about Mr. Kargman's and Ms. Berger's relationship, Misters McConville and Rohrer were not happy about her salary. Mr. Rohrer called it "bullshit."[3] Mr. McConville called it "insane."[4] They thought she was overpaid. Both

---

[1] Mr. Kargman's testimony.
[2] JX 14.
[3] Ms. Berger's testimony.

complained that she had too much equity in the company.   Mr. McConville was upset by Mr. Kargman giving her bonuses.[5]  The two came abeard sometime after Ms. Berger.

Ms. Berger alleges as follows: in her four years, the company grew from approximately $5,000,000 in annual revenue to $135,000,000; at the outset of 2016, she was responsible for generating more than half of that revenue;[6] notwithstanding her extremely successful productivity, which generated this significant revenue for the company, she was terminated and denied her earned commissions, as well as her vested and unvested stock options unlike other male managers.

On the other hand, Kargo claims it terminated Ms. Berger for cause; thus, she was not entitled to the benefits it denied her.

Ms. Berger disputes this and asserts numerous claims including, *inter alia*, termination due to gender discrimination, retaliation, equal pay violation, and a breach of the implied covenant of good faith and fair dealing.  Initially, Ms. Berger asserted Defamation but she did not pursue this claim.

Kargo counterclaims for a return of the $100,000 bonus it gave her pursuant to their Bonus Agreement, as well as damages it maintains it suffered because of her solicitation of Kargo employees after her termination, violating a non-compete obligation, divulging confidential information, tortious interference of contractual relations, and her breach of a duty of loyalty she owed to the company.   It also submits that New York law does not control this case.

Ms. Berger disputes all.

---

[4] *Id.*
[5] Mr. McConville's testimony.
[6] JX 29

3

Several contacts are involved in this dispute – an Employment Agreement, commencing August 21, 2012; an Inventions Agreement, which was never signed by Ms. Berger; a Bonus Agreement; and Stock Incentive Plan/Stock Option Agreements. Notwithstanding the Employment Agreement, Ms. Berger was an "at-will" employee.

There was no court reporter at the parties' seven days of evidentiary Hearing.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Governing Law

The parties agreed in their Employment Contract that New York law **shall** govern this case and that the case is to be administered under the American Arbitration Association's Employment Rules. [7]

### Termination – For Cause or Gender Discrimination

Ms. Berger must prove by a preponderance of evidence that:

- She suffered an adverse employment action;
- Her gender was a motivating factor in Kargo's termination decision, or
- If Kargo proves a legitimate reason for the termination, its stated reason for that decision is a pretext to hide gender discrimination; and
- Damages were caused by its adverse action.

The stage was set for Ms. Berger's termination on February 17, 2016. Misters Kargman, Rohrer, and McConville called her in to meet with them in New York. Mr. Rohrer presided. *Inter alia*, he told her there were serious concerns raised about her behavior; "someone" said

---

[7] § **8.13 Governing Law: Exclusive Jurisdiction**, p. 7.

working for her was like being in an "abusive relationship," HR had conducted an investigation and was compiling the results.[8] She was stunned and visibly upset. Essentially, she was blindsided. She asked for examples, but they provided none nor an opportunity for her to defend herself.[9] She learned later that the "someone" was Ms. Geistman. Kargo had terminated her for under performance. She had never worked for Ms. Berger.

Notwithstanding this rebuking, oddly, on February 26, 2016 – nine days later – Kargo gives her a Retention Bonus of $100,000 with a letter, praising her **"current level** of service" and encouraging her to continue <u>it</u>:

> As you know, Kargo Global, Inc. (the "Company") greatly appreciates your efforts on the Company's behalf thus far. **To incentivize you to <u>continue</u> providing your current level of service** to the Company, the Company is offering you the opportunity to receive a retention bonus as set forth below." (Emphasis added.)[10]

On January 7, 2016, approximately one month before the New York meeting, Mr. Kargman told her [I am] "looking forward to many more years together as our partnership is strong and together we take the world by storm." Within the six months leading up to this February 16, 2016 meeting, he promoted her and praised her management of her teams. He shared much of this with the entire company, holding her out as an example for them to emulate:

For example, on August 19, 2015 – he promoted Ms. Berger to Senior Vice President, covering the Midwest/West Territory (Chicago and Los Angeles offices) because of her success as a manager. He describes her to the rest of the company as:[11] (Emphasis added.)

    a. "[g]reat <u>team</u> leader;"

---

[8] JX 38, Mr. Rohrer's and Ms. Berger's t e s t i m o n y .
[9] Ms. Berger's testimony.
[10] JX43.
[11] JX22.

b. someone who "give[s] a shit about this company and everyone here;"

c. someone who "really care[s];"

d. someone who "want[s] everyone around [her] to be successful," and tries "to help wherever [she] can."

e. "By herself with only moderate support from New York, Alexis (Berger) launched and recruited the entire Chicago and LA teams from scratch – **almost half the Company.**"

f. "She was able to find our amazing people, drive a vision of differentiation, and lead **explosive growth and success**."

g. "Her curiosity and thoughtfulness around our future potential programmatic will drive our next set of successes."

h. "Tirelessly hard working and competitive."

i. She and Kevin have "driven revenues from $14M to almost $100M in two years."

j. She's "admired by agencies and clients; strong reputation in the industry."

