EXHIBIT A-2

widespread dissemination to limit distractions and potential disappointment for employees. Moreover, non-managerial employees were kept informed with appropriate company information via Kargo's publication of its executive meetings' minutes to everyone in the company.

When Ms. Berger's suggested that they create separate distribution lists (aliases) for communications – one for the management team and one for the executive team – Mr. McConville used it as evidence of her "general tendency to want to suppress and control information."[97] In fact, Kargo had already set up other similar email "aliases,"[98] and Amanda Katz, Director of HR at the time, did not share Mr. McConville's view. Instead, she enthusiastically supported Ms. Berger. She wrote: "Good idea!"[99]

Kargo failed to identify any specific evidence to support its contention that Ms. Berger was inappropriately withholding or controlling information other than in her business judgment as a manager and within Kargo's established practices.

Mr. Rohrer testified that Ms. Gossman also complained to him that Ms. Berger had plagiarized, but Kargo did not present any evidence of this either.

Ms. Gossman was also unhappy that Ms. Berger, her superior, required accountability from her regarding how she spent her time. Essentially, she did not like Ms. Berger's protocols and procedures.[100] It was apparent from Ms. Gossman's testimony that she wanted to do what she wanted when she wanted without her manager's control or oversight and that there should be no problem with her going over her manager's head when she was annoyed or displeased.

Ms. Gossman's credibility is lacking and her motive for complaining about Ms. Berger is

---

[97] JX 31.
[98] Id.
[99] Id.
[100] Ms. Gossman's testimony.

suspect. She resented the fact that Ms. Berger was a layer of management between her and upper management. She wanted direct access to Mr. Rohrer and Mr. McConville.[101] Recently, Kargo promoted her to peer management.

Behind her manager's back, Ms. Gossman contacted Mr. Rohrer and arranged a clandestine meeting with him, in part, to complain about Ms. Berger, and it can be inferred – to gain favor. As a participant in getting Ms. Berger's terminated, Ms. Gossman no longer had to deal with Ms. Berger coming between her and higher management and her complaints furthered Mr. Rohrer's agenda.

Secretly, Ms. Gossman met with Mr. Rohrer at the company's retreat in Costa Rica in late January 2016, where, as Ms. Gossman testified, they concocted a "fake" cover story to tell Ms. Berger and to devise a plan of action. She testified that she had "texted Doug in advance that I wanted to spend time with him. I sat next to him at dinner. We left, went into a private area, and talked. We talked about my concerns about the commission change, why I didn't take the promotion in L.A., opportunities in New York, and problems working with Alexis."

It is noteworthy that there is no mention of her "quitting" if Ms. Berger were permitted to stay – the reason Mr. McConville gave to support the need to rescind the PIP and place Ms. Berger on an involuntary leave which culminated in her constructive discharge.

Ms. Gossman continued: "He followed up later and called my cell phone from an airport when I was at home."

The "information" she provided to Mr. Rohrer was used to discredit and oust Ms. Berger. It was Ms. Gossman who started the whole "investigation" against Ms. Berger.[102] According to Mr. Rohrer, she told him she "felt cutoff from him, Ryan (Mr. McConville), and the New York office; Ms. Berger's behavior was erratic – abusive at times – she was fearful; Ms.

---

[101] *Id.*; JX 37.
[102] Ms. Katz' testimony.

Berger's language made her uncomfortable."

At the Hearing, when she was asked what she was "fearful" of, she had no answer. Behaviors she described as "erratic" were no different in nature or severity from complaints that had been made against male managers against whom no action had been taken. "Feeling uncomfortable with Ms. Berger's language" is, likewise, curious since she made no complaints about the men's language that she admitted at the Hearing was "offensive." It is unclear what she meant by "abusive," if, indeed, she said that to Mr. Rohrer, as that characterization seemed to originate with the terminated employee who did not even work for Ms. Berger.

Furthermore, nothing Ms. Gossman said rises to the level of "abusive." It is also noteworthy that Ms. Berger's management style, about which Ms. Gossman complained, remained the same throughout Ms. Berger's tenure,[103] Mr. Kargman constantly praised her for it, and in the four years she was at Kargo, not one person on either of her teams quit, which is unheard of in the industry.[104]

Ms. Gossman, even, blamed Ms. Biegel's shingles on Ms. Berger. No evidence was presented that Ms. Berger was anything but kind and extremely generous to and supportive of Ms. Biegel.

Ms. Gossman testified that she was "sad they were going to keep Ms. Berger on and work through the issues with her," and she appeared to be proud of having had this underhanded meeting and concocting a dishonest story. She saw no problem with it nor did upper management (Mr. Rohrer, Mr. McConville, Mr. Kargman) or HR, despite the fact that Mr. Kargman believed this type of behavior was improper and acknowledged that it was not the right way to treat your superior. In fact, it was not his practice as CEO of the company. He gave an example at the Hearing.

---

[103] Ms. Berger's testimony.
[104] Ms. Berger's testimony.

When he was asked what was the appropriate "chain of command" for employees at Kargo, he answered by describing a similar situation to Ms. Gossman's which had occurred concerning one of his other managers – Kartel Goksel, the Chief Technology Officer – who reported directly to him. He explained that Mr. Goksel's report, Bernard, had gone around him to complain that Mr. Goksel was, essentially, "keeping too tight a leash on him." Mr. Goksel was very upset that Bernard had gone over his head. Mr. Kargman intervened and spoke to Mr. Goksel to help him better manage his reports and he made it clear to Bernard that he "should not go around his boss;" instead, he should first raise his issues with his manager and if that was unsuccessful, HR could work with the two of them.

Mr. Goksel, a male manager, was not disciplined for the way he managed his complaining report and the report was not permitted to go above him.

