EXHIBIT A-3

The record is replete with evidence – expressed and implied – of hostility towards Ms. Berger, which is reflected in many of Kargo's actions, in particular, in Mr. McConville's and Mr. Rohrer's aggressive efforts to force her out.

To that end, they drove a sham, biased "investigation" against Ms. Berger, faulting her for behaviors they and other male managers were engaging in; Mr. Rohrer arranged a "clandestine" meeting with Ms. Berger's direct report, Ms. Gossman, to collect nefarious information against Ms. Berger and conspired with Ms. Gossman to concoct a "fake" cover story; and in accordance with Mr. Rohrer's and Mr. McConville's agenda, Mr. McConville pushed to have Ms. Berger placed on an unprecedented leave without giving her an opportunity to defend or explain herself in the face of the accusations being stacked against her or to give her an opportunity to "change."

He emailed Ms. Sybesma on February 15, 2016, "**we** have a **plan** but would like to vet it with you."[180] (Emphasis added.) The "plan" was to put Ms. Berger on a leave of absence.[181] Despite Ms. Sybesma advising against it; that they should first speak with Ms. Berger and give her "*clear examples* of when her behavior has not met expectations,"[182] he and Mr. Rohrer did not do so. Despite Ms. Sybesma's disapproval of their "plan," Mr. McConville uprooted the PIP Ms. Sybesma had put in place and had Ms. Berger placed on the involuntary leave he had wanted Ms. Sybesma to condone.

Mr. McConville described the process as one to "put Alexis to the side."[183]

Ms. Sybesma admitted that neither she nor Ms. Katz followed Bloomberg law[184] regarding proper investigation procedures for complaints.

---

[180] JX 36.
[181] JX 37.
[182] *Id.*
[183] Mr. McConville's testimony.
[184] CX 49.

Kargo's "investigation" led to adverse action against Ms. Berger and was not just unsound but "inexplicably unfair."[185] That renders the "investigation," itself, evidence of discriminatory animus against Ms. Berger.[186]

Additionally, Kargo did not investigate Ms. Berger's unequivocal complaint of gender discrimination raised in her letter of April 15, 2016.[187] Kargo's failure to do so is more evidence of its discriminatory intent[188] and animus towards Ms. Berger.

It was no secret at Kargo that Mr. McConville and Mr. Rohrer resented the close relationship Mr. Kargman and Ms. Berger had fostered with each other. At the Hearing, Mr. McConville testified that their relationship was "unhealthy" and "rogue." An example he gave was that "on a daily basis, they would talk to each other, not involving others." This upset him despite the fact that Ms. Berger was Mr. Kargman's direct report. Mr. McConville stated that Ms. Berger is "so used to getting her way because of her relationship with HK (Harry Kargman)."[189] Thus, Mr. McConville and Mr. Rohrer purposefully excluded Mr. Kargman from their communications regarding Ms. Berger because, as Mr. McConville wrote to Mr. Rohrer, "that just plays into the whole triangle."[190] Mr. Kargman was excluded from almost all of the communications from February and March of 2016 regarding their collection of "information" to support their "plan."[191] They were vigilant about maintaining control of their stratagem.[192]

Examples include that they did not tell Mr. Kargman that Ms. Gossman had reported on March 6th a substantial improvement; that Ms. Biegel and Ms. Gossman had not in truth threatened to quit because of Ms. Berger; that the PIP HR had decided on was upended because

[185] *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006).
[186] *Id.*
[187] Ms. Sybesma's testimony.
[188] *Sassaman*, 566 F.3d at 314-315; *Torres v. Pisano*, 116 F.3d 625, 638 (2d Cir. 1997).
[189] JX 53.
[190] RX 22.
[191] JX 31, 32, 33, 36, 37, 38, 46, 55, 58, 64, or 66.
[192] JX 38.

of Mr. McConville's baseless unilateral decision, or that Ms. Berger had already begun to significantly implement the plan when Mr. McConville ordered it to be rescinded.[193]

Mr. Kargman was not aware of the complaints against Ms. Berger and "unhappy people" until Mr. Rohrer and Mr. McConville set up the New York meeting to censure Ms. Berger.[194] To ensure his support, Mr. Rohrer and Mr. McConville lead him to believe they needed to take immediate action against Ms. Berger to avoid "a widespread exodus out of -- out of the Chicago office."[195]

> Mr. Kargman testified:
>
> I wasn't as in the loop as I would have liked to have been, and I certainly am now, but basically he (Mr. Rohrer) said that there were serious and grave morale issues, which I didn't know the details around at the time, and that we needed to do something about it swiftly or we would have an even bigger problem on our hands.[196]

After they had accomplished getting Ms. Berger demoted and reassigned, Mr. Rohrer was still not happy because she was not, yet, completely out of the company. On April 5, 2016, he wrote to Mr. McConville (not copying Kargman):

> . . . . What was hard to hear was the hit to our culture in condoning her behavior by **allowing her to return** even in a role that **stripped** title, pay, sales, etc.[197]

Along with the sentiment, his choice of the word, "stripped," was telling of his attitude and animus intention.

Once Kargo placed Ms. Berger on an unpaid leave based on its fabricated "cause," it, not only denied her $300,000 in earned commissions, when it paid everyone else, but even

---

[193] Mr. Kargman's Deposition, 130:12 – 131:19.
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] JX 66.

refused to reimburse her $400 in costs that it had promised.

This Arbitrator finds that Ms. Berger has satisfied the "discriminatory animus" requirement for the Title VII violation.

### BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Ms. Berger claims that:

"Kargo breached Berger's Employment Agreement and modifications thereto[198] and her Options Agreements[199] as well as the implied covenant of good faith and fair dealing by: (1) refusing to pay her earned commissions; and (2) asserting a "for cause" termination and on that basis terminating Berger's vested options and seeking repayment of the retention bonus.

Regarding the breach of contracts, Ms. Berger must prove, by a preponderance of the evidence, the:

1. formation of a contract,

2. performance by [Ms. Berger],

3. breach by Kargo and

4. resulting damage.[200]

To establish a breach of the implied covenant of good faith and fair dealing, Ms. Berger must establish that:

1. Kargo owed her a duty to act in good faith and conduct fair dealing,

2. Kargo breached that duty; and

3. the breach of duty proximately caused her damages."[201]

---

[198] JX 2, 29.

[199] JX 3, 8, 13.

[200] *Genger v. Genger*, 2016 BL 321652, 2 (2d Cir. Sept. 29, 2016) (citing *McCormick v. Favreau*, 82 A.D.3d 1537, 1541 (N.Y. App. Div. 2011).

*Gaia House Mezz LLC* held that the implied covenant of good faith and fair dealing prevents "any party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[202]

There is no credible evidence that Ms. Berger did anything but satisfy all of her obligations to Kargo. On the other hand, as is chronicled above and for those reasons, the evidence confirms that Kargo committed the first material breach of the parties' Employment Agreement and that Kargo acted in bad faith regarding all contracts with Ms. Berger; namely, by labeling her termination as "for cause" when there were no bases, cutting her salary and benefits, denying her the commissions she had earned, and forfeiting her options.

Accordingly, she is entitled to damages for Kargo's breach of contract and the implied covenant of good faith and fair dealing.[203]

### Did Kargo's Failure to Pay Earned Commission Violate New York Labor Law

To establish a violation of NYLL section 193, Berger must establish that:

1. Kargo was Ms. Berger's employer, and
2. Kargo unlawfully made deductions from her earned compensation.[204]

Under NYLL, earned commissions are "wages," and the failure to pay wages, including earned commissions, is an improper deduction under the statute.[205]

---

[201] *Harte v. Ocwen Fin. Corp.*, 2014 BL 260903, 9 (E.D.N.Y. Sept. 19, 2014) (citing *Champagne v. United States*, 2014 WL 1404566, at *9 (N.D.N.Y. Apr. 10, 2014); *In re Tremont Sec. Law, State Law, & Ins. Litig.*, 2013 WL 5393885, 8 (S.D.N.Y. Sept. 26, 2013)(stating elements); *Washington v. Kellwood Co.*, No. 2009 BL 347072, 6 (S.D.N.Y. Mar. 24, 2009) (same).

[202] *Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013).

[203] See *Genger v. Genger*, 2016 BL 321652, 2 (2d Cir. Sept. 29, 2016) (citing *McCormick v. Favreau*, 82 A.D.3d 1537, 1541 (N.Y. App. Div. 2011).

[204] NYLL § 193, *Ryan v Kellogg Partners Inst. Servs.*, 968 N.E.2d 947, 945 (N.Y. 2012).

[205] *Scarpinato v. East Hampton Point Mgmt. Corp.*, 2015 BL 288786,*4 (Sup. Ct. Aug. 14, 2015), *Ryan*, 968 N.E.2d at 945.

60

In the instant case, Kargo failed to pay Ms. Berger $305,121.33 in earned commissions for Quarters 1 and 2 of 2016 – January 1, 2016 through and including May 2, 2016. This amount is undisputed.[206] These commissions were due and owing to her as had been and was at the time Kargo's practice with all of its employees to pay them when their work had been booked and run.[207] Ms. Katz verified this, testifying in her deposition that "Typically they're paid 60 days after the close of a quarter."[208]

Moreover, contrary to Kargo's assertions, those commissions are not subject to forfeiture.[209]

New York law is settled that once a commission is earned, it may not be forfeited.[210] "New York has a longstanding policy against the forfeiture of earned wages."[211] This policy "applies to earned, **uncollected** commissions as well."[212] (Emphasis added.)

Kargo argues that due to Ms. Berger's "for cause" termination, the provision in the parties' Employment Agreement requires her to forfeit her accrued but unpaid commissions. Having determined that her termination was not for cause but rather due to unlawful discrimination, this provision is moot.

Finally, in a 2007 opinion letter addressing commission wages, the New York Department of Labor provided that "failure to pay wages **by reason of termination of employment, whether by resignation** or otherwise, is a violation of [New York Labor Law] § 191(3)."[213] (Emphasis added.)

---

[206] CX 42; Testimony of Ms. Sybesma, Ms. Katz, Mr. Kargman, Ms. Berger.

[207] Ms. Berger's testimony.

[208] Ms. Katz deposition, p. 35.

[209] V.A.3.

[210] *Arbeeny v. Kennedy Exec. Search, Inc.*, 71 A.D.3d 177, 182 (N.Y. App Div, 2010).

[211]*Esmilla v. The Cosmopolitan Club*, 936 F. Supp. 2d 229, 252 (S.D.N.Y. 2013) (citing and quoting *Weiner v. Diebold Group, Inc.*, 568 N.Y.S.2d 959, 961 (N.Y. App. Div. 1991).

[212]*Arbeeny*, 71 A.D.3d at 182.

[213] NYDOL Opinion Letter, April 10, 2007 (available at https://labor.ny.gov/legal/counsel-opinion-letters.shtm).

Kargo further attempts to justify its failure to pay Ms. Berger her earned commissions by arguing that it has a practice of being able to "claw back" or refuse to pay commissions based on it having not yet received the fees from clients on which the commissions are based.