On December 17, 2015 – Again, Mr. Kargman told her:[12] (Emphasis added.)

a. Even Doug Rohrer was remarking at how well the whole evening was put together – in classic "Alexis style."

b. "You are so **fucking** buttoned up and I am proud of you and the fact that you have chosen to work with me."

c. You are a force and glad that force is on my side . . . .

d. "**Looking forward to changing the industry with <u>you</u> in 2016!!!** . . . Ps – don't forget to charm the **shit** out of Kassan."

On January 7, 2016, he said:[13]

---

[12] CX 9

a. "I treasure our give and take and brutal honesty and **love working** and playing with you." (Emphasis added.)

b. "Looking forward to many more years **together** as our partnership is strong and together."

Despite all of this extraordinary praise and endorsement of her and her management performance and, even, imploring her to continue doing her job as she had been doing it, sweetened with a $100,000 reward, on March 9, 2016 – less than two weeks after giving her this bonus, she is placed on a termination track. Ms. Sybesma, the newly hired HR Vice President who reports to Mr. McConville and does his bidding, met with Ms. Berger to warn her, essentially, that she must change her personality and management or be terminated. Ms. Sybesma related, only, generalities about "complaints." She gave no specifics and no indication of who is doing the complaining. Accordingly, she afforded Ms. Berger no opportunity to defend herself or to explain.

Prior to this meeting, Mr. McConville urged that Ms. Berger be put on an involuntary leave.[14] Ms. Katz did not agree with it.[15] Ms. Sybesma advised against it.[16] She believed that the appropriate action to take is, **first**, to place Ms. Berger on a Performance Improvement Plan (PIP). Mr. McConville's "plan" is temporarily placed on hold. Ms. Sybesma follows through with putting Ms. Berger on a PIP during their March 9, 2016 meeting; namely:

> Alexis, over the past few weeks you have received feedback from your management team on some areas of performance concern including:
>
> - Unprofessional behavior
> - Inconsistent approach to management
> - Withholding information from your team or your superiors

---

[13] JX 27
[14] Ms. Sybesma's testimony.
[15] Ms. Katz' testimony.
[16] Ms. Sybesma's testimony.

Alexis, it is imperative that you begin demonstrating improvements in these areas, and maintain consistent performance at such level. Failure to do so may result in further disciplinary action up to and including the **termination of employment**.[17] (Emphasis added.)

Again, Ms. Berger requested examples but Ms. Sybesma refused to give them. Thus, Ms. Berger declined to sign the PIP because it was vague, lacking specifics.[18] Notwithstanding, Ms. Sybesma acknowledges in a March 9, 2016 memo that Ms. Berger took immediate steps to comply with the plan. These steps include:

1. She arranged weekly life coach appointments;

2. She registered for Kellogg management school courses for executive coaching and management training at her expense;[19]

3. She will touch base weekly with HR;

4. She set up one-on-one discussions with her direct reports proactively to understand what she could do better for them.

Ms. Sybesma added to her memo, in part, "What I know so far:"

"It sounded to us like there may have been some mixed messages along the way . . . ."

Ms. Sybesma reported to leadership that she had placed Ms. Berger on a PIP, giving her a reasonable amount of time to fulfill it.[20]

After the February 17th New York meeting, scolding Ms. Berger and before Ms. Sybesma's March 9th meeting with her, Ms. Berger took proactive, remedial action. As a result, on March 6, 2016, Ms. Berger's fiercest complainant – Aly Gossman – wrote, in part:[21]

---

[17] JX 52.
[18] Ms. Katz', Ms. Sybesma's, and Ms. Berger's testimony.
[19] JX 51; Ms. Berger's testimony.
[20] Ms. Sybesma's testimony.

. . . there has definitely been a shift in Alexis's attitude and actions . . . over the past 2 weeks.

I have seen an improvement in overall communication, skills, attitude, and the relationships she is trying to foster and build within the team.

Notwithstanding this positive feedback, HR having placed Ms. Berger on a PIP, and HR having given her time to change, Mr. McConville decided not to accept any of it. He went to Chicago – Ms. Berger's base of operations – to interview four employees he knew to be averse to her, two of whom HR had already questioned – Ms. Biegel and Ms. Gossman. One of the other two he spoke with did not work for Ms. Berger, and the fourth was new. He does not give these "interviewees" an opportunity to review his notes of their conversations to verify the correctness of his recordings. He does not speak with Ms. Berger to get her side of the story. He does not interview anyone who would be in Ms. Berger's favor, even though she supervised approximately 30 employees and there were employees with a dramatically different view of her and her management. For example, Mr. Hillier reported to Ms. Berger and respected and appreciated her and her management to such an extent that he left Kargo's employ in order to continue to work with her.