When Ms. Gossman did precisely the same thing as Bernard, i.e., went around her boss to one of the two senior most sales executives in the company, Mr. Kargman did not intervene in the reasonable, common sense way that he had approached the Kartal/Bernard issues. Instead, Ms. Gossman was commended, while Ms. Berger was faulted for doing the job of a manager.

Ms. Biegel also testified against Ms. Berger. Her testimony equally revealed the inappropriate treatment of Ms. Berger and betrayal of her for personal gain.

On about August 2016, Kargo gave Ms. Biegel her "dream" job – Senior Director of Learning and Development. She reports to Ms. Sybesma in HR.

Ms. Berger had recruited and hired Ms. Gossman and Ms. Biegel. Ms. Biegel began working with her around October 2012. Ms. Biegel testified that they were friends outside of work and that they maintained a close relationship until Ms. Berger's departure.

Documentary evidence presented at the Hearing showed that Ms. Berger had been a fierce supporter of her reports, always looking out for their best interest. This is demonstrated in part by her having always done her best to get them better compensation packages and, especially, by her having stepped in to defend and protect Ms. Biegel when Mr. McConville mistreated her on a call.[105] Ms. Biegel acknowledged that Ms. Berger had also tried to get her promoted and that when she "would share with Alexis (Ms. Berger) when she was too stressed, Alexis would say, 'what we can do to reduce your stress.'"[106] Another example – Ms. Berger had convinced Kargo to give Ms. Biegel a BMW to incentivize her to meet her goal.[107]

In addition to "having Ms. Biegel's back" professionally, Ms. Berger had supported her personally. One touching example was that Ms. Berger treated Ms. Biegel and twenty other women important to Ms. Biegel, to a celebratory, 30th birthday dinner party for Ms. Biegel, sparing Ms. Biegel that expense. At the Hearing, Ms. Biegel characterized Ms. Berger's "insistence" with the manager that she pay for the entire dinner as "bullying," instead of expressing gratitude for the gift and her generosity.

This is dramatically different from her testimony at her deposition and, *inter alia*, damages her credibility.

At her deposition, she was questioned about the email she had sent Ms. Berger and her partner after the dinner expressing appreciation.[108] After the party, she sent Ms. Berger and her partner, Catherine, this email:[109]

Subject: Thank you so much!

Friends, I just wanted to say thank you again for being there on Friday. And for the extremely unnecessary but amazingly thoughtful gifts and actions taken at Bar Siena ;)

---

[105] Ms. Berger's testimony.
[106] Ms. Biegel's testimony.
[107] Ms. Berger's testimony.
[108] Ms. Biegel Deposition, 31:6 – 32:14.
[109] JX 21.

So lucky to have you in my life and am very grateful to call you my friends. Thank you thank you thank you! Biegs

At her deposition, she was asked:

Q. Do you recall sending that e-mail?

A. Absolutely.

Q. And is what you're saying in this e-mail, is it truthful?

A. Totally....

Q. Do you recall what the event was?

A. Absolutely. It was my birthday....it was my 30th birthday. It was a big birthday, and I had a dinner with about 20 girls....

Q. Yep. And your thank you e-mail went to just Catherine and Alexis. Did they put on the dinner for you or why was it just to them I guess is what I'm asking.

A. So I planned the dinner, and Lex unbeknownst to me **worked with the manager to pay for the dinner**. So she -- I had paid for it upfront but she actually went ahead and **talked to the manager** and ended up taking care of the dinner for all of my friends that were there. (Emphasis added.)

Q. Got you. You appreciated that?

A. I did appreciate that.

Other credibility questions, regarding Ms. Biegel's truthfulness, are raised by her contrary representations regarding the question of whether Kargo's attorneys represented her. Kargo's litigation counsel consists of Mr. Turcotte, Ms. High, and Ms. Anderson. Its in-house counsel is Mr. Greco. Mr. Greco had been present at the witnesses' preparation sessions and for much of the Hearing.

At her deposition, Ms. Biegel testified that none of the lawyers represented her.[110] When Ms. Berger's counsel wanted to examine her about the contents of Kargo's counsel's

---

[110] Ms. Biegel's Deposition, 9:1-16.

four-hour preparation of her for the deposition, Kargo's counsel maintained that they **did** represent her. After the deposition, this Arbitrator ordered Ms. Siegel to provide an affidavit on the issue. This time, contrary to her deposition testimony, she asserted also under oath that Mr. Turcotte and Ms. High offered to represent her, personally, and that she accepted. She also provided in the affidavit that Mr. Greco was, simply, **present** at the deposition preparation session and that: (Emphasis added.)

> At the beginning of our meeting (to prepare for the deposition) Ms. High and Mr. Turcotte informed me that, based on their representation of me, my discussion with them was protected from disclosure under the attorney-client privilege and therefore Ms. Berger's counsel was precluded from any inquiry into to [sic] the substance of my communications with counsel.

Additionally, at Ms. Biegel's and Ms. Gossman's depositions, Mr. Greco stated that he represented Kargo **and the witness**[111] when, in fact, he admitted at the Hearing that he never sought to represent these witnesses, never told them he represented them, and never believed he represented them.

Other credibility issues regarding Kargo relates to its refusal to answer one of Ms. Berger's interrogatories which was pivotal to the issue of discrimination in this case. Ms. Berger's interrogatory was unambiguous – "Identify all instances in which a complaint was made about a male executive or manager at Kargo." Kargo responded that "no **formal** complaints had been filed;" that the only one it was aware of was the one which Claimant had asserted against Mr. McConville. (Emphasis added.)

Obviously, Ms. Berger had not limited her inquiry to "formal" complaints.

Pursuant to Ms. Berger's Motion to Compel, this Arbitrator issued an Order, compelling Kargo to answer the question, providing information as to **any** complaints – formal or informal.

---

[111] Ms. Biegel's Deposition, 5:18-19; Ms. Gossman's Deposition, 5:18-19.