Ms. Berger testified that in her four years of managing sales teams at Kargo she was not aware of a single time in which a commission was withheld or clawed back on the basis of revenue not being received from a client. Nothing in the commission plan allows Kargo to do so and Kargo failed to produce any documentary evidence demonstrating even one instance in which it withheld or clawed back commission compensation.

In fact, the commission plan contradicts Kargo's assertions. The plan states specific dates on which the commissions will be paid. It provides no exceptions:

> Commission amounts paid on same date schedule as 2015 – 60 days after quarter end.
>
> - Q1 2016 paid May 31st, 2016
> - Q2 2016 paid August 31st, 2016
> - Q3 2016 paid November 30th, 2016
> - Q4 2016 paid Feb 28th, 2017

It is undisputed that every employee, other than Ms. Berger, earning commissions for Q1 and Q2 2016 under the plan received them on time in keeping with this payment schedule on a book and run basis.

According to all of the evidence and the law, Kargo's failure to pay Ms. Berger these wages violated NYLL section 193, and Ms. Berger is entitled to damages.

### KARGO'S COUNTERCLAIMS

The lack of validity of all of Kargo's counterclaims has been handled herein above. Thus, they will not be discussed further.

### DAMAGES

Having found that Ms. Berger is entitled to relief on all of her claims, a determination of the amount of her damages is, now, necessary.

Ms. Berger's original estimate in her Demand for Arbitration was $3,000,000. Due to information garnered during discovery, this estimate was revised to approximately $25,000,000 before the Hearing. Based on evidence adduced at the Hearing, it was updated to the present amount of approximately $47,000,000, admittedly, a vast difference.

Kargo argues that Ms. Berger should be limited to her original amount because "defending a $3,000,000 claim is much different from defending a $47,000,000 claim." What was litigated were **claims.** These never changed. Kargo had the same ability as Ms. Berger to estimate damages based on evidence adduced. There was no need for Kargo to rely on Ms. Berger's estimates. Thus, Ms. Berger's recovery will not be limited.

## Commissions and Related Liquidated Damages

### Commissions

Under the commission plan applicable to Ms. Berger, which Kargo issued for 2016,[214] her commissions totaled $305,131.33 for the period of January 1, 2016 through and including May 2, 2016, the day she was put on unpaid leave.[215] She is awarded that amount.

### Liquidated Damages, Fees and Costs

---

[214] CX 10.
[215] Ms. Sybesma, Ms. Katz, Mr. Kargman, and Ms. Berger's testimony.

A failure to pay earned commissions renders the employer liable for mandatory liquidated damages in an amount equal to the amount of commissions it failed to pay.[216] Thus, Ms. Berger is entitled to an additional $305,133.15 in statutory liquidated damages. She is also entitled to attorneys' fees and costs which will be addressed upon her post-Award motion.

## Options

As Ms. Berger urges, she is entitled to recover the value of her stock options on two bases:

1. contractual; and/or
2. statutory because of discrimination, retaliation, and/or an equal pay violation.

Kargo breached its contractual obligations to Ms. Berger when it unlawfully invoked "cause" for terminating her employment, having the effect of precluding her from exercising her stock options.

Stock options were a component of her compensation package. Their value is recoverable as damages under the discrimination, retaliation, and equal pay statutes.[217]

Ms. Berger had, both, vested and unvested stock options. What must be decided is whether she is entitled to recover her unvested options, avoiding undue speculation.

She helped build Kargo from infancy to adulthood. Kargo was her life and her identity. She had enormous success there, enjoying a close working relationship with its CEO. She was paid extremely well – much more there than she could garner anywhere else in the industry doing the same work. Having to go to another employer would mean she would have to start

---

[216] NYLL § 198(1-a); *Walpert v. Jaffrey*, 2016 BL 270608, 8 (S.D.N.Y. Aug. 17, 2016).
[217] *See Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1243 – 44 (10th Cir. 2000).

all over and recreate at least the same successful environment. She had no intentions of doing this. She had invested her money, her time, her reputation, and her expertise in Kargo.

Given the evidence and finding Ms. Berger to be completely credible, this Arbitrator is convinced that but for Kargo's illicit actions, she would have remained at Kargo until the Company is sold. She had full intention to do so, no reason to leave, and every reason to stay until she was able to have the fruits of her labor along with the rest of Kargo's employees. In fact, exiting was "the carrot" she and the other Kargo employee stockholders were working towards, looking forward to, and constantly talking about – "exiting."[218] To that end, approximately six months before the Hearing, Kargo engaged an expert, Mr. Hadi, to provide his opinion, *inter alia*, on the value of the company for the purpose of its "exit."

Given all of the above facts, this Arbitrator finds that Ms. Berger is damaged for the loss of the value of her unvested options, as well as her vested options.

Kargo's actions breached her options contract.

"The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of the breach." [219] "The rule is precisely the same when the breach of contract is nondelivery of shares of stock."[220]

Accordingly, the value of her options must be determined as of the date of constructive discharge – April 11, 2016. Ms. Berger and Kargo are at odds as to what methodology to use to arrive at the value – whether to use the exercise value or the value for which they would likely trade.

---

[218] Ms. Berger's testimony.

[219] *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971), citing *Parker v. Hoppe*, 257 N.Y. 333, 341; *Hoppe v. Russo-Asiatic Bank*, 235 N.Y. 37, 39; 11 Williston, Contracts [3d ed.], § 1339; 25 C. J. S., Damages, § 74, at pp. 850-851; 13 N. Y. Jur., Damages, § 43; Restatement, Contracts, § 329, esp. Comment b; cf. § 338, incl. Comments

[220] *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971).