As with Ms. Sybesma's "investigation," his intention appears to be to build a case against Ms. Berger, not to seek the truth.

He testified at the Hearing that Ms. Abney identified some positive things about Ms. Berger, but he did not include those in his "report."

Moreover, testimony at the Hearing revealed that some of the most pejorative and harmful information he used to get Ms. Berger out of Kargo is inaccurate. For example, Ms. Biegel had submitted a letter of resignation. She stated reasons for leaving that had nothing to

---

[21] JX 54.

do with Ms. Berger.[22] Yet, Mr. McConville reported that she, along with Ms. Gossman – two of Ms. Berger's reports and highest producers – were quitting because of her. This is the reason, which became characterized as "the fear of a large scale mutiny,"[23] he used to manipulate Mr. Kargman, to justify rescinding the PIP, and to order that Ms. Berger be placed on an involuntary leave of absence.

Ms. Gossman testified regarding Mr. McConville's incorrect reporting:

1. He reported that Ms. Gossman told him that Ms. Biegel's quitting was 80% due to Ms. Berger and 20% because of stress.[24]

Ms. Gossman said that she did not recall saying this to Mr. McConville and that she never said anything to him about quitting, herself.[25]

Contrary to Mr. McConville's testimony, Ms. Biegel testified that she never told Ms. Gossman that Ms. Berger was 80% the reason for her resignation; she simply wanted a job outside of sales. When Mr. McConville flew to talk with her in Chicago after her resignation, he wanted to know what would make her happy; she never brought up anything about Ms. Berger, and she never said anything to HR about Ms. Berger.[26]

Furthermore, Ms. Biegel testified that there are numerous other points in Mr. McConville's notes of her comments that are wrong or that she did not recall saying. Some of them include:

        a. no accountability;

        b. shaking talking to HK (Harry Kargman);

        c. tried to shield;

---

[22] Ms. Biegel's testimony.
[23] Mr. Kargman's testimony.
[24] JX 53.
[25] Ms. Gossman's testimony.
[26] Ms. Biegel's testimony.

    d.  plays the role of friend in order to deal with her (Ms. Berger);

    e.  what does AB (Alexis Berger) do;

    f.  Only person in company with a personal assistant;

    g.  Emily – go get dogs, dry cleaner, book action flights with Catherine.

Despite Mr. McConville's representations, Ms. Katz testified that no new issues had come up between the time of placing Ms. Berger on the PIP and Mr. McConville's going to Chicago.

Much of what he gathered is not only inaccurate but also unsubstantiated, third-hand "information" – what he is told somebody told somebody.  He also exaggerated.[27] Nevertheless, he announced it as fact to the rest of management and HR and used it to have Ms. Berger removed.

He ordered what he, and presumably Mr. Rohrer, wanted in the first place – an involuntary leave of absence.  Namely, in his email of February 15, 2016, he advised Sybsema that "***we*** have a ***plan*** but would like to vet it with you."[28] (Emphasis added.)  The "plan" was to put Ms. Berger on a leave of absence.[29] Sybesma testified that she advised against it; that the company should speak with Ms. Berger before forcing her out on a leave of absence.[30] She, also, recommended that the company provide Ms. Berger with "*clear examples* of when her behavior has not met expectations."[31]  Mr. Rohrer and Mr. McConville did not follow that advice when they met with Ms. Berger in New York on February 17th.  Ms. Sybesma did not follow her own advice when she met with Ms. Berger March 9th.

---

[27] Mr. McConville's testimony.
[28] JX 36.
[29] JX 37.
[30] *Id*.
[31] *Id*.

11

Ms. Sybesma complied with Mr. McConville's directive. She rescinded the PIP, cut off Ms. Berger's email, and gave Ms. Berger no information for a month about her position and her future with Kargo, despite Ms. Berger's inquiries.[32]

Foreshadowing what is about to happen to Ms. Berger, on April 5, 2016, (not copying Mr. Kargman) Mr. Rohrer wrote to Mr. McConville that it is "hard to hear" that she will be allowed to return, "even in a role that **stripped** title, pay, sales, etc."[33] (Emphasis added.)