Kargo refused to comply and repeated its previous answer along with 14 objections it had not previously asserted. Again, pursuant to Ms. Berger' Motion, this Arbitrator entered a second Order, compelling Kargo to answer the question asked. Again, Kargo refused to comply with the order and restated its previous answer in reverse order.

Contrary to Kargo's representation regarding complaints, at the Hearing, Ms. Berger presented evidence of numerous complaints, suggesting sexual discrimination, against male managers:

1. Ms. McCallum complained on **multiple occasions** to HR that her male managers were being disrespectful to her; they told her she was the problem if she spoke up about issues needing correction, and they treated her like a housekeeper.[112]

   For example, her manager, Evan Schwartz, would not respect her as a manager – he called her "too sensitive; he made her cry a few times."[113] He would tell her she was "being emotional all the time."[114] One example was when there was a break-in. On the entire side of the office, computers were missing. "He indicated it was no big deal. [She] asked that no one be allowed to come into that space until police had done their processing; he said [she][115] had to stop acting with her emotions and be level headed like him."

   "He went on a screaming rampage, saying she wasn't doing her job."[116]

   Ms. Katz, the Director of HR at the time, was part of the conversation when Ms. McCallum was making these complaints.[117]

   Mr. Modi, Head of Finance and Business Operations, was Mr. Schwartz' boss. Ms. McCallum went to him and to Mr. McConville, but she received "no help from either so she went to HR."

   She continuously told Ms. Sybesma [Head of HR] about her issues with Mr. Canty, and it "resulted in a write up about [her] short comings."

---

[112] Ms. McCallum's testimony.
[113] *Id.*
[114] *Id.*
[115] Ms. Berger's testimony.
[116] *Id.*
[117] *Id.*

Neither Mr. Schwartz nor Mr. Canty was ever disciplined, while Ms. McCallum was written up and later terminated. She believed it was because she was "too vocal."[118]

"In [her] performance warning, [her] manager had used examples but they were false and [she] advised Joy [Sybesma] and asked to have an opportunity to refute them but that never happened."

2. After having taken maternity leave, Ms. Dalton, an employee in sales reporting to Mr. Canty, asked him to take her "work from home" day, which was granted to all other employees. He refused the request. She complained to Ms. Sybesma about him and his management:[119]

> I asked Kevin if I could WFH (work from home) this Thursday . . . . He said that *because I've been out for 12 weeks, he feels it is more appropriate that I am in the office and did not approve*. (Emphasis is hers)

> I feel that denying me of a privilege granted to the entire company strictly because I was on medical leave is discriminatory and inappropriate. I also worry that Kevin will hold my medical leave against me for future PTO.

> I believe there needs to be a level set that *my medical leave should have no bearing on my privileges as an employee nor should impact anything moving forward*. I do not want to be punished for my time away or have it held over my head.

3. Ally Cuervo, also, complained to HR about Mr. Canty, but Ms. Sybesma dismissed it as Mr. Canty was just "being a boy." Ms. Cuervo quit in a few months just prior to the Hearing.[120]

Kargo ignored more of Ms. Berger's discovery requests. It did not produce extremely pertinent responsive documents. To that reciprocal request, Ms. Berger had provided all correspondence, whether it had been created on her workplace account or personal one. She even produced emails in her partner's possession. It was not learned until the Hearing that

---

[118] *Id.; see* RX 88, 89.

[119] CX 41.
[120] Mr. Kargman's testimony.

36

Kargo had provided only those communications created on workplace accounts even though it was aware that employees also used their personal accounts for work related matters. At the Hearing, Kargo maintained that it had made no attempt to obtain information from these sources. Notwithstanding, it had in its possession and had prepared its witnesses from the extremely relevant email between Mr. Rohrer and Ms. Gossman regarding Ms. Berger and her case. Mr. Rohrer and Ms. Gossman had created it on their personal accounts.

More credibility problems for Kargo surfaced when Ms. Berger was about to call Ms. McCallum at the Hearing. She had included her on her witness list. At that time, Ms. McCallum was no longer at Kargo.[121] Kargo had terminated her.

Initially, she had contacted Ms. Berger because she admired her.[122] Ms. Berger had been Ms. McCallum's only "ally" at Kargo.[123] Ms. Berger had helped her with Mr. Kargman.[124] She told Ms. Berger that she would welcome the opportunity to talk with Ms. Berger's counsel, both, about her own potential claims, as well as whether she might have information germane to Ms. Berger's case; she would also testify for Ms. Berger.[125] She advised that she was considering her own legal action against Kargo because she felt she was being pushed out for being "too vocal."[126]

After the Hearing had begun, Ms. Berger's counsel received a text from Ms. McCallum:

> "Hey Seth meant to let you know, I signed a separation agreement yesterday and cannot discuss Kargo in that capacity."[127]

Kargo prepared her Separation Agreement during this litigation. Ms. Berger's Demand for Arbitration was received on June 3, 2016. Kargo had Ms. McCallum sign a Separation

---

[121] Ms. McCallum's testimony.
[122] *Id.*
[123] Id.
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] CX 55.

Agreement on November 16, 2016, effective November 18, 2016.

While the agreement did not contain the usual exclusion of being able to testify in legal proceedings, it did include provisions that Ms. McCallum had an obligation to cooperate with Kargo and to testify if necessary[128] and could not disparage Kargo:[129]

> You shall not make, publish or issue any **detrimental, derogatory or other critical comments or statements**, whether written or oral, **concerning the Company, or any of its officers, directors or employees** . . . to any third party including, without limitation, public or trade media. (Emphasis added.)

Ms. Sybesma testified that she had worked on many separation agreements and that they all included the familiar widespread clause that makes clear to an employee that nothing in a separation agreement can prevent him or her from testifying in a legal process.