Kargo contends that the appropriate measure is arrived at by using the 409A methodology which its expert, Carlyn Taylor, used, and Kargo's other expert, Dr. David Lewin, supported. Professor Lewin, acknowledged that he is not a valuation expert and to the extent his report utilized valuation data, it was prepared by people at Ms. Taylor's firm.

Notwithstanding, Kargo's two experts, Ms. Berger's expert, and Misters Modi, Rohrer, and McConville agreed that potential investors and acquirers look at valuing a company based on factors, such as a multiple of its annual revenues, multiple of its EBITDA, multiple of cash flow, etc. Mr. McConville, Kargo's President, was unable to identify any purpose Kargo's 409A valuations serve other than setting the exercise price for stock options granted to employees.[221]

Indeed, Mr. Hellgren, Ms. Berger's expert, testified that in his experience with 409A valuations, he has only seen them used for setting the exercise price of options and that they are skewed towards lower valuations to make the options more attractive to employees.

This makes sense because, since the exercise price is lower than the price expected, if the stock were traded, and it is a popular method for companies to use to attract, motivate, and retain employees who hope to make a significant profit at the time of the stock's sale.

Nevertheless, both of Kargo's experts calculated the options based on 409A values and using data, only, applicable to **publicly** held companies, not to privately held companies, which is Kargo's status. Ms. Taylor was unable to identify an ad tech sector investment, acquisition, or similar transaction in which the stock price in the acquisition was a 409A valuation. **She agreed that private company data would be relevant** but testified that none was available. However, when pressed, she admitted that she had not made any effort to determine whether any private company data was available.

---

[221] Mr. McConville's Deposition, 23:13 – 24:12.

Kargo's two experts, Ms. Berger's expert, and Misters Modi, Rohrer, and McConville agreed that data for *privately* held companies is different from that pertaining to publicly held companies. Obviously, data regarding private companies like Kargo's would be more germane and accurate than that of publically held companies.

Ms. Taylor's opinion is rejected as it is not based on a proper foundation.

Mr. Hellgren has been an executive in the ad tech industry for nearly a decade. For the past two years, he has been the Chief Executive Officer of a technology company. He worked at JumpTap – a mobile advertising company for eight years until end of 2013 as head of operations – part of the leadership team – and ran the ad operations, publishing side, etc. JumpTap was a trail blazer in building an ad platform to show on a mobile.[222] He moved on after it was acquired by Millenial Media, a competitor.

He is the only witness who testified to having personal experience concerning an acquisition in the ad tech industry – the acquisition of JumpTap. He submitted that the valuation used for that acquisition was a multiple of the annual revenues projected for JumpTap at the time of the acquisition, not its most recent 409A valuation.

He is the only expert to have provided recent market data published by Business Insider regarding the valuations of **privately** held ad tech companies in recent market transactions.[223] That data shows the valuation trend in the privately held ad tech industry for the last 12 months to be 6 times annual revenues; i.e., a multiple of 6X.[224] This evidence is unrebutted.

For the reasons above, this Arbitrator accepts Mr. Hellgren's opinion and valuation methodology.

---

[222] Mr. Hellgren's testimony.
[223] CX 50.
[224] CX 50, p 15.

To calculate the amount of damages necessary to compensate Ms. Berger for her lost options, four factors must be applied:

1. the fair market value of Kargo stock;

2. the exercise price of Berger's options;

3. an appropriate discount rate for lack of marketability; and

4. the number of options subject to the calculation, e.g., all unvested options, all options whether vested or unvested.

Kargo retained consultant, John Hadl, a widely sought-after consultant with a profound expertise in ad tech valuation and related transactions such as acquisitions and mergers.[225] Evidence adduced reveals that he had been involved in some of the largest acquisitions in the industry; Kargo had asked him to provide his opinion on Kargo's valuation, *inter alia*, to aid Kargo in its "exit" strategy; any it paid him $10,000 per month for his expertise and opinion. Notwithstanding, Kargo does not use his opinion in the instant matter, but rather, it presents Ms. Taylor's who did not use private company data and who presents a much lower value and a very different methodology for valuation from Mr. Hadl's. Kargo could have had Mr. Hadl testify by video if necessary to modify his opinion, if he could, but it chose not to call him and did not offer any reasons that prevented him from testifying. This gives rise to an adverse inference.[226] Furthermore, Ms. Taylor ignores Mr. Hadl's opinion but does not offer an explanation why Mr. Hadl's opinion on valuation should be marginalized.

Misters Rohrer, McConville, Kargman, and Modi testified that Mr. Hadl's opinion, six months earlier, was that Kargo's market value is in the range of $150M to $450M.

Mr. Hellgren testified that Mr. Hadl is "highly respected," and everyone knows him in the industry because he is the "Godfather."

---

[225] Mr. Rohrer's testimony.
[226] *People v. Kitching*, 78 N.Y.2d 532, 536 (1991).

Ms. Berger offers that $400 million is a fair valuation given: the credible evidence adduced; that it is at the mid-point of the latest market data;[227] and it is within the valuation Mr. Hadl provided, albeit near the top of his range.

To arrive at a price per share, the $400M is divided by the number of outstanding shares in the company which is 6,000,100. Mr. McConville testified that this is the correct number of outstanding shares, and both the 2015 409A valuation and Ms. Taylor's valuation rely on this number.[228] This yields a per price share of $66.66.