A week later, on April 11, 2016, Ms. Berger is informed that:

1. she has been "reassigned;"

2. she will lose her title and her office;

3. she will be isolated from other sales employees;

4. she will have no employees to manage;

5. her salary will be cut from $375,000 to $250,000, (which will render a far less commission);

6. her position is no longer available to her; and

7. she must report to the new job on April 25, 2016 or be terminated.[34]

On April 22, 2016, her counsel informed Kargo that she will not accept this and that Kargo is discriminating against her by taking these actions, not having properly vetted the complaints against her and by not having investigated complaints she had previously made against Mr. McConville; therefore, she is filing an Equal Employment Opportunity Commission (EEOC) claim against Kargo.[35] Kargo did not terminate Ms. Berger despite her filing an EEOC

---

[32] Ms. Berger's testimony.
[33] JX 66.
[34] JX 69.
[35] CX 22.

complaint against it for discrimination and making it clear that she was not accepting the new job and returning to Kargo under those conditions.

Ms. Berger began to look for other employment. She did not return to Kargo on April 25, 2016.

On April 29, 2016, Ms. Sybesma advised her via email that on May 2, 2016 she would be placed on unpaid leave because of her "failure to return to work on April 25, as discussed."[36]

Kargo placed Ms. Berger on unpaid leave on May 2, 2016, and on May 30, 2016, when Ms. Berger's first Quarter (Q1) commissions were due, Kargo did not pay her. In Q1, she had earned $171,491.86 and an additional $133,639.47 through May 2. Ms. Katz testified that she was in a meeting when Mr. Kargman when he said that Ms. Berger was not going to be paid.[37] It is undisputed that Kargo paid everyone else theirs for both periods.[38]

On June 3, 2016, Ms. Berger filed her Demand for Arbitration, primarily, based on sexual discrimination via a double standard/stereotyping.

On July 22, 2016, Kargo's attorney sent Ms. Berger a letter, stating that Kargo is terminating her for cause, in pertinent part:

> . . . as a result of your client's continuous **abandonment of her position** for the past three months and, upon information and belief, her breach of the terms of her employment, including non-disclosure and non-compete obligations, effective immediately Alexis Berger's unpaid leave of absence shall end and she is terminated for cause. (Emphasis added.)

A termination for cause activates numerous negative consequences to Ms. Berger in various contracts; namely:

---

[36] JX 80.
[37] Katz, former HR Director's Hearing testimony; deposition testimony, p. 31:24 – 33:13.
[38] *Id.*

1. Under the terms of Kargo's Stock Incentive Plan, the entire options, including vested options are terminated.

2. Under the Retention Bonus Agreement, Ms. Berger must repay the $100,000 retention bonus paid to her in 2016; and

3. Under the terms of her Employment Agreement, Ms. Berger must forfeit her already earned commissions.

In her Demand, Ms. Berger contended that: the evidence will show that she was not terminated for cause but, rather, because of Kargo's double standard and stereotyping regarding females and men, all of which would constitute sexual discrimination; Kargo's stated reasons for termination are pre-textual; and the so-called "investigations" Kargo used to support its reasons were, essentially, a sham and not done according to accepted procedures, further indicia of discrimination.

At the evidentiary Hearing, Kargo's witnesses denied all of the above and maintained that Kargo did not discriminate against Ms. Berger.

Ms. Berger makes her discrimination claims under Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e); the New York State Human Rights Law (NYHRL ) (N.Y. Exec. § 296, *et. seq.*); and the New York City Human Rights Law ("NYCHRL") (Admin. Code of the City of New York § 8-107, *et seq.*).

To establish gender discrimination under Title VII and the NYHRL, Ms. Berger must prove, by a preponderance of the evidence, that:

1. she suffered an adverse employment action,

2. her gender was, at least in part, **a motivating factor** in Kargo's decision, or

3. Kargo's stated reason for its decision is a pretext to hide gender discrimination and

4.  that she suffered damages caused by the adverse action.[39]

Further, under the NYCHRL, Kargo is liable if gender played *any* role in its employment decision.[40] *(Emphasis added.)* ". . . NYCHRL claims (must be analyzed) separately and independently from any federal and state law claims, **construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs**, to the extent that such a construction is reasonably possible."[41] Even if the challenged conduct is not actionable under federal and state law, a trier of fact "must consider separately whether it is actionable under the broader New York City standards."[42] (Emphasis added.)

The law is well settled that an employer who permits, requires, or encourages certain behavior or traits in men (such as aggressive management and/or a sales' style), but holds it against women, discriminates on the basis of sex and gender. As the Supreme Court in *Price Waterhouse v. Hopkins*[43] discussed this as stereotyping and held:

> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for "'[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" [citation]. An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.

Likening her situation to that of the plaintiffs in these cases, Ms. Berger correctly points

---

[39]*Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997); *see also* Manual of Model Civil Jury Instructions for The District Courts of The Eighth Circuit (applying same standard and precedent as Second Circuit courts).

[40]*Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 76 (N.Y App. Div. 2009).