The agreement also provided Ms. McCallum with a $4000 **"bonus"** along with six weeks severance pay.[130]

After receiving Ms. McCallum's text, Ms. Berger's counsel requested a subpoena for her appearance. To dissuade this Arbitrator from signing it, Kargo's counsel repeatedly and adamantly represented to this Arbitrator that "she does not **want** to testify/she does not **want** to have anything to do with this."

This Arbitrator signed Ms. Berger's subpoena.

Knowing the, now, difficulty in securing Ms. McCallum's presence, shortly after the subpoena was issued, Kargo's counsel called her and alerted her that Ms. Berger was

---

[128] CX 54, provision nos. 11 and 18.
[129] *Id.*, provision no. 11.
[130] *Id.*; provision no. 3.

attempting to serve a subpoena on her.[131] As a result, it took around the clock efforts and several days to accomplish service on Ms. McCallum.

When she testified, essentially, she stated that "Joy [Ms. Sybesma] advised [her] that it was in [her] Separation Agreement that [she] had to assist Kargo if asked, and Joy told her that her assistance was needed;"[132] that Kargo's counsel's representation to this Arbitrator was not the truth. It was not that she did not **want** to testify, rather, based on her conversations with Kargo personnel, she understood that she was **prohibited** from testifying against Kargo and was required, instead, to assist it.

Further damage to Kargo's credibility is done when its witnesses tried to explain what warranted a change from the PIP to an involuntary leave of absence in just a few days. The main reason the witnesses gave is that they learned that Ms. Gossman and Ms. Biegel, their two top producers, threatened to quit if Ms. Berger were not removed, and they did not want to lose the income these them. However, this is not the truth according to Ms. Gossman and to Ms. Biegel. They testified that they did not tell Mr. McConville this. There is no credible evidence that Ms. Gossman told Mr. Rohrer this during their surreptitious meeting. In fact, when Mr. Kargman received Ms. Biegel's resignation notice around March 1, 2016, he went to talk with her to ask the reason.[133] During their conversation, Ms. Biegel never brought up Ms. Berger.[134] Furthermore, Ms. Biegel's email resignation and actions support that the reason she wanted to leave her job in sales was not because of Ms. Berger. She no longer wanted the stress of sales. Ms. Biegel was going to leave sales whether Ms. Berger stayed or left, and she did just that.

Furthermore, Kargo's explanation is not credible or logical. Ms. Gossman and Ms. Biegel were Kargo's top money producers **because of Ms. Berger's management**, whose management

---

[131] Ms. McCallum's testimony.
[132] *Id.*
[133] Mr. Kargman's testimony.
[134] *Id.*

Kargo was about to lose as well as the income from its highest producer – Ms. Berger – through its own actions. After Kargo removed her, it offered a job to Ms. Beigel that she wanted in HR, out of sales. It is obvious that doing this meant that they would lose the income they now urge they were trying to preserve.

Mr. Kargman's credibility was severely damaged when he testified, *inter alia*, about the "cause" for Ms. Berger's ultimate "official" termination of July 22, 2016. Kargo has maintained that it was, in part, because she violated the non-disclosure provision of the Inventions Agreement by sharing confidential information, but Mr. Kargman had no credible information to support that allegation, revealed by the following testimony at his deposition:

> Q: I'm asking you if you have any knowledge of a specific piece of confidential information disclosed by Alexis Berger other than compensation information that you've described already.
>
> A: My understanding, it's that there was an **allusion to other information being disclosed, which I don't have exact, personal, detailed knowledge of,** but I'm sure it's something that we can get at in the litigation. (Emphasis added.)

This litigation has uncovered that the "confidential information" which was the foundation, in part, for Kargo's termination "for cause" was her sharing her compensation at Kargo when she was interviewing with Emogi for a job. This is not prohibited even if she had been bound by the Inventions Agreement, which she is not. Under federal law, employees are not prohibited from discussing their compensation.[135]

That aside, Mr. Kargman testified that he was not told until *August 2016* that Ms. Berger had shared her compensation at Kargo. Yet, Kargo terminated her in *July* for **this** "cause" and stated such in its counsel's July 22, 2016; namely, she had violated the Inventions Agreement by

---

[135] *See, e.g., Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 209 (5th Cir. 2014).

divulging her compensation information to her prospective employer, Emogi.[136]

Furthermore, another part of Kargo's "for cause" basis was an alleged violation of the non-compete clause in the Inventions Agreement. Again, this termination letter "for cause" was not sent until July 22. Ms. Berger had not begun working for Emogi until August so she could not have violated the provision and, simply, looking for a job is not a violation of a non-compete obligation. Certainly, it is not a "good faith" basis and reasonable belief (as the Equity Plan requires) to evoke "cause."[137] Mr. Kargman testified that "**They came up with the idea** of cause when **they** found out the job she was going to go to." (Emphasis added.) This suggests an attempt at an after the fact fabrication of a reason to support cause from which bad faith and a lack of credibility can be inferred.

In summary, when Ms. Berger sought a job at Emogi after learning of Kargo's intent to demote her, Kargo considered this job **search** to be a violation of the non-compete provision of the Inventions Agreement which Ms. Berger had not signed. It used her search as a violation of the non-compete restriction to strengthen its "termination for cause" claim and maintained that this forfeited her options, *inter alia*. However, Kargo permitted Mr. McConville, to provide actual services to Emogi while at Kargo in exchange for Emogi giving options to him, and Kargo permitted him to retain all of his stock options even though Mr. McConville has the same non-compete covenant Kargo claims Ms. Berger violated.[138] Additionally, presumably, Kargo would have allowed Mr. McConville to continue this service as it was Emogi that terminated the contract between it and Mr. McConville. Furthermore, when Mr. Hiller, Ms. Berger's direct report, left Kargo to work with her at Emogi, Kargo did not tell him that he could not exercise his options or that he was terminated for cause.[139]

---

[136] Mr. Kargman's Deposition, 8-9.
[137] JX 1, pg. 28.
[138] JX 6.
[139] Mr. Hillier's testimony.