The next step is to discount that price per share by an appropriate discount percentage to reflect lack of marketability. All of Kargo's 409A valuations and Ms. Taylor's valuation utilized a 30% discount rate. Utilizing that rate, the discounted price per share is $46.66. This figure is multiplied by the number of shares. Ms. Berger's vested and unvested shares at the time of her termination were 200,000. The resulting figure is $9,332,000 which is the "Discounted Option Value."

Next, subtract the exercise price Ms. Berger would have had to pay to exercise the option. This is determined by multiplying the number of shares granted in each option grant by the exercise price of the applicable option grant. The result is $470,000.

The final step is to subtract the exercise price from the Discounted Option Value equaling $8,862,000.

**Back Pay and Front Pay**

Given the findings of discrimination and retaliation, Ms. Berger is entitled to recover

---

[227] Mr. Hellgren's testimony.
[228] RX 97.

back pay and front pay.[229]

Back pay is the value of wages and benefits she would have earned between the time she was placed on unpaid leave and the date of an Award. Front pay is the difference in salary benefits she would have earned at Kargo versus what she is receiving in her current employment.[230]

An award of front pay is within the factfinder's discretion.[231] The *Reed v. A.W. Lawrence & Co.* court found that front pay is proper "where reinstatement is inappropriate and the plaintiff has been unable to find another job, in order to make victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no **reasonable** prospect of obtaining **comparable** alternative employment'" and that a factfinder has wide latitude in determining the appropriate amount.[232] (Emphasis added.) Front pay is "the difference in the benefits and salary Plaintiff would have received at Defendant and what [he/she] is earning and receiving in [his/her] current employment."[233]

Factors that are considered in determining the amount of back pay and front pay due Ms. Berger, are:

1. the value of the wages and benefits Ms. Berger would have received at Kargo had she not been placed on unpaid leave and her employment terminated;

2. the date through which it is reasonably certain to take her to attain employment at a compensation comparable to that which she earned at Kargo;

3. the mitigation offset, i.e., the amount she will earn from new employment over that same period; and

---

[229] *United States v. Burke*, 504 U.S. 229 at 238, 58 FEP 1323 (1992); *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371 at 374 – 75; *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996).
[230] *Burke*, 504 U.S. at 238; *Reed*, 95 F.3d at 1182 (2d Cir. 1996).
[231] *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993), cert. denied, 510 U.S. 1164(1994)," quoted in *Reed v. A. W. Lawrence Co*, 95 F.3d 1170, 1177 n.7 (2d Cir. 1996).
[232] 95 F.3d 1170, 1182 (2d Cir. 1996).
[233] James Publishing, Inc., Federal Employment Jury Instructions, §1:1290.

4. a method to discount the front pay portion to present value.

**Value of Wages & Benefits**

The value of her lost options is discussed above. In addition to that loss, she no longer has the benefit of the 401k employer match Kargo provided; namely, an annual match of $10,600.

Regarding the value of her cash compensation loss, the evidence establishes that: Ms. Berger's earnings grew substantially for each year she worked at Kargo; she had always achieved, if not exceeded her quotas; and she was on track in meeting her quotas for 2016 – her commission earnings through the end of April were already $305,133. Continuing at this level of production, at 100% of her assigned quota for 2016, she would have received $562,000. In other words only one month into the second quarter, she had already achieved more than 50% of her *annual* quota. Thus, it is reasonable to assume and more probable than not that her earnings would have continued to grow each year she remained at Kargo. Notwithstanding, Ms. Berger limits her damage demand by assuming that her earnings for 2016 and beyond would have remained at the same level as her 2015 earnings. They were $1,084,037.30.

Adding this value to her 401k match yields $1,094,637.30 per year or $91,219.77 per month – the "Unmitigated Monthly Wage/Benefit Amount."

**The Time It Will Take Ms. Berger To Attain Comparable Employment – Front Pay**

Mr. Kargman testified that he believes that "Kargo pays people better than any other company in the industry." This was also Ms. Berger's experience when she searched for jobs.

Turning to case law for guidance to determine a reasonable time period for front pay in Ms. Berger's case, *Padilla v. Metro-North Commuter R.R.*[234] affirmed a front pay Award for 20+ years; *Buckley v. Reynolds Metals Co.*[235] allowed nine years; *Meacham v. Knolls Atomic Power Lab*[236] approved Awards for 9, 10, 12, and 12.5 years for four employees.

Notwithstanding, these protracted front pay periods affirmed by courts, Ms. Berger suggests that she be compensated for only five years beyond the date of this Award.

In considering Ms. Berger's suggestion, this Arbitrator took into account the following evidence:

1. The testimony of Misters Kargman, Rohrer, and McConville that Kargo's sales force was paid **above market**;

2. Professor Lewin, the expert retained by Kargo, was unable to provide any data showing that there are comparable jobs with comparable compensation available for Ms. Berger;

3. After realizing that she would not be able to return to her position at Kargo, Ms. Berger explored alternative, "comparable" employment possibilities with a number of employers in the industry to no avail. It was after this search that she accepted the opportunity at Emogi where she earns much less than she did at Kargo; and

4. It took Ms. Berger four years to accomplish the income level she had at Kargo when she was terminated and it paid its sales force above the market,

Accordingly, this Arbitrator finds that Ms. Berger has met her burden of proof for entitlement to front pay and that a five years period is more than reasonable under these facts.

---

[234] 92 F.3d 117, 126 (2d Cir. 1996).
[235] 690 F. Supp. 211, 216 (S.D.N.Y. 1988).
[236] 381 F.3d 56, 78 (2d Cir. 2004).

These damages are calculated by Multiplying the Unmitigated Monthly Wage/Benefit Amount of $91,219.77 by the 71 months between May of 2016, when Kargo stopped paying her, and May 31, 2022, the end of the front pay period. This yields the total unmitigated wage/benefit damages of $6,476,603.60.