[41]*Laboy v. Office Equip. & Supply Corp.*, 2016 BL 322722, 11 (S.D.N.Y. Sept. 29, 2016) (citing and quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 & 110 n.8 (2d Cir. 2013).

[42] *Id.*

[43] 490 U.S. 228, 251 (1989).

out that:

> *Price Waterhouse v. Hopkins* . . . is directly on point. Hopkins, like Berger, was one of very few women among a predominately male executive staff. (Like Ms. Berger) Hopkins suffered an adverse employment action in part because the male partners took issue with Hopkins' aggressiveness and her use of profanity, traits either required or condoned in men . . . .

And in she notes that,

> *Johnson v. J. Walter Thompson U.S.A., LLC,* a 2016 decision – the court recognized, language that does not explicitly reference a person's gender can nevertheless signify hostility towards a woman and, specifically, hostility towards *a woman exercising power* in the workplace. "Martinez's references to Johnson's being 'bossy' can be understood not as a sex-neutral insult but rather as invoking a double standard for men's and women's leadership in the workplace."[44]

> Evidence that female executives are described negatively in terms such as, "bossy," "emotional," and/or "aggressive" supports reliance on an impermissible double standard.[45]

As the *Johnson v. J. Walter Thompson U.S.A., LLC* court explained:

> [R]eferences to [a female executive] being "bossy" can be understood not as a sex- neutral insult but rather as invoking a double standard for men's and women's leadership in the workplace.[46] "[W]omen were twice as likely [than men] to be branded bossy in the workplace." The view of female bosses as "bossy" is a feature of the "glass ceiling problem[], namely, that given the close association of 'managers' and 'leaders' with masculinity, subjects tend to dislike women whom they rate highly as managers and leaders because of 'role incongruity'—the sense that it is incongruous for women to successfully perform masculine roles as opposed to feminine roles." [citation omitted].

---

[44] 2016 BL 413160, 10 (S.D.N.Y. Dec. 13, 2016).

[45] *See Johnson v. J. Walter Thompson U.S.A., LLC,* 2016 BL 413160, 10 (S.D.N.Y. Dec. 13, 2016).

[46] See, e.g., Cathleen Clerkin et al., Bossy: What's Gender Got to Do with It? Ctr. for Creative Leadership 5 (2015).

16

This brand of stereotyping has been deemed impermissible under Title VII.[47]

Ms. Berger, also, reports that:

*Lam* is important for similar reasons. The *Lam* court held that describing a woman in inherently gendered language such as she is "too aggressive" and "too emotional" (just as Berger is "too emotional" while male employees are "passionate") can support an inference of discrimination.[48]

Ms. Berger addresses Kargo's attempt to distinguish these cases:

Kargo alleges that the facts of *Sassaman* "have no applicability here."

In *Sassaman*, Ms. Berger notes, we find that, as here, a complaint was made about the plaintiff's work place conduct. There, as here, the plaintiff argued that the employer did not conduct an adequate investigation and assumed the plaintiff's guilt without actually taking proper steps to come to that conclusion. Fearing retribution by the complaining employee (in *Sassaman*, a lawsuit, in this case, the alleged resignation of sales employees), the company forced the employee out of the company. *Sassaman* held, "where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent."[49] That is precisely the case here.

She continues,

---

[47] *Id.*

[48] *Lam v. Univ. of Haw.*, 164 F.3d 1186, 1188 (9th Cir. 1998).

[49] *Sassaman v. Gamache*, 566 F.3d 307, 314-315 (2d Cir. 2009).

17

Moreover, the factual parallels of *Mastro* are striking. In *Mastro*, the employer took adverse action against the plaintiff, Mastro, following a poorly executed investigation into whether Mastro had lied to his employer about another employee. **The company did not interview Mastro.** It "relied heavily" on the statements of Mastro's subordinate, Bryant, with whom he "had a strained working relationship and that, [] as a second-in-command to Mastro, stood to gain from disciplinary action against his boss." **The company did nothing to assess the credibility of Bryant. Nor did it assess the credibility of any other witnesses interviewed,** who were a "tight knit group" **and failed to consider that certain witnesses had a motive to lie,** while Mastro did not.[50] (Emphasis added.)

There, as here, the employer argued that "the mere fact that they conducted an investigation and fired Mastro as a result should insulate their actions from further scrutiny." The *Mastro* court disagreed, holding that evidence that an employer's investigation "which was central to and culminated in [the plaintiff's] termination, was not just flawed but inexplicably unfair" is sufficient evidence for a finding of discriminatory intent.[51]

A failure to investigate or to properly investigate a claim of discrimination can be further indicia of discrimination.[52]

In response to a workplace complaint, in addition to interviewing the complainant, a thorough and proper workplace investigation by a company includes:

(1) interviewing the person accused of improper behavior **to obtain his or her version and identify witnesses or documents that support this version,**

(2) interviewing witnesses identified by the accusing and accused employees, **as well as other people likely to have observed relevant interactions or events,** and

---

[50] *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, (D.C. Cir. 2006) at 855, 856.
[51] *Id.* at 856, 857.
[52] *Sassaman*, 566 F.3d at 315.