41

These are just two other clear inappropriate acts of discrimination against Ms. Berger and applications of the double standard. Kargo's failure to properly investigate claims against her, as well as failure to investigate claims of discrimination she made are other indicia of discrimination.[140]

Even though Ms. Berger was an "at-will" employee, she had a right not to be terminated because of her sex/stereotyping or to be subjected to a different standard than her male counterparts.

Having listened to the witnesses and considered documentary evidence, this Arbitrator finds Ms. Berger and her witnesses to be more credible. Having reviewed all the law presented by both sides, especially the shifting burdens of proof expressed in *Price Waterhouse* and having considered each argument both parties' counsel submitted, as well as their evidence, this Arbitrator finds that:

1. Ms. Berger has met her, preponderance of the evidence, burden of proof that she was **not** terminated for cause;

2. The "causes" Kargo provided are pre-textual;

3. Sexual discrimination was, <u>**at the very least**</u>, a motivating factor in her termination, and this was a collaborative orchestration carried out in a malicious, insidious, and humiliating manner, having the effect of depriving her of her earned commissions, her retention bonus, her stock options, her position, her livelihood, and her dignity.

The evidence is overwhelming that Kargo violated Title VII, NYHRL, and NYCHRL. Additionally, Kargo breached its implied obligation to act in good faith and fair dealing in the Employment Agreement by manufacturing reasons to label her termination as a "for cause" termination. The evidence exposed that Kargo labored under a double standard, treating Ms. Berger differently from its male managers, who were never even written up, reprimanded, or disciplined in any way for similar or worse behaviors it used to discredit her. They criticized

---

[140] *Sassaman*, 566 F.3d at 315.

behavior from her that they would accept from a man to run her out of the company.

It is clear from Kargo's actions and collective attitude that a woman is not permitted to act like a man.

Its "reassignment" of Ms. Berger to "a role that **stripped** title, pay, sales, etc.;"[141] specifically, taking away her "Senior Vice President" title,[142] cutting her salary from $375,000 to $250,000 and her commission potential in 2016 from $562,000 to $12,000[143] - were part of its acts of discrimination and constituted a constructive discharge as of April 11, 2016.[144] Kargo's refutation, that it did not intend it to be a termination; that it thought Ms. Berger – an industry wide extolled and accomplished professional who had won an award in a business publication for her management and for being a "woman to watch" in mobile marketing[145] – would accept such an obvious degradation, is not credible, nor is Mr. Kargman's testimony that he thought she would try to negotiate. With probing, he backed off of this statement and conceded that he really did not think she would try to negotiate since Kargo had taken a more formal approach upon Ms. Sybesma's advent. Furthermore, if indeed he thought she would negotiate, he knew this position was not worthy of her and he did not expect her to accept it. Moreover, Ms. Sybesma's talking points[146] for the conversation with Ms. Berger about this "reassignment" make Kargo's real intention of an ultimatum clear:

> If you decide not to take the role at any point during the 4 weeks (of involuntary leave of absence) then **we will terminate you** from your current role.
>
> If you don't take this leave of absence, **you will be terminated**. (Emphasis added.)

There is no room in the above for negotiation, and it amounts to a constructive discharge. A "constructive discharge" occurs when an employer creates an "intolerable work

---

[141] JX 66 - Mr. Rohrer's email to Mr. McConville.
[142] Ms. Sybesma's testimony; JX 62; JX 66.
[143] JX 29; Mr. Kargman's testimony.
[144] *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161-62 (2d Cir.1998).

[145] R9.
[146] JX 62.

atmosphere that forces an employee to quit involuntarily."[147] Ms. Berger did not accept this "reassignment" but did offer to return to her position of SVP over sales.[148]

>The *Ingrassia v. Shell Oil Co.* court held:

>New York courts have uniformly held that any reduction in rank or material change in the duties of an employee will form the basis of an action by an employee for breach of his employment contract and that a wrongfully discharged employee may refuse an offer of "other" employment without affecting the liability of the employer for wrongful discharge if the "other" employment amounts to a reduction in rank.[149]

Kargo argues that the parties' Employment Agreement gave it the right to reassign her with impunity; thus, her refusal to report to work on April 25th for the new job constituted "abandonment of her position" and, thus, "cause" for termination.

>The pertinent part of the Agreement provides:

>Company, in its sole discretion, may change, amend or alter Employee's **position, duties and/or work location** from time-to-time as it deems appropriate; however, Company shall not relocate Employee outside of Illinois without Employee's consent . . . .[150] (Emphasis added.)

This provision does not include authority to decrease her salary. However, section 4 of the Agreement, entitled COMPENSATION AND BENEFITS, does address it and mandates a compensation certain except for an increase. It provides that:

>Company **shall** compensate Employee **pursuant to the terms stated in this Section 4.1**, to be paid **in accordance with Company's then-current payroll practices** commencing on the Commencement Date and continuing **for the duration of the Employment Period**, prorated for any partial compensation period. Employee shall be eligible for compensation **increases** at the discretion of Company. (Emphasis added.)

---

[147]*Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996).
[148] JX 76; Ms. Berger's testimony.
[149] 394 F. Supp. 875, 886 (S.D.N.Y. 1975).
[150] Employment Agreement, Section 3.

In other words, this provision gives Kargo the right to increase her salary but not to decrease it, providing that her salary will remain constant throughout her employment except for increases at the Company's discretion.

Indeed, it is extremely difficult to imagine and unreasonable to think that Ms. Berger would have consented to giving Kargo such an indiscriminate power to decrease her salary and resulting benefits. Kargo's logic means that it could have, legally, reassigned her to even a janitorial position and salary or the like. It is absurd to suggest that this would have been contemplated or accepted Ms. Berger. Moreover, this ambiguity must be construed against Kargo, the drafter.