This amount must be offset by an amount Ms. Berger will reasonably earn during the same period. She had no income from May 2, 2016 through late August 2016, when she started working for Emogi. Her salary at Emogi is $300,000 with an opportunity to earn up to an additional $200,100 in commission compensation.[237] Ms. Berger testified that Emogi is not presently generating revenue, and because a contract did not come to fruition, revenue originally projected to commence in early 2017 is now delayed. Ms. Berger did not earn any commission compensation from Emogi for 2016.[238] Accordingly, her projected Emogi salary and commission earnings for 2017 more probably than not will not exceed $400,000. Giving Kargo the benefit of the doubt, assuming Emogi and Ms. Berger excel in 2018 and beyond, her annual earnings would be $500,100, as well as a guaranteed $50,000 bonus. Thus, that amount is added to the offset amount. In addition, Ms. Berger suggests factoring in an increase in her Emogi earnings of $25,000 for each of the years from 2019 to 2022. This suggestion is accepted.

Accordingly, the Unmitigated Monthly Wage/Benefit Amount of $91,219.77 should be offset by Ms. Berger's Emogi earnings. This yields $3,623,706.20.

### Discounting Front Pay Portion to Present Value – 2% Year-By-Year

As of May 31, 2017, $898,357.03 would be the back pay which is not subject to discounting to present value. The remaining $2,725,349.17 is subject to a 2% discount on a year-by-year basis[239] which comes to $2,673,265.51. This front pay is added to the back pay of

---

[237] JX 98.
[238] Ms. Berger's testimony.
[239] *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 746-748 (2d Cir. 1988).

$898,357.03 for a total mitigated, discounted back pay and front pay award of $3,571,622.54.

In anticipation of an Award as of May 31, 2017, Ms. Berger submitted charts in her "Exhibit B Updated Damages For May 31, 2017" document. This provides the step by step calculations for all of the totals above. This Arbitrator accepts those calculations and the methodology behind them, incorporates them into this Award by reference, and attaches the charts to the Award as "AWARD EXHIBIT A."

**Equal Pay Liquidated Damages**

"Liquidated damages may be up to three hundred percent of the total amount of the wages found to be due for a willful violation of section one hundred ninety-four of this article."[240]

Having found that Ms. Berger satisfied her burden of proof for an equal pay violation and that Kargo's violation was willful, this Arbitrator finds that she is entitled to liquidated damages in an amount equal to 300% of the total amount of damages found to be due under New York law.

Her unpaid commissions were $305,133.15; her options are valued at $8,862,000. Adding these two figures and multiplying by 300% equals $27,501,399.

**Liquidated Damages for Retaliation**

Having also prevailed on her retaliation claim, Ms. Berger is entitled to $20,000 as liquidated damages.[241]

---

[240] NYLL § 198(1-a).

[241] New York Labor Law § 215; *Antolino v. Distribution Mgmt. Consolidators Worldwide, LLC*, 2013 BL 208006, 5 (N.Y. Sup. Ct. Aug.02, 2013).

## Emotional Distress

Ms. Berger is entitled to receive damages for emotional distress.[242] In addition to the facts above which reveal how she was treated by Kargo, she testified that, essentially, she was devastated by its treatment, as well as by losing her position, her livelihood, and by having to relocate from her home place in Chicago where her family lives to New York. She suffered from sustained insomnia, nausea, stress, and severe depression. Her depression was so severe, she rarely left her house the month she was on leave.

Evidence also shows that she felt betrayed and humiliated by Kargo's placing her on involuntary leave to the point that she asked Ms. Sybesma to tell her teams that she was on a vacation.

It bears repeating that, beginning on February 17, 2016 at the New York meeting and throughout the entire process, Kargo's handling of her and her termination were a collaborative orchestration carried out in the most malicious, insidious, humiliating manner. Furthermore, during her tenure, Kargo constantly sent her mixed messages – praising her one minute, holding her up to the company as a model to emulate and giving her a $100,000 bonus to "incentivize" her to continue doing what she had been doing and the next minute, blindsiding her – telling her that some unidentified person had said working with her was like being in an abusive relationship.

Before her official termination, they moved her things out of her office which was obviously visible to all at Kargo. Mr. Rohrer confirmed that she did not have to vacate her office in Chicago to do the new job.[243] Given his hostile attitude towards Ms. Berger, it can be inferred that having her vacate was done purely to further denigrate her. Remembering his remark: it is "hard to hear that she will be allowed to return, even in a role that stripped title,

[242] *Dotson v. City of Syracuse*, 2011 BL 53682, 15 (N.D.N.Y. Mar. 02, 2011).
[243] Mr. Rohrer's testimony; see also his deposition, p.128. L 4.

pay, sales, etc."

Being labeled "abusive" was, especially, hurtful to Ms. Berger. It was later discovered that the person who supposedly initially made this remark did not even work with her and had been terminated by Kargo about which she was upset.[244]

Never being given specifics of who was complaining and exactly what the complaints were, she was not able to defend herself against the allegations above. Instead of providing this information, again, Kargo, gave her mixed messages. First, it placed her on a PIP giving her a chance to "remedy" the situation, on which she immediately began working. Then, just days later, it rescinded that and put her on involuntary leave for a month, keeping her "in the dark" for the month; and it cut-off her email access. After a month, it gave her an ultimatum – take a shameful demotion or you are terminated. When she refused, it refused to pay her over $300,000 in earned commissions. She was counting on this amount as she was building a new house in Chicago, which Kargo knew about. With no justifiable legal reason, it portrayed her termination as one "for cause" about which company employees became aware. When Kargo discovered she was seeking a new job at Emogi, it advised her that her right to her options was forfeited – no job, no salary, no commissions, no options. She had to start all over to build a successful environment for herself.