(3) summarizing interviews and asking those interviewed to review, **correct**, and return signed copies of the written summary.[53] (Emphasis added.)

*Mastro* held that failure to follow these procedures when investigating an employee and taking adverse action against him or her supports an inference that such adverse action was pre-textual and motivated by discrimination; such an "inexplicably unfair" investigation, leading to the plaintiff's termination that failed to interview the employee who was the target of the investigation, failed to consider motive of the witnesses' interviewed and "lacked the careful, systematic assessments of credibility one would expect in an inquiry on which an employee's reputation and livelihood depended."[54]

To properly apply the above law to this case and determine whether Ms. Berger was discriminated against or whether she was terminated for cause, in addition to examining Kargo's actions, we must inspect complaints regarding Ms. Berger's behavior in the context of Kargo's culture, expectations, and standard, as well as how men's behavior was perceived and how they were treated versus women, Ms. Berger in particular.

Kargo accused Ms. Berger of the following and used these representations to justify a "for cause" termination:

- Unprofessional behavior
- Inconsistent approach to management
- Withholding information from your team or your superiors
- Abandoning her position
- Violating the non-compete and non-solicitation provisions in the Inventions Agreement

When terminating Ms. Berger, Kargo provided no specifics for these portrayals. Notwithstanding, this Arbitration will consider the evidence presented as being intended for

---

[53] CX 49 (treatise citing EEOC investigation guidelines).
[54] *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir. 2006) at p. 855 -57.

the above. "Unprofessional behavior" can be considered as a conclusory umbrella under which all of the other categories fall.

Reviewing the evidence presented, specific complaints made about Ms. Berger included:

1. She was "too emotional;"[55]
2. She was "over sensitive" and "harsh;"[56]
3. She "shut people down;"[57]
4. She was "too edgy for Kargo's culture;"
5. She used profane, inappropriately suggestive, and politically incorrect, offensive language;[58]
6. Her management was like being in an "abusive relationship;"[59]
7. She was a "bully;"[60]

Ms. Biegel and Ms. Gossman are best friends and roommates, and Ms. Gossman was Ms. Biegel's direct report.[61] They are the only ones out of the four Mr. McConville interviewed to testify against Ms. Berger. They characterized her as a "bully" because of what they deemed to be her "aggressive" behavior.

Essentially, Mr. Rohrer testified in his deposition that "aggressive behavior" is a compliment – a positive trait:

Q   Did you ever describe Miss Berger as a pit bull?

A   If I did, it would have been in **complimentary** sense.

Q   Do you recall whether you described her as a pit bull? . . . .

---

[55] Mr. Kargman's and Ms. Gossman's testimony.
[56] JX 35; Mr. McConville's testimony.
[57] Id.
[58] Ms. Gossman's and Ms. Biegel's testimony.
[59] Mr. Rohrer February 17, 2016 New York meeting.
[60] Id.
[61] Ms. Biegel's testimony.

20

**A**   Not specifically. And like I said, it would have been complimentary, particularly to a partner.

**Q**   That's how you would have intended it?

**A**   Yes, that is.  There's something that is good about being a pit bull in the line of work that we are in.

**Q**   What do you mean by that?

**A**   There is a **personality trait of aggressiveness <u>in what we do that can be helpful to what you do</u>**. . . . Some people are really aggressive, and it serves them well,  so "pit bull" would  have been used in that context.  It's not meant to be a negative -- (Emphasis added.)[62]

He added that he, Mr. McConville, Mr. Kargman, and Mr. Canty were, also, "pit bulls."[63] At the Hearing, Mr. Rohrer changed his statement to: "it is more useful for a seller than a manager."

Mr. Rohrer is Kargo's Chief Strategy Officer.  Obviously, being a "pit bull" – having a "personality trait of aggressiveness" – was, not only, considered to be a positive approach and an expectation, it was also part of Kargo's culture for men.  Ms. Berger was the only one faulted for it.

Aside from this double standard, this put her in a Catch-22 situation, which the Supreme Court addressed in *Price Waterhouse*.[64]

It was Mr. Rohrer who told Ms. Berger at the New York meeting among himself, Mr. Kargman, and Mr. McConville that an unnamed employee had stated that working for her was like being in an "abusive relationship."  Ms. Berger found out later that this employee was Ms.

---

[62] Mr. Rohrer's deposition, 47:8 – 48.
[63] *Id.*, 47:8 – 49:5.
[64] 490 U.S. 228, 251 (1989).

Geistman, who had been terminated for her poor performance[65] and who had not worked for Ms. Berger. Interestingly, even though she was on Kargo's witness list, Kargo did not call her as a witness to authenticate such a damaging account which seemed to have "poisoned the well" at Kargo (being picked up and used by others).