Nevertheless, even if there were such a mutual intent, Kargo cannot use a contract as a shield against its unlawful discrimination. Findings of constructive discharge and sexual discrimination render its "abandonment of her position" claim moot.

Kargo's other "termination for cause" arguments are that Ms. Berger violated the non-disclosure, non-solicitation, and non-compete provisions of the Inventions Agreement. Kargo failed to present a copy of the agreement with Ms. Berger's signature. Ms. Katz testified that Ms. Berger never signed it. Kargo argues that this is of no moment because the Employment Agreement, expressly, incorporates the Inventions Agreement into the Employment Agreement, which she did sign; thus, she is bound by the Inventions Agreement.

Kargo is correct that the language in the Employment Agreement does, expressly, incorporate the Inventions Agreement, but it is incorrect that this means the Inventions Agreement binds Ms. Berger, for the following reasons.

1. No evidence was presented that it was attached to the Employment Agreement which Ms. Berger did sign – there could have been more than one version; there is no evidence that she read the Inventions Agreement alluded to; thus, there is no way she could know the **specifics** in it, as is required by the Agreement's "acknowledgement" requirement entitled "**ENFORCEMENT OF COVENANTS**:"

Individual acknowledges that Individual has carefully read **and considered all the terms and conditions** of this Agreement, including the restraints imposed upon him pursuant to Section 4 hereof. (Emphasis added.)

2. No evidence was presented as to whether the Inventions Agreement had never been modified.

3. All the Employment Agreement did was reference the name of the agreement. This does not satisfy the requirements to bind Ms. Berger.

Kargo's argument that she knew what was in it and that she was supposed to sign it or that she agreed she was bound by it is of no legal moment. *Nobel Ins. Co. v. Hudson Iron Works, Inc.*[151] rejected parole evidence where defendants "seek to rely on, at best, inconclusive, **unexecuted**, one-sided documents to markedly alter the terms and plain meaning of the [original agreements]." (Emphasis added.)

Moreover, Kargo's counsel misstates Ms. Berger's testimony concerning Ms. Berger's understanding of whether she was bound by the Inventions Agreement. She questioned Ms. Berger about this at her deposition:

Q [Ms. High]: Did you understand that you're bound by the inventions agreement?

Mr. RAFKIN: Objection, calls for a legal conclusion.

A [Ms. Berger]: I never signed the inventions agreement because **it was never presented to me.**

Q: Do you have an understanding one way or the other whether you're bound by the inventions agreement by its incorporation into this document?

MR. RAFKIN: Objection, calls for a legal conclusion.

A: It's my opinion I would be bound to it **if I had executed that document**, and for

---

[151] 51 F. Supp. 2d 408 (S.D.N.Y. 1999).

whatever reason they never presented me with that document **when joining the company.**[152] (Emphasis added.)

Finally, even if a signed Agreement did exist, New York Courts generally do not enforce these restrictive covenants when an employee is terminated without cause,[153] which is the finding in the instant case; the alleged violations did not theoretically transpire until after Kargo terminated her; and this allegation evidences a further act of unlawful discrimination.

For all of the above reasons, an Inventions Agreement cannot be enforced against Ms. Berger; thus, the "non-disclosure," "non-compete," and "non-solicitation" provisions do not bind her. As such, they cannot form part of "cause" for her termination.

Additionally, Kargo's failure to pay Ms. Berger her Q1 earned commissions constitutes a "first breach" of the agreement upon which it predicates these counterclaims. "When a party benefiting from a restrictive covenant in a contract breaches that contract, the covenant is not valid and enforceable against the other party because the benefiting party was responsible for the breach."[154]

Accordingly, Kargo is barred as a matter of law from asserting a breach by Ms. Berger.[155]

As to its remaining counterclaims of Breach of Duty of Loyalty and Fair Dealing and Tortious Interference, the "unclean hands" doctrine precludes Kargo from obtaining relief.

The elements of the "unclean hands" defense are:

---

[152] Ms. Berger's Deposition, 37:25 – 38:16.

[153] *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010).

[154] Cornell v. T.V. Development Corp., cited in *Decapua v. Dine-A-mate, Inc,* 292 A.D.2d 489, 491 (N.Y. App. Div. 2002).
[155] *DeCapua v. Dine-A-Mate, Inc.,* 292 A.D.2d 489, 491 (N.Y. App. Div. 2002); *In re UFG Int'l, Inc.,* 225 B.R. 51, 56 (Bankr. S.D.N.Y. 1998); *Cornell v. T.V. Dev. Corp.,* 268 N.Y.S.2d 29, 34 (N.Y. 1966); *J.K. Dental Lab Servs., Inc.,* 2013 BL 54293 at p. 6; *In re UFG Int'l, Inc.,* 225 B.R. 51, 56 (Bankr. S.D.N.Y. 1998).

47

1. the plaintiff is guilty of immoral, unconscionable conduct;

2. the conduct was relied upon by the defendant; and

3. the defendant was injured thereby."[156]

This Arbitrator finds that these elements are supported by the evidence adduced outlined above.

Furthermore, regarding an employee's Duty of Loyalty, as Ms. Berger reports, this notion is "rooted in the law of agency.[157] That is obviously inconsistent with a blanket duty to be forever loyal to a **former** employer of whom an employee is no longer an agent, outside an employee's common law continuing duty not to misappropriate a company's proprietary information." (Emphasis added.) There is no evidence that Ms. Berger misappropriated Kargo's proprietary information. Thus, she did not breach a duty of loyalty.

In summary, Ms. Berger has satisfied her burden of proof that none of the reasons Kargo provided support its "for cause" termination and they are nothing more than a demonstration of impermissible stereotyping and a double standard, amounting to a pre-text.

In short, Kargo cannot identify a nondiscriminatory reason, standing alone, to support a legitimate "for cause" termination.