At every turn, Kargo did its best to "choke off" her attempts to move on and to support herself. She was scared of losing her savings and her home.[245]

Throughout this drawn-out trauma, she had to deal with knowing that she had been branded as a malevolent force inside the company she helped build and that people she had defended, advocated for, and thought were her friends, betrayed her in favor of the company they still work for and labeling her a "bully" for doing an act of kindness for them.

---

[244] Ms. Katz's testimony.
[245] Ms. Berger's testimony.

Her "insomnia, depression, sustained physical nausea, stress," are understandable under these circumstances and completely credible.

The challenge is how to quantify the damage Kargo's unlawful actions caused.

As guidance, Ms. Berger offers, *inter alia, Thorsen v. County of Nassau*[246] which revised a $1,500,000 award to $500,000, and *Phillips v. Bowen*[247] which upheld a judgement of $400,000. Accordingly, Ms. Berger submits that, in her case, $650,000 would be a reasonable award.

*Thorsen* provides a framework for categorizing and measuring emotional distress damages. It specifies, in pertinent part, that:

> Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant and egregious. In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration. Garden variety emotional distress claims generally merit $30,000 to $125,000 awards.

> Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. Finally, egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff. In significant or egregious cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

> In *Rainone,* the court found $175,000 in compensatory damages was excessive even though the plaintiff's emotional distress was "more than mere 'garden variety.'"[248] The court was persuaded by the fact that "there was **no evidence of physical manifestations**

---

[246] 722 F. Supp. 2d 277, 294, 2010 BL 149202, 14 (E.D.N.Y. 2010).

[247] 278 F.3d 103, 111-12 (2d Cir. 2002).

[248] *Rainone v. Potter,* 388 F. Supp.2d 120 (E.D.N.Y. 2005) (Cited in *Thorsen, supra*).

of emotional distress or debilitating alterations in lifestyle, and no evidence of permanency," and thus found that an award of $50,000 was appropriate.[249] (Emphasis added.)

Thorsen was seen by a psychologist for his depression and anxiety for six months, twice a week and continued to have therapy for about a year and a half. He was prescribed Celexa and Wellbutrin. "The psychologist testified in detail about his emotional state . . . ."[250]

The evidence also showed that "Thorsen became detached from his family and co-workers."[251] Most significantly, Dr. Bayer testified that Thorsen suffered "from what he termed a 'major stress attack' in February 2001 that required hospitalization."[252]

This court found that Thorsen's emotional distress damages are properly categorized as significant rather than merely garden-variety."[253]

*Phillips v. Bowen*[254] upheld a $400,000 judgment. In that case,

Plaintiff submitted evidence of ongoing harassment by each defendant over a five-year period. Phillips and her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships. Phillips' co-workers testified about the deterioration they observed in Phillips. Other less direct indicia of plaintiff's damages came from the defendants themselves, who unapologetically described their treatment of plaintiff. (Citations omitted).

In the instant case, given the case law above, the suggested award of $650,000 would most appropriately be awarded if the emotional distress were categorized as "egregious." While completely credible, *inter alia*, the only evidence Ms. Berger presented was her own;

---

[249] *Id. at 126.*
[250] *Thorsen v. County of Nassau, supra.*
[251] *Id.*
[252] *Id.*
[253] *Id.*
[254] 278 F.3d 103.

there was no testimony from friends, co-workers, or health care professionals, no hospitalization, no medication, and no evidence of debilitating and permanent alterations in lifestyle. Accordingly, the evidence she presented does not rise to legal standard of significant or egregious.

Given these guidelines, this Arbitrator finds that the evidence of her emotional distress falls within the "garden variety" and awards $60,000.

**Punitive Damages**

Ms. Berger offers *Luciano v. Olsten Corp.* for guidance.

That court provided that punitive damages are applicable when a plaintiff proves that a defendant discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."[255] The *Zakre v. Norddeutsche Landesbank Girozentrale*[256] court is in agreement with *Luciano* and awarded punitive damages under the NYCHRL.

"In *Kolstad v. Am. Dental Ass'n,*[257] the Supreme Court explained that the terms 'malice' and 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law. The Court stated that to be liable for punitive damages under Section 1981a, 'an employer must at least discriminate in the face of a perceived **risk** that its actions will violate federal law to be liable in punitive damages.'" (Citations omitted. Emphasis added).

In the instant case, there is significant evidence of unlawful complicity motivated by malice, stemming from the very top – Mr. Kargman, the Chief Executive Officer, Mr. McConville, the President and Chief Operating Officer, Mr. Rohrer, the Chief Strategy Officer, and Ms. Sybesma, the Vice President of Human Resources. Even though it is widely known by the lay

---

[255] *Luciano v. Olsten Corp.,* 110 F.3d 210, at 220 (2d Cir. 1997).
[256] 541 F. Supp. 2d 555, 102 FEP Cases 1320 (S.D.N.Y. 2008).
[257] 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (Cited in *Zakre v. Norddeutsche Landesbank Girozentrale, supra*).

people that it is unlawful to discriminate based on sex and double standards, giving Kargo every benefit of the doubt, it had counsel to advise it and, certainly, should have known the risk when it took the unlawful actions it took.