Furthermore, Ms. Katz testified that, in 2014, Ms. Geistman had told her she had "concerns about Ms. Berger's management style." Notwithstanding, Ms. Katz had no apprehensions about it; thus, she did not investigate further.[66] The lack of concern was later buttressed by the fact that Ms. Berger was rewarded for her management by being promoted from Regional Vice President to Senior Vice President in 2015.[67]

Regarding the use of profane, inappropriately suggestive, and politically incorrect, offensive language, Ms. Berger admits and the evidence confirms that she spoke in these manners.

One example Kargo cites of the latter is her having called her reports, "my little monkeys." Ms. Berger testified that this had nothing to do with the color of their skin; she used it before black people were there and meant it as "my little kids," a term of affection; she borrowed it from her former boss who had called her and her co-workers that.[68]

Evidence shows that this type of speaking was not unique to Kargo's approved of culture for men and further evidences the double standard.

One example is from Mr. McConville, Kargo's President and Chief Operating Officer. He did a video for airing at a national sales conference. In the video, he talks about his fictional

---

[65] Ms. Katz testimony.
[66] Id.
[67] Mr. Kargman's testimony.
[68] Ms. Berger's testimony.

22

band, "guitarded" – a clear double entendre, making fun of the retarded.[69]  Nevertheless, Mr. Rohrer testified this was not inappropriate and that he thought "in Kargo's culture, people would see it in a humorous way and not offend anyone."

The use of profanity and inappropriately suggestive language was no less part of the men's culture at Kargo than was politically incorrect and potentially offensive language.  Their use of profane and inappropriately suggestive language was prolific – the lead coming from the top – starting with Kargo's founder and CEO, Mr. Kargman, and continuing throughout the company.   No one found it to be a problem, except when Ms. Berger used it – more evidence of a double standard.

Examples are too numerous to include all of them.  Just a few come from Mr. Kargman. In one, he promoted his company through a sexually provocative advertising campaign for **public** consumption.  In this advertisement, he had placed on the cover of a major advertising magazine – "ADVERTISING AGE" – a picture of a used condom wrapper having Kargo's name stamped on it.   The by-line was, "**DO YOU PRACTICE SAFE MOBILE?**"[70]   Another example involves a video he filmed for a national sales conference.    Essentially, he promised his employees that if they met their goals, he would "shave his balls."[71]  Ultimately, this comment was not used because Ms. Berger advised against it, that it was inappropriate.[72]  Mr. Kargman denies saying this.

Mr. Kargman typically used profanity.   Below are examples of it in his praise of Ms. Berger, which he emailed to her and to the whole company: (Emphasis added.)

---

[69] Mr. McConville's deposition and Hearing testimony.
[70] CX 53.
[71] Ms. Berger's testimony.
[72] Id.

"You are so fucking buttoned up and I am proud of you and the fact that you have chosen to work with me."[73]

I treasure our give and take and **brutal honesty** and love working and playing with you.[74]

Berger is someone who "give[s] a **shit** about this company and everyone here."[75]

Mr. Kargman admitted that his language is so bad he is now paying a coach to help him "kick the habit."[76]

Mr. Rohrer, Kargo's Chief Strategy Officer, also, generously used unbridled profanity. One example is his asking Kargo's consultants to "beat the **shit** out of us."[77] (Emphasis added.) At the Hearing, he admitted that he used profanity and he has heard other people at Kargo use profanity. He also acknowledged that he was featured in a video for the sales force, talking about smoking and drinking – "it was a humorous video." He felt "his behavior was **within the boundaries of reasonable** in this context, and there is a "sales culture" at Kargo, which involves partying, drinking, and **swearing**, etc. ( E m p h a s i s a d d e d ).

These three are the leaders of the company, using the same type of language and "humor" for which they fault Ms. Berger.[78] They set the tone and the example for and, implicitly, give permission to other employees to emulate them.

Moving to the issue of behavior and management style, Mr. McConville called Ms. Berger "over sensitive" when she respectfully asked him not to criticize her in front of her reports. He also testified that she is "harsh." In addition to labeling Ms. Berger as "too emotional" and complaining that she "shut people down," Ms. Gossman testified, essentially,

---

[73] CX 9.
[74] JX 27.
[75] JX 22.
[76] Mr. Kargman's testimony.
[77] CX 8.
[78] JX 22, CX 8, 9.

that she was moody. She said, "You never knew which Alexis would show up." This may refer to her complaining to Mr. Rohrer that Ms. Berger was "erratic" and was attributed to Ms. Berger's expression of frustration when things were not done correctly. Presumably, it is what Ms. Sybesma meant when she listed "inconsistent approach to management" in the PIP since she interviewed only Ms. Gossman. Since Ms. Sybesma gave no specifics to support her conclusions, it is not clear.