RETALIATION

Ms. Berger asserts that Kargo retaliated against her for complaining about discrimination; this was a violation of violation of Title VII, the NYHRL, the NYCHRL, and New York Labor Law section 215.

---

[156] *Doe ex rel. Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 350, 2010 BL 145991, 14 (S.D.N.Y. 2010).
[157] *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 200 (2d Cir. 2003).

Under NYCHRL, as with discrimination, if retaliatory intent played any role in Kargo's decision not to pay Ms. Berger her commissions, to label her termination as "for cause," and/or to forfeit her options, Kargo is liable for retaliation.[158]

To establish a *prima facie* case, she must show that:

> (1) she was engaged in [a protected] activity;
>
> (2) the employer was aware of [her] participation in the protected activity;
>
> (3) the employer took adverse action against her; and
>
> (4) a causal connection existed between the protected activity and the adverse action taken by the employer.[159]

Retaliation claims are subject to the McDonnell Douglas burden-shifting standard.[160]

The evidence shows that, when Kargo sought to "reassign" her, Ms. Berger complained to Kargo about unfair treatment, and her counsel sent a letter to Ms. Sybesma, asserting that Kargo's actions discriminated against her on the basis of gender. He also followed up with a draft EEOC charge, alleging gender discrimination.[161]

Ms. Berger need not prove that she was discriminated against to establish that she was engaged in a protected activity.[162]

The *Adams v. Canon USA, Inc.* court found that "The letter from Adam's attorney, as well as Adams' complaint to the EEOC, constitute protected activity."[163] The *Lamberson v. Six West Retail Acquisition Inc.* court held that, "Protected oppositional activities include informal as well

[158] *Williams v. New York City Hous. Auth.*, 61 A.D.3d at 76; *Laboy*, 2016 BL 322722 at 11.

[159] *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001); *see also Antolino v. Distribution Mgmt. Consolidators Worldwide, LLC*, 2013 BL 208006, 5 (N.Y. Sup. Ct. Aug. 02, 2013) (applying NYLL § 215).

[160] *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014).

[161] CX 22; *see Raniola*, 243 F.3d at 624-25.

[162] *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996).

[163] 2009 BL 204652, 19 (E.D.N.Y. Sept. 22, 2009).

as formal complaints and complaints to management."[164]

Notwithstanding, Kargo argues that Ms. Berger did not engage in a protected activity in good faith because she had been advised of alleged performance issues and the "reassignment" had a self-evident business rationale.

Ms. Berger counters that:

a plaintiff need only "have had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII."[165] The question is whether the plaintiff has "challenged employment practices that, if proven, were unlawful under Title VII."[166] Gender discrimination, if proven, violates Title VII and New York law.

Kargo further maintains that none of the actions Ms. Berger has identified had anything to do with her protected activity.

Ms. Berger replies that:

The first adverse action is the leave of absence. Placing an employee on an involuntary, unpaid leave of absence constitutes adverse employment action.[167] The only question is whether Kargo did so *at least in part* because Berger asserted her right not to be discriminated against. **Berger was put on an unpaid leave just days after complaining about discrimination.** (Emphasis added.)

In *Ibraheem v. Wackenhut Servs.*, Inc., the plaintiff was terminated after he filed an EEOC charge and a lawsuit. The court said that this permitted "an inference that he was retaliated against."[168]

[164] 122 F. Supp. 2d 502, 511 (S.D.N.Y. 2000).
[165] *Kessler v. Westchester Cnty. Dept. of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).
[166] *Id.*
[167] *Taedger v. New York*, 2013 BL 284262, 6 (N.D.N.Y. Oct. 15, 2013); *Lara v. City of New York*, 1999 BL 545, 5 (S.D.N.Y. June 29, 1999).
[168] *Ibraheem v. Wackenhut Servs.*, Inc., 29 F. Supp. 3d 196, 213 (E.D.N.Y. 2014).

50

*Kaytor v. Elec. Boat Corp.* held that a "close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may itself be sufficient to establish the requisite connection between a protected activity and retaliatory action."[169]

Additionally, there is no evidence that Kargo investigated Ms. Berger's claim of discrimination against her. Failure to fulfill a duty is no less an adverse employment action than an affirmative action.[170] Kargo claims that it had no duty to investigate and that a failure to investigate cannot constitute an adverse employment action.[171]

Kargo is partially correct. The *Fincher* court Kargo relies on held that a failure to investigate a complaint of discrimination, **standing alone**, is not an adverse employment action. However, that is not the situation in the instant case.

Ms. Berger clearly demonstrated that a "failure to investigate" was not the only discriminatory act against her. In addition to failing to investigate or to remedy her complaint of discrimination, Kargo:

1. put her on an unprecedented leave of absence as a disciplinary action which it had not done with male employees for the same or worse behaviors;

2. put her on an unpaid leave without benefits;

3. refused to pay her earned commissions for 2016 when it paid everyone else theirs; and

4. terminated her employment for pre-textual "causes" to deny her the right to exercise her vested stock options and to trigger the repayment of her retention bonus.

Finally, *Fincher* does not stand for the proposition that an employer is relieved of its duty to investigate claims of discrimination or that the failure to do so is not evidence of an

---

[169] 609 F.3d 537, 552 (2d Cir. 2010).
[170] *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d at 712.
[171] *Id.*

51

unlawful motive.[172]

Next, we examine the reason Mr. Kargman ordered that Ms. Berger not be paid her earned Q1 commissions when he approved the payment of everyone else's commissions. His testimony in his deposition and at the Hearing differ. At his deposition, he had no answer other than it is part of the dispute in the litigation. At the Hearing, he maintained that his decision was because her termination for cause contractually forfeited her commissions.