The evidence supports Ms. Berger's experience that "the executive team is a boy's club."[258]Although the initial discriminatory efforts were driven and motivated by Mr. McConville's and Mr. Rohrer's resentment and jealousy of her, about which Mr. Kargman knew, Mr. Kargman participated and permitted the unlawful behavior. When a CEO's top producer is being targeted in this manner, common and business sense dictate that he should thoroughly investigate what is really going on before taking such drastic actions. Instead, Mr. Kargman:

1. accepted Misters McConville's and Rohrer's speculation that there would be "large scale mutiny" without checking it out;

2. did not question his managers for full disclosure of details despite his strong praise of Ms. Berger just three weeks earlier, which he obviously thought was warranted, when their mission was to assemble "evidence" against her rather than do an unbiased investigation in search of the truth;

3. did not require a fair and proper investigation for complaints against her or for her complaint of sexual discrimination;

4. did not vet the so-called witnesses Mr. McConville and Mr. Rohrer had collected nor even inquire as to why more people were not questioned before taking such a drastic action against his top producer;

5. did not provide Ms. Berger with an opportunity to defend herself, even, in the New York meeting in which he was present. Instead, he permitted Mr. Rohrer to insult her;

6. did not question the "findings" and actions of his managers, whom he knew to have animosity towards her;

7. retaliated against her and ordered that she not be paid her earned commissions;

---

[258] Ms. Berger's testimony.

8. labeled her termination as "for cause" intending its detrimental consequences to her, knowing that his "reasons" were false and not physically possible under the timeline of events.

For these reasons and for all the **clear and convincing** evidence detailed herein above, the elements for punitive damages have been satisfied. The purpose of punitive damages is to deter the employer from engaging in the wrongful conduct again.[259]

In this regard, Ms. Berger suggests that "a punitive award should be equal to no less than 5% of Kargo's 2016 annual revenues ($6,750,00). It is an amount likely to get the attention of Kargo's executives, i.e., send the message that conduct such as that engaged in here will lead to material financial impact."

In *Luciano*, the court reduced the jury's punitive damages award from $5,000,002 to $300,000, pursuant to the statutory cap under 42 U.S.C. § 1981a(b)(3)(D). While it is true that there is no cap for compensatory and punitive damages under NYCHL, in determining the appropriate amount of punitive damages, this Arbitrator is guided by the wisdom of the principle expressed in *Luciano*; namely, the purpose of punitive damages is to deter the employer from engaging in the same wrongful conduct in the future but **not to cause it financial ruin**.

Ms. Berger's equal pay liquidated damages award of 300% of her total damages – $27,501,399 – along with anticipated attorney fees and costs, should send the "message that conduct such as that engaged in here will lead to material financial impact" but will not lead to financial ruin.

However, since punitive damages are warranted, Ms. Berger is awarded an additional $300,000.

**Attorneys' Fees and Cost**

---

[259] *Luciano*, 110 F.3d at 221.

Ms. Berger has noted correctly that her "causes of action also entitle her to an award of her reasonable attorneys' fees and costs.[260] An award of reasonable fees to a prevailing plaintiff for an Equal Pay Act claim is mandatory.[261]

## AWARD

In arriving at this AWARD, this Arbitrator has considered all of Kargo's arguments on all issues in the context of pertinent legal authorities in the instant matter and found them to be without merit.

I, the **UNDERSIGNED ARBITRATOR**, having been duly designated and sworn, and having duly heard the proofs and allegations of the parties, do hereby, Award, as follows:

1. Claimant is awarded $305,131.33 for her commissions from January 1, 2016 through and including May 2, 2016;

2. Claimant is awarded Liquidated damages pursuant to NYLL § 198(1-A) in the amount of $305,133.15;

3. Claimant is awarded $8,862,000 for the value of lost vested and unvested options;

4. Claimant is awarded $3,571,622.54 for back pay and front pay;

5. Claimant is awarded $27,501,399 for Equal Pay Liquidated Damages;

6. Claimant is awarded $20,000 for NYLL § 215 as liquidated damages for retaliation;

7. Claimant is awarded $60,000 for emotional distress damages;

---

[260] 42 U.S.C. § 2000e-5(k); N.Y. Exec. Law § 297.10.
[261] 29 U.S.C. § 216(b); *Eddleman v. Switchcraft*, Inc., 927 F.2d 316, 317, 55 FEP 483 (7th Cir. 1991); *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 86, 33 FEP 977 (2d Cir. 1983); *Herndon v. William A. Straub, Inc.*, 17 F. Supp. 2d 1056, 1065 (E.D. Mo. 1998).

2. Claimant is awarded Liquidated damages pursuant to NYLL § 198(1-A) in the amount of $205,133.15;

3. Claimant is awarded $8,862,000 for the value of lost vested and unvested options;

4. Claimant is awarded $3,571,622.54 for back pay and front pay;

5. Claimant is awarded $27,501,399 for Equal Pay Liquidated Damages;

6. Claimant is awarded $20,000 for NYLL § 215 as liquidated damages for retaliation;

7. Claimant is awarded $60,000 for emotional distress damages;

8. Claimant is awarded $300,000 for punitive damages.

9. Claimant may retain her $100,000 bonus.

10. All of Respondent's claims are expressly denied.

11. Claimant is given two weeks from the date she receives this Award to move for attorney fees and costs. Kargo is given two weeks from receipt of Claimant's Motion to provide a response, if any.


This Award is in full settlement of all claims/counterclaims submitted to this arbitration, except for attorney fees and costs. All claims/counterclaims not expressly granted herein are hereby denied with prejudice.

May 31, 2017
**DATE**

*Billie Colombaro*

**Hon. Billie Colombaro (ret.), Arbitrator**