Kargo's witnesses were asked about men manager's behavior at Kargo. They admitted that Mr. McConville is, essentially, "hostile" in his communications: "hot headed," "testy," "impatient," has a "temper," and **"shuts down"** when angry or his ideas are challenged.[79] Notwithstanding, these emotional, erratic behaviors were acceptable. The witnesses attributed them to his being "passionate,"[80] a positive. And, his temper is "spun" into being a "strong personality."[81]

Mr. Kargman testified that when he disagrees with Mr. McConville, "he becomes sullen and **you know not to continue discussion because he's not listening.**" (Emphasis added.) As is evident by this testimony, "shutting down" when other employees are trying to communicate with him has the effect of shutting them down because he is not available — "not listening."

Anger is a very strong emotion, which Mr. McConville expresses at work, but it, too, is acceptable at Kargo, even though it has a detrimental effect on the process, on other employees and on their ability to express opposing views. Yet, he is not considered to be "too emotional." He is not faulted or disciplined while Ms. Berger is.

---

[79] JX 17; Mr. Kargman's, Mr. Rohrer's, and Ms. Berger's testimony.
[80] Ms. Sybesma's and Mr. Kargman's testimony.
[81] *Id.*

25

Ms. Berger had complained numerous times, not only to Mr. Rohrer[82] but also, directly to Mr. Kargman and to HR[83] about Mr. McConville's temper and his mistreatment of her on a call, as well as his unprofessional behavior, criticizing her in front of her colleagues.[84] He has also "screamed" at her.[85] Ms. Biegel had complained to Mr. Kargman about him, as well.[86] Nevertheless, both Ms. Berger's and Ms. Beigel's complaints fell on deaf ears.[87] No reprimand, no disciplinary action was taken.

On the other hand, when Ms. Gossman complained to Mr. Rohrer about Ms. Berger's "unprofessional behavior," he turned it over to HR. When Ms. Berger complained to him about Mr. McConville's temper and unprofessional behavior, he did not turn it over to HR.[88] Instead, he excused him.

He defended Mr. McConville's volatility, inconsistency, negative communications, explaining that his communication issues were limited and not impactful because Kargo's business has been successful and Mr. McConville is a big part of that success.

Ms. Berger, Kargo's senior-most female sales executive and highest earner,[89] was a vast part of Kargo's success. She helped build the company for what it is today. As noted above, at the outset of 2016, she was responsible for generating more than half of the company's revenue and was the highest paid employee because of her success in generating income for the company. "The reason Mr. McConville and Mr. Rohrer did not earn as much as Ms. Berger is because they did not meet their goals."[90] Yet, unlike Mr. McConville, she is criticized,

---

[82] Mr. Rohrer's and Ms. Berger's testimony.
[83] *See* Mr. Rohrer's Deposition, 39-42; JX 17; Ms. Berger's testimony.
[84] Ms. Berger's testimony.
[85] *Id.*
[86] JX 17, p. 4.
[87] Mr. Rohrer's Deposition, 40:5-14; JX 35; Mr. McConville's testimony.
[88] Mr. Rohrer's deposition testimony, 39-42.
[89] Mr. Kargman's testimony.
[90] *Id.*

disciplined, and, ultimately, terminated, in part, for being "too emotional," for having an "inconsistent approach to management," for her communications, and for "unprofessional behavior" in general.

These leaders were not the only ones with behavioral/managerial issues. Evidence was presented that there were numerous complaints from various women, faulting Mr. Canty's behavior, his style of communication, and his management as being offensive and sexist, but he, too, was never reprimanded, disciplined, or even written up. Rather, these complaints were ignored because, as Ms. Sybesma said, "he was just being a boy."[91]

Mr. Canty was Ms. Berger's counterpart. They did not have a positive working relationship. At times, it was "hostile."[92] They had competing markets. At retreats, he would comment on her sexuality and talk about "flipping her back." (She is gay) He also asked her and her partner in Cannes to have "a threesome with him."[93]

The allegation that Ms. Berger "[withheld] information from [her] team or [her] superiors," [94] apparently, came solely from Ms. Gossman. As a result, Mr. Rohrer testified that the biggest area of concern for the company was "secrecy and hiding of information that seems to be going on under [Ms. Berger's] guidance."[95]

Kargo entertained this complaint even though it was management's prerogative to determine what should be shared with their reports, and Kargo's practice had been to restrict information shared with non-managerial personnel.[96] Ms. Berger testified that, in her view as a manager, it makes sense to keep certain information (e.g., a deal not yet signed) from

---

[91] Ms. Sybesma's testimony.
[92] Ms. Berger's testimony.
[93] Id.
[94] JX 52.
[95] JX 37, JX 31.
[96] J31; Mr. McConville's testimony.