This, like so many of Kargo's assertions, compounds the damage to his and to Kargo's witnesses' credibility because this account cannot be true physically. His former HR Director, Ms. Katz, testified at the Hearing that everyone else, except Ms. Berger, was paid their Q1 commissions on May 30, 2016. The evidence reveals that **none** of the contractual bases Kargo cites to support its purported "for cause" termination existed as of May 30, 2016 or even as of July 22, 2016 when Mr. Kargman terminated her; namely, Kargo had asserted that Ms. Berger had violated the non-compete, non-solicitation, and non-disclosure provisions in her Inventions Agreement. This is impossible because Ms. Berger did not begin working for Emogi (which Kargo deemed to be a competitor) until August and disclosure of her compensation before then was not a violation of the non-disclosure provision, but more importantly, she was not bound by this unsigned agreement. The fact is that Mr. Kargman decided not to pay her commissions before he decided to terminate her and he did so without valid cause.

Kargo argues that Ms. Berger has not proved a causal connection between her protected activity and the adverse action taken by the employer — the final element of proof required for proving retaliation; namely, she has not proved a causal connection between her complaining that the demotion, pay cut, etc. were discriminatory and Kargo's subsequent placing her on unpaid leave, days later, and having taken no action in the interim to respond to, investigate, or address her alleged discrimination.

---

[172] *Sassaman*, 566 F.3d at 315.

Aside from the inference of retaliation, which can be drawn from the proximity between Ms. Berger's complaint and Kargo's adverse actions, the causal connection and Kargo's intent to punish Ms. Berger are reflected in Mr. Kargman's state of mind. In response to "why did you have Ms. Sybesma send Ms. Berger the April 29, 2016 letter,[173] telling her she was being placed on **unpaid** leave and Kargo will be **terminating her benefits**," he said,

> "I did it because I was disappointed that she hired an attorney and threatened to sue me without discussing this with me."

This begs the more probable than not inference that Mr. Kargman's actions were not taken because Ms. Berger legally deserved them but rather as acts of retaliation to punish her for making an official complaint against Kargo for its discrimination.

This Arbitrator finds that she has proven by a preponderance of the evidence every element she is required to prove for a retaliation claim against Kargo.

### EQUAL PAY ACT CLAIM

Ms. Berger claims that Kargo violated state and federal equal pay laws, in particular, Title VII, the Equal Pay Act, the Lilly Ledbetter Fair Pay Act, and New York Labor Law (NYLL) section 194, when it cut her base salary by 45% and, thus, her commissions, which are wages;[174] failed to pay her earned Q1 commissions; and in its diverse treatment of her options.

The "Equal Pay Act requires that men and women in the same workplace be given equal pay for equal work . . . . All forms of pay are covered by this law, including salary, overtime pay, bonuses, **stock options**, profit sharing and bonus plans, life insurance, vacation

---

[173] JX 80.
[174] NYLL § 193.

and holiday pay, cleaning or gasoline allowances, hotel accommodations, reimbursement for travel, expenses, and benefits."[175] (Emphasis added.)

To prevail on an equal pay claim, Ms. Berger must prove:

1. Kargo treated her wages or benefits (including stock options) differently than it treated the wages or benefits of men;

2. Berger performed equal work on a job requiring equal skill, effort, and responsibility; and

3. the jobs are performed under similar working conditions.[176]

"An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act."[177]

"An equal pay claim under Title VII is analyzed under the same standards as an Equal Pay Act claim, except that, in addition to establishing the elements of an Equal Pay Act claim, a plaintiff must produce evidence of discriminatory animus.[178]

Regarding element number 1 above, the evidence presented highlights the diverse way in which Kargo treated Ms. Berger versus her male counterparts regarding wages. It did not cut the base compensation or commissions of any other male executive at the company in 2016. These men behaved in the same or worse manner as that for which Kargo disciplined Ms. Berger. It did not, even, cut Mr. Canty's pay. He held the same position as Ms. Berger and numerous sexual discrimination complaints had been lodged against him.

---

[175] https://www.eeoc.gov/laws/types/equalcompensation.cfm; *See Perdue v. City University of New York*, 13 F. Supp. 2d 326, 333 (E.D.N.Y. 1998).
[176] *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992), *also* 29 U.S.C. § 206(d); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1973), *Talwar v. Staten Island Univ. Hosp.*, No. 14-1520-cv (2d Cir. 2015).
[177] *Talwar v. Staten Island Univ. Hosp.*, No. 14-1520-cv (2d Cir. 2015).
[178] *Id.* (citing *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999)).

Regarding options, a difference in treatment is also blatantly apparent; namely, Kargo permitted its Vice President, Mr. McConville, to work for Emogi in an advisory capacity and to receive equity as compensation without penalizing him by taking away his Kargo options, *inter alia*. On the other hand, when Ms. Berger simply applied to Emogi for a job, she was terminated with Kargo avowing bogus reasons "for cause," depriving her of her vested options. Mr. McConville was bound by the same restrictive covenants Kargo relied on to terminate Ms. Berger and to "strip" her of her options.

Regarding the second and third elements of proof required of Ms. Berger, there is no dispute that she performed the same "work on a job requiring equal skill, effort, and responsibility" and that the job was performed under similar working conditions as Mr. Canty, who was Senior Vice President for the East Coast. The only difference is that, given that she was the highest earner, she performed her job better.

Ms. Berger has satisfied the requirements for establishing a *prima facie* case.

"Once the plaintiff establishes a *prima facie* case, the employer must justify the disparity by showing it results from:

1. a seniority system;
2. a merit system;
3. a system which measures earnings by quantity or quality of production; or
4. a differential based on any other factor other than sex."[179]

Given the evidence outlined above, Kargo has failed to show any factors other than sex being responsible for the disparity it showed.

To prove a violation under Title VII, one factor remains – discriminatory animus. Animus means hostility or ill feeling.

---

[179] *Aldrich*, 963 F.2d at 524 (citing 29 U.S.C. § 206(d)(1), *Corning*, 417 U.S. at 196).