UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

In the Matter of Arbitration between,

ALEXIS BERGER,

                 Petitioner,

           -and-

KARGO GLOBAL, INC.,

              Respondent.

----------------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 17-cv-04288 (RA)


**RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION
TO THE PETITION TO CONFIRM AND IN SUPPORT OF ITS
<u>MOTION TO VACATE OR MODIFY THE ARBITRATION AWARD</u>**


WACHTELL, LIPTON, ROSEN & KATZ

Herbert M. Wachtell
S. Christopher Szczerban
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
*Attorneys for Respondent Kargo Global, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS AND PROCEEDINGS ........................................2

    A.    Kargo and its business ....................................................... 3

    B.    Petitioner excels at sales becoming Kargo's highest paid employee..................... 3

    C.    Petitioner repeatedly recognized her problems as a manager. ............................... 4

    D.    Kargo attempts to intervene. .................................................. 6

    E.    Petitioner rejects Kargo's efforts and joins a company it deems its competitor. ........................................................................ 7

    F.    Petitioner rushes to arbitration. .............................................. 9

    G.    The flawed arbitration award. ................................................ 10

ARGUMENT ..............................................................................10

POINT I    THE ARBITRATOR MANIFESTLY DISREGARDED SETTLED NEW YORK AND FEDERAL LAW. ...............................12

    A.    The New York Labor Law simply does not apply to Petitioner, an Illinois employee. ................................................. 13

    B.    Options are not "wages" covered by the New York Labor Law. ......................... 18

    C.    No equal pay damages with respect to the options are available under federal or state law, as Petitioner's termination was not a "pay" decision. .......... 21

POINT II    THE ARBITRATION WAS FUNDAMENTALLY UNFAIR BECAUSE THE ARBITRATOR EFFECTIVELY EXCLUDED RESPONDENT'S EVIDENCE..................................................26

POINT III    THERE ARE SERIOUS QUESTIONS OF (1) EVIDENT PARTIALITY ON THE PART OF THE ARBITRATOR; (2) WHETHER THE ARBITRATOR WAS QUALIFIED TO SIT; (3) AND WHETHER THE ARBITRATOR WAS GUILTY OF "MISBEHAVIOR" .......................36

CONCLUSION..........................................................................39

# TABLE OF AUTHORITIES

<u>Cases</u>

*Avis Rent A Car Sys., Inc.* v. *Garage Employees Union*,
791 F.2d 22 (2d Cir. 1986) ................................................................................................ 38

*Aviall, Inc.* v. *Ryder System, Inc.*,
110 F.3d 892, 895-96 (2d Cir. 1997) ........................................................................ 38 n.**

*Barrett* v. *Forest Laboratories, Inc.*,
39 F. Supp. 3d 407 (S.D.N.Y. 2014) ................................................................................ 25

*Burnett* v. *Physicians' Online, Inc.*,
1997 WL 470136 (S.D.N.Y. Aug. 15, 1997) ................................................................ 17 n.*

*Capo* v. *Bowers*,
2001 WL 36193449 (S.D.N.Y. Mar. 12, 2001) .......................................................... 12, 18

*Cofinco, Inc.* v. *Bakrie & Bros., N.V.*,
395 F. Supp. 613 (S.D.N.Y 1975) ................................................................................... 27

*Counihan* v. *Allstate Ins. Co.*,
194 F. 3d 357 2d Cir. 1999) ............................................................................................. 27

*DiRussa* v. *Dean Witter Reynolds Inc.*,
121 F.3d 818 (2d Cir. 1997) ...................................................................................... 12, 26

*Doron Precision Sys., Inc.* v. *FAAC, Inc.*,
423 F. Supp. 2d 173 (S.D.N.Y. 2006) .......................................................................... 2 n.*

*Duferco Int'l Steel Trading* v. *T. Klaveness Shipping A/S*,
333 F.3d 383 (2d Cir. 2003) ............................................................................................ 12

*Econn* v. *Barclays Bank PLC*,
2010 WL 9008868 (S.D.N.Y. June 10, 2010) .................................................................. 20

*Faragher* v. *City of Boca Raton*,
524 U.S. 775 (1998) ........................................................................................................ 28

*Gilman* v. *Marsh & McLennan Companies, Inc.*,
868 F. Supp. 2d 118 (S.D.N.Y. 2012), *aff'd,* 654 F. App'x 16 (2d Cir. 2016) ........................ 20

*Grabovac* v. *All-State Ins. Co.*,
2004 WL 3583989 (E.D. Mo. Sept. 23, 2004) ................................................................. 25

*Grant* v. *Gen. Motors Corp.*,
908 F.2d 1303 (6th Cir. 1990) .................................................................................... 23, 25

*Greene* v. *Safeway Stores, Inc.*,
210 F.3d 1237 (10th Cir. 2000) ....................................................................................... 19

*Guiry* v. *Goldman, Sachs & Co.*,
814 N.Y.S.2d 617 (1st Dep't 2006) ...................................................................... 19, 20, 21

*Guy* v. *MTA New York City Transit*,
2016 WL 8711080 (E.D.N.Y. Sept. 23, 2016) ................................................................ 2 n.*

*Halligan* v. *Piper Jaffray, Inc.*,
148 F.3d 197 (2d Cir. 1998) .................................................................... 13, 14, 21

*Hammell* v. *Paribas*,
1993 WL 426844 (S.D.N.Y. Oct. 22, 1993).......................................... 14, 17 n.*

*Hein* v. *Oregon Coll. of Educ.*,
718 F.2d 910 (9th Cir. 1983) ................................................................................ 22

*Hoffman* v. *Parade Publ'ns*,
15 N.Y.3d 285 (2010).......................................................... 13, 14, 15 & n.*, 16

*Hoteles Condado Beach* v. *Union de Tronquistas Local 901*,
763 F.2d 34 (1st Cir. 1985)............................................................................ 27, 36

*In re Stage Presence Inc.*,
559 B.R. 93 (Bankr. S.D.N.Y. 2016)................................................................... 16

*In re T.H. Richards Processing Co.*,
910 F.2d 639 (9th Cir. 1990) ............................................................................... 27

*Jock* v. *Sterling Jewelers, Inc.*,
143 F. Supp. 3d 127 (S.D.N.Y. 2015), *vacated on other grounds*, 2017 WL
3127243 (2d Cir. Jul. 24, 2017) .................................................................... 10, 18

*Kassman* v. *KPMG LLP*,
925 F. Supp. 2d 453 (S.D.N.Y. 2013) ........................................................ 14 n.*, 16

*Klock* v. *Lehman Bros. Kuhn Loeb Inc.*,
584 F. Supp. 210 (S.D.N.Y.1984) ................................................................. 17 n.*

*Konkar Maritime Enters.* v. *Compagnie Belge D'Affretement*,
668 F. Supp. 267 (S.D.N.Y. 1987) ............................................................... 27, 37

*Krock* v. *Lipsay*,
97 F.3d 640 (2d Cir. 1996) ............................................................................ 17 n.*

*Lopez-Mendez* v. *Lexmark Int'l, Inc.*,
680 F. Supp. 2d 357 (D.P.R. 2010)...................................................................... 23

*Magnuson* v. *Newman*,
2013 WL 5380387 (S.D.N.Y. Sept. 25, 2013)............................................... 14 n.*

*Matter of Pitchford* v. *State of New York*,
268 AD.2d 286 (1st Dep't 2000) ........................................................ 8 n.*, 24 n.*

*Mitchell* v. *Developers Diversified Reality Corp.*,
2010 WL 3855547 (E.D. Tex. Sept. 8, 2010)............................................... 22, 26

*Moehle* v. *Mineta*,
EEOC DOC 01A51030 (E.E.O.C.), 2005 WL 1903531 (2005)...................... 22, 25

*Move, Inc.* v. *Citigroup Global Markets*, Inc.,
840 F.3d 1152 (9th Cir. 2016) ........................................................................ 38-39

*Neary* v. *Prudential Ins. Co. of Am.*,
63 F. Supp. 2d 208 (D. Conn. 1999)..................................................................... 21

*O'Neill* v. *Mermaid Touring, Inc.*,
 968 F. Supp. 2d 579 (S.D.N.Y. 2013) ........................................... 14 n.*

*Plymack* v. *Copley Pharm., Inc.*,
 1995 WL 606272 (S.D.N.Y. Oct. 12, 1995) ................................... 17 n.*

*Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*,
 497 F.3d 133 (2d Cir. 2007) ...................................................... 11, 18

*Price* v. *N. States Power Co.*,
 664 F.3d 1186 (8th Cir. 2011) ......................................................... 23

*Rice* v. *Scudder Kemper Invs, Inc.*,
 2003 WL 21961010 (S.D.N.Y. Aug. 14, 2003), *aff'd sub nom. Rice* v. *Wartsila NSD Power Dev., Inc.*, 183 Fed. App'x 147 (2d Cir. 2006) ..................... 16, 17

*Sperry Int'l Trade, Inc.* v. *Gov't of Israel*,
 689 F.2d 301 (2d Cir. 1982) ........................................................... 10

*Sphere Drake Ins. Ltd.* v. *All Am. Life Ins. Co.*,
 307 F.3d 617 (7th Cir. 2002) ...................................................... 40 n.**

*T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*,
 592 F.3d 329 (2d Cir. 2010) ........................................................ 11, 12

*Talwar* v. *Staten Island Univ. Hosp.*,
 610 F. App'x 28 (2d Cir. 2015) ................................................... 22 n.*

*Teamsters, Charuffeurs, Warehouseman, and Helpers, Local Union No. 506* v. *E.D. Clapp Corp.*,
 551 F. Supp. 570 (N.D.N.Y. 1982) .................................................. 27

*Tempo Shain Corp.* v. *Bertek, Inc.*,
 120 F.3d 16 (2d Cir. 1997) ........................................................ 11, 27

*Truelove* v. *Ne. Capital & Advisory, Inc.*,
 95 N.Y.2d 220 (2000) ...................................................................... 19

*Warman* v. *Am. Nat'l Standards Inst.*,
 2016 WL 3676681 (S.D.N.Y. July 6, 2016) ......................... 13-14, 16, 17

*Webber* v. *Mut. Life Ins. Co. of N.Y.*,
 731 N.Y.S.2d 447 (1st Dep't 2001) ............................................ 14 n.*

*Westerbeke Corp.* v. *Daihatsu Motor Co., Ltd.*,
 304 F.3d 200 (2d Cir. 2002) ........................................................... 13

Statutes, Rules, and Regulations

29 C.F.R. § 1620.10 ................................................................. 19 n.*

29 C.F.R. § 1620.27 ................................................................. 22, 24

29 U.S.C. § 206(d) ................................................................. 21-22

29 U.S.C. § 216 ...................................................................... 21, 25

29 U.S.C. § 260 ...................................................................... 21, 25

775 ILCS 5/8A-104 ................................................................................................ 18 n.*

820 ILCS 112/30 .................................................................................................. 18 n.*

9 U.S.C. § 5 ............................................................................................................ 38

9 U.S.C. § 10 ...................................................................................... 11, 12, 27, 38, 39

9 U.S.C. § 10(a)(2) ................................................................................................. 38

9 U.S.C. § 10(a)(3) ..................................................................................... 11, 27, 39

9 U.S.C. § 10(a)(4) .................................................................................................. 11

NYLL § 190 ................................................................................... 15 n.*, 19 n.*

NYLL § 194 ............................................................................ 15 n.*, 20 n.*, 22 n.*

NYLL § 198(1-a) ............................................................................... 13, 14 n.*

NYLL § 200 .......................................................................................... 14 n.*

NYLL § 240(1) ..................................................................................... 14 n.*

NYLL § 241(6) ..................................................................................... 14 n.*

Other Authorities

Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 19-4-1
    (C. Geoffrey Weirich, ed., 5th ed. 2012) ................................................ 22

Respondent Kargo Global, Inc. respectfully submits this memorandum of law in support of its motion to vacate or modify the arbitration award entered on May 31, 2017 (the "Award"), and in opposition to Petitioner Alexis Berger's petition to confirm the Award.

## PRELIMINARY STATEMENT

Petitioner held a combined managerial and sales position with Respondent. She oversaw the company's Midwest and West Coast sales teams and headed its Chicago and LA offices. She was highly successful in her sales role: her combined salary plus commissions totalled more than any other person at the company, including the CEO. Understandably, it is uncontroverted that she was a favorite of the CEO.

But there was a less happy side to Petitioner's performance. For over a year, female subordinates complained strongly about her management style, including unprofessional and abusive conduct. Repeatedly, in writing, she acknowledged her management failings.

When Petitioner failed to improve and two key salespersons (both female and her direct reports) threatened to quit, the company had no choice but to reassign her to a non-managerial role. It chose one in which she could continue to succeed using her sales attributes.

For months, she adamantly refused to accept the new position. Ultimately, her at-will employment was terminated by the company. And Petitioner turned this state of facts into an employment claim of sexual discrimination that was accepted wholesale by a single arbitrator — an arbitrator who proceeded to permit an original claim of some $3 million to mushroom into a $41 million Award based in major part upon invocation of quadruple damages under the New York Labor Law — a statute which had no applicability to Petitioner, an out-of-state employee.

And that is to say nothing of the fact that the EEOC subsequently rejected Petitioner's claim of discrimination, finding, based upon its investigation, that it was "unable to conclude that the information obtained establishes violations" of any of the statutes it enforced.

Respondent is well aware of the restrictive standards that govern challenges to an arbitration award.  Nevertheless, it is submitted that those standards are fully met here.  The damages award, in major part, stems from manifest disregard of the law.  *See* Point I, *infra*.  The conduct of the arbitration, its outcome, and the arbitrator's conclusions could only be reached by total disregard of critical evidence rising to the level of "fundamental unfairness."  *See* Point II, *infra*.  And post-Award, serious issues have arisen heightening concerns as to the arbitrator's impartiality as well as her qualifications to have presided over the arbitration and her representations with respect thereto.  *See* Point III, *infra*.  In sum, this case represents the exceptional circumstance where an arbitrator's Award is required to be either vacated in its entirety or, alternatively, modified in major respect.

## STATEMENT OF FACTS AND PROCEEDINGS

The arbitration award paints a lurid picture of Kargo, its business and its employees.  It asserts that Kargo's actions were a "collaborative orchestration carried out in a malicious, insidious, and humiliating manner," which demonstrated "impermissible stereotyping and a double standard" where "a woman is not permitted to act like a man."  Award at 42-43, 48.[*]  But, the arbitrator could only reach this conclusion by failing to take into account — among other things — indisputable documentary evidence, including admissions by Petitioner herself, that tell a very different story leading up to Petitioner's termination from the company.  Respondent presents the following review of the facts as they bear upon the "fundamental unfairness" challenge to the Award as set forth in Point II, *infra*.

---

[*]    Submitted herewith is the Declaration of Tracy Richelle High of Sullivan & Cromwell (herein "S&C Decl."), which served as co-counsel for Respondent during the arbitration.  As there was no transcript of the arbitration hearing, the arbitration record is presented in the S&C Decl. and its exhibits ("S&C Ex.").  Also submitted herewith is the Declaration of S. Christopher Szczerban ("Szczerban Decl."), which transmits materials ("Szczerban Ex.") since the commencement of the district court proceeding, and other materials for which judicial notice can be taken, *see Doron Precision Sys., Inc.* v. *FAAC, Inc.*, 423 F. Supp. 2d 173, 179 (S.D.N.Y. 2006) (websites); *Guy* v. *MTA New York City Transit*, 2016 WL 8711080, at *4 (E.D.N.Y. Sept. 23, 2016) (EEOC documents).  For ease of reference, the Award is cited as "Award" and can be found at S&C Ex. 16.

A.      **Kargo and its business**

Kargo designs and builds high-end mobile advertising campaigns for over 200

leading consumer brands.  The company has grown quickly, from 30 employees in 2012 to over

275 employees today.  It is headquartered in New York with offices in Chicago and Los Angeles,

among other places.  Just last month, the company has garnered a spot on Fortune's list of the 25

Best Small and Medium Workplaces in New York.  Szczerban Ex. 3 at 12.

B.      **Petitioner excels at sales becoming Kargo's highest paid employee.**

Petitioner Alexis Berger was Kargo's Senior Vice President of Sales covering the

Midwest and West Coast territory.  Award at 1-2.  An openly gay woman who had been going

through a divorce, she was based in Chicago and responsible for the company's offices in

Chicago and Los Angeles.  *Id.* at 5.  It is undisputed that she was an excellent salesperson, and

her teams were slated to generate half of Kargo's revenue in 2016, approximately $80 million.

*Id.* at 3 n.6.  Petitioner enjoyed a close relationship with Kargo's CEO Harry Kargman that gave

her unique access not shared by other more senior executives.  *E.g.*, S&C Ex. 55 (Berger Dep.

Tr. 94:4-6; 223:9-11).

As a result of her sales acumen, Petitioner was Respondent's highest paid

employee and earned more than her male counterpart, Kevin Canty, who oversaw sales on the

East Coast.  Award at 2; S&C Ex. 9 at 11.  In 2015, she received roughly $275,000 in base

salary, S&C Ex. 29 (JX 29 at 4), and roughly $800,000 in commissions, bringing her total

compensation to over $1 million, S&C Ex. 25 (JX 11 at 1).  For 2016, Petitioner's base salary

was increased to $375,000, S&C Ex. 29 (JX 29 at 1), and, in February of that year, she further

received a $200,000 retention bonus to be paid out over two years.  S&C Ex. 33 (JX 43 at 1).

**C.     Petitioner repeatedly recognized her problems as a manager.**

Nevertheless, as Kargo grew, it became apparent that Petitioner's management style often made subordinate employees uncomfortable.  As early as February 2014, CEO Kargman emphasized to Petitioner the "need" for her "to communicate better internally."  S&C Ex. 45 (RX 14 at 2).  A year later, Petitioner acknowledged as much:  In an email to HR in February 2015, she admitted, "I'm aware that I need to button it up and I am going to make a conscious effort to do so.  I would never want to offend anyone ever and perhaps my humor is misinterpreted as such."  S&C Ex. 46 (RX 26 at 1); *see also* S&C Ex. 31 (JX 34 at 1) (February 2016 email from Kargman to Petitioner "surfacing a larger concern about how you communicate and the word choices and behavior you use" and noting that it could "become career impacting").

Concerns about Petitioner were continually raised to, and discussed among, management.  In March 2015, when Petitioner was up for a potential role heading a new growth initiative that Kargo was rolling out, Kargman warned Petitioner that she had "a few major challenges that [she] need[ed] to work on and show progress prior to announcing the promotion." He characterized Petitioner as "quick to point blame on others for issues," "threatening" and displaying "attitude, shortness/lack of patience."  S&C Ex. 27 (JX 20 at 2-3).  Ultimately Petitioner was not selected for that role, but instead promoted to Senior Vice President in her management and sales position.  S&C Ex. 28 (JX 22 at 1).

Petitioner's abusive behavior only increased, as she admittedly dealt with the stress of a divorce and other personal issues.  S&C Ex. 48 (RX 48 at 1).  By way of example, by late 2015 and early 2016, three Kargo employees — all women — came forward to complain to Kargo's senior executives and HR personnel of Petitioner's management style.

In October 2015, Alexa Geistman, who had worked in Kargo's Los Angeles office managed by Petitioner, related her serious complaints about Petitioner's "unprofessional

4

behavior," including "crude, racist, sexually inappropriate and offensive comments."  S&C Ex.
49 (RX 63 at 1) (further noting that "employees in [Kargo's Los Angeles office] feel
uncomfortable every time [Petitioner] is present").  Having complained to Human Resources, she
was fired by Petitioner.  *See* S&C Ex. 54 (RX 91 at 3); S&C Ex. 49 (RX 63 at 1).

   In early 2016, Stephanie Biegel, a top sales director reporting to Petitioner in
Chicago, informed the company that she was planning to quit.  S&C Ex. 34 (JX 44 at 1).  Among
other things, Biegel testified that Petitioner called her team a "dictatorship" and showed little
appreciation for her subordinate's work.  S&C Decl. ¶ 17.  Biegel eventually tendered her
resignation saying that, in large part, she wanted to leave the stress of working for Petitioner,
after having become "very ill and very run down" and contracting shingles, S&C Ex. 56 (Biegel
Dep. Tr. 40:1-7; 66:13-67:9).  Ultimately, despite having earned hundreds of thousands of
dollars in commissions in her sales role, Biegel testified that she accepted drastically reduced
compensation in a non-sales role no longer reporting to Petitioner, which was created for her to
entice her to stay with the company.  S&C Decl. ¶ 16.

   Also in early 2016, another of Petitioner's top sales directors, Aly Gossman
reported that she too was contemplating leaving Kargo to escape Petitioner's abuse.  S&C Ex. 58
(Gossman Dep. Tr. 34:22-35:04).  Documenting her unhappiness, Gossman sent a detailed, five-
page email to a member of senior management chronicling Petitioner's abusive management
style, including Petitioner's propensity to scream at and micromanage her sales team, hoard
information, restrict access to management, pick favorites, and make inappropriate and
unprofessional comments in the workplace.  S&C Ex. 54 (RX 91).  For example, after Petitioner
helped Gossman get a raise, Petitioner told Gossman that she would "want to make out with"
Petitioner and told Gossman that she could only attend an industry conference if she were to

share Petitioner's hotel room and king-sized bed.  *Id.* at 3, 5.  And, not only was Petitioner referring to her subordinates as "monkeys," Petitioner had declared that she was "not hiring anymore vaginas in this office, only penises.  There's too much estrogen around here."  *Id.* at 4.

The Award largely ignores these subordinates' detailed chronicling of Petitioner's behavior.  *See* Point II, *infra*.  Rather, the Award incorrectly asserts that Kargo failed to identify specific evidence of Petitioner's unprofessional behavior.  Award at 18.  But, not only is this *not* the case, on multiple occasions, Petitioner herself acknowledged the crux of these women's complaints — for example, writing in February 2016 that she was aware of complaints that "working with [her] was like being in an abusive relationship," that she "had a very rough year" in her personal life and "being [a] work-aholic . . . it affected those around [her]," and that she was "eager to work on ways of helping with [her] stress" and explained and had "identified some relationships . . . to work on internally."  S&C Ex. 48 (RX 48 at 1).

**D.    Kargo attempts to intervene.**

Necessarily, in response to these serious complaints of abusive and inappropriate behavior, Kargo executives took action.  On February 17, 2016, they met with Petitioner in New York, and then set up a number of interviews with employees in the Chicago office.  Award at 10-11.  During the Chicago interviews, Biegel and Gossman described Petitioner's unprofessional management style, which left them feeling "siloed" and "stunted," as well as "scared to . . .go around [Petitioner] or go above her."  S&C Ex. 56 (Biegel Dep. Tr. 46: 5-15); *accord* S&C Ex. 58 (Gossman Dep. Tr. 22:6-20).

To address the situation, Kargo came up with an alternative approach:  Petitioner would be placed on paid leave for a month commencing on March 17, 2016 — continuing to collect her $375,000 base salary — so that her role at the company could be redesigned to become sales, not management, focused.  S&C Ex. 37 (JX 57 at 1); S&C Ex. 38 (JX 69 at 2);

S&C Ex. 55 (Berger Dep. Tr. 30:12-22).  Indeed, Petitioner had repeatedly told the company that she needed time to recharge.  S&C Ex. 35 (JX 51 at 1); *see also* S&C Ex. 47 (RX 46 at 3-4) (disclosing that in 2015 she had previously contemplated taking a leave of absence and would now follow the company's recommendation regarding a leave); S&C Ex. 48 (RX 48 at 1) (admitting that she was a workaholic and had marched forward as if nothing was going on during the previous, very stressful year).  Yet, the Award asserts that Petitioner was "betrayed and humiliated" by the paid leave of absence.  Award at 75.  But, per Petitioner's own testimony, the company had explicitly worked with her to avoid negative perceptions, even going as far as to oblige her request to describe her leave to others at the company as a "vacation."  S&C Ex. 55 (Berger Dep. Tr. 256:22-257:4-7).

As the 30-day leave ended, on April 11, 2016, Kargman and the company's HR director reached out to Petitioner to offer her a new position, which would eliminate the managerial functions that had given rise to her difficulties.  S&C Ex. 38 (JX 69 at 2).  Petitioner was to oversee the launch of Kargo Shops, which Kargman described as "one of the major growth areas in the Company."  S&C Ex. 60 (Kargman Dep. Tr. 179:17-18).  It was believed that, within a year, Petitioner would have the opportunity to earn more in this sales role than she had in her previous position.  *Id.* at 177:8-15; 178:20-22.  This prophecy proved accurate:  Just a few months later, Kargman testified that the new business was set to generate close to a million dollars annually in sales commissions, which would have been Petitioner's had she accepted the proffered position.  *See* S&C Decl. ¶ 15.

**E.    Petitioner rejects Kargo's efforts and joins a company it deems its competitor.**

Within days of receiving notice of her new role at Kargo, Petitioner hired counsel and informed the company that she would not accept the new position.  Rather, she set forth that she unilaterally planned on April 25 to return to her previous job.  Petitioner's employment

7

agreement explicitly gave Kargo the discretion to reassign her as necessary.  S&C Ex. 24 (JX 2 at § 3) ("Company, in its sole discretion, may change, amend or alter Employee's position").[*] She was notified that the company was placing her on unpaid leave for failure to return to work. S&C Ex. 43 (JX 80 at 1).  Petitioner refused to return — then or ever.  S&C Ex. 44 (JX 97 at 1).

Ultimately, after months of offering to try to find a path forward for Petitioner at the company, on July 22, 2016, Kargo notified Petitioner that she was being terminated for cause for abandonment of her position.  *Id.*  At this point, the company also had reason to believe that she was violating her non-disclosure and non-compete obligations.  *Id.*

That belief ultimately proved true.  In seeking new employment with another mobile advertising company, Emogi Technologies, Inc., Petitioner held out the carrot of being able to solicit away Kargo employees and was actively engaged in attempting to do so.  S&C Ex. 50 (RX 65 at 2); S&C Ex. 55 (Berger Dep. Tr. at 350:3-15) (asking Kargo employee Sonali Gupta if she "knew of any talented people like herself . . . who wanted to come work at [Emogi]").  Ultimately, she hired her former direct report, Brandon Hillier.  *Id.* at 324:2-16.

Further, Petitioner solicited Kargo clients for Emogi's new Wink application, which Kargo deemed directly competitive of its business.  *See id.* at 294:12-16 (acknowledging that she showed the Wink platform to McDonalds, a Kargo client); *id.* at 297:7-13 (stating that she met with Kargo client Essence to discuss Emogi); *id.* at 319:3-16 (admitting introducing Wink to Kargo's partner Ansible); S&C Ex. 7 at 2 (listing 13 Kargo customers and business partners with whom Petitioner had communicated); *see also* S&C Ex. 60 (Kargman Dep. Tr. 25:1-3) (noting Emogi "ha[d] pivoted into a directly competitive business with Kargo").

---

[*]   This is also settled New York Law — an at-will employee can be reassigned at the employer's discretion. *Matter of Pitchford* v. *State of New York*, 268 A.D.2d 286, 286-87 (1st Dep't 2000).

**F.      Petitioner rushes to arbitration.**

On May 2, 2016, months before being terminated, Petitioner filed a claim with the Equal Employment Opportunity Commission.  Then, on June 2 — without having received an EEOC right-to-sue letter — Petitioner filed her arbitration complaint.  S&C Ex. 2 at 1.

Petitioner's arbitration complaint alleged that she was pushed out of Kargo to achieve the "twin goals of reducing expenditures and freeing up equity."  S&C Ex. 2 at 5.  In other words, her initial allegations were *not* premised on any gender-based animus; but rather, that a so-called fake "cover story" gave rise to gender discrimination, in that Kargo purportedly would have acted otherwise with a male.[*]  Kargo denied these novel allegations.  *See* S&C Ex. 4.

By the time of the arbitration hearing, Petitioner was alleging that Kargo had not only breached its employment contract with Petitioner and its implied covenant of good faith and fair dealing, but had also violated the New York Labor Law, the State and City Human Rights Laws, and federal laws.  S&C Ex. 8.  Notwithstanding having initially sought only some $3 million in damages, by this time, Petitioner's claim had escalated to between $5 and $12 million.  S&C Decl. ¶¶ 27-28.  Kargo once again denied Petitioner's allegations, arguing that she lacked standing under New York employment laws, as well as federal and state equal pay statutes, and counterclaimed for breach of Petitioner's contractual covenants.  S&C Ex. 9 at 16-17, 23, 30-35.

The seven-day arbitration hearing took place in December 2016.  As detailed in the Sullivan & Cromwell declaration, co-counsel for the company in the arbitration, the arbitrator issued multiple rulings that precluded Kargo from effectively presenting its evidence and having it fairly heard.  *See* Point II, *infra*.  Following that hearing, Petitioner again expanded the scope of her damages claims to over $49 million.  S&C Ex. 12 at 83.

---

[*]      Kargo denied Petitioner's allegations and sought to stay the arbitration pending the EEOC's investigation.  S&C Ex. 4 at 1-2.  The arbitrator nonetheless allowed Petitioner to proceed.  S&C Ex. 6 at 2.

**G.     The flawed arbitration award.**

On May 31, 2017, the arbitrator awarded Petitioner over $41 million, finding that she was "entitled to relief on all of her claims."  Award at 63.  Although the Award spans 83 pages, it fails to address several key legal and factual matters.

For example, the bulk of the Award — more than $36.5 million — was the result of the arbitrator's application of provisions for quadruple damages contained in the New York Labor Law.  *Id*. at 82-83.  Although the arbitrator acknowledged in the Award that Kargo took the position that New York law did not apply to Petitioner (*id.* at 3) — whose place of employment was Chicago — nowhere is that issue ever even discussed or analyzed.

Regrettably, this pattern played out over many additional legal arguments and pieces of crucial evidence, which the arbitrator excluded, glossed over or ignored entirely in reaching her decision.  The result thus was an Award that unfairly labels Kargo as discriminating based on gender and responsible for tens of millions of dollars in unfounded quadruple damages.

Notably, after the arbitration concluded and as this memorandum was being prepared, the EEOC on July 12, 2017 stated in a letter that "Based on its investigation, the EEOC is unable to conclude that the information obtained established violations of" any of the statutes enforced by it.  Szczerban Ex. 2 at 2.

## ARGUMENT

Clearly a "district court's review of an arbitration award is limited."  *Sperry Int'l Trade, Inc.* v. *Gov't of Israel*, 689 F.2d 301, 304 (2d Cir. 1982).  "But deference to arbitrators is not without its limits."  *Jock* v. *Sterling Jewelers, Inc.*, 143 F. Supp. 3d 127, 133-34 (S.D.N.Y. 2015) (Rakoff, J.), *vacated on other grounds*, 2017 WL 3127243, at *2 (2d Cir. Jul. 24, 2017).  "[A] ruling lacking 'barely colorable justification' in black-letter law or common sense" need not be "upheld purely because it issued from an arbitrator's pen."  *Id.* (internal citation ommitted);

*see Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) ("A decision of an arbitrator . . . is not totally impervious to judicial review").

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, provides four statutory bases for vacating an arbitration award, at least three of which are implicated here.  First, a court may enter "an order vacating the award upon the application of any party to the arbitration . . . where the arbitrators exceeded their powers."  9 U.S.C. § 10(a)(4).  Interpreting this standard, the Second Circuit has recognized that "manifest disregard" of the law provides grounds for vacatur. *T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010).  Here, the arbitrator manifestly disregarded settled law by:  (i) awarding quadruple damages under a New York statute that plainly does not apply to an out-of-state employee such as Petitioner; (ii) improperly treating options as wages for purposes of calculating damages under that statute; and (iii) applying equal pay statutes — federal and state — to the case of an employee who was the highest paid employee at the company and whose termination was not a "pay" decision.  *See* Point I, *infra*.

Second, "where the arbitrators were guilty of . . . any other misbehavior by which the rights of any party have been prejudiced," the resulting award should be vacated.  9 U.S.C. § 10(a)(3).  Applying this provision, the Second Circuit has overturned arbitration awards on the basis of "fundamental unfairness" in the proceedings.  *Tempo Shain Corp.* v. *Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997).  Here, the arbitration was riddled with instances of improper conduct on the part of the arbitrator — including but not limited to manifest disregard of the law — that taken together substantially prejudiced Kargo by denying it fair consideration of its evidence and yielding damages that metastasized from $3 million at the commencement of the proceeding to $41 million in the Award.  *See* Point II, *infra*.

Third, post-Award events and disclosures pose issues as to whether the arbitrator (i) acted by reason of "evident partiality," § 10(a)(2); (ii) was authorized to arbitrate the dispute, § 10(a)(4);  or (iii) was guilty of "misbehavior," § 10(a)(3), as serious questions exist as to whether the arbitrator met the requirements of, or made proper disclosures to, the American Arbitration Association with respect to her qualifications.  *See* Point III, *infra*.

As set forth, the Award should be vacated in its entirety.  If not, it should be modified in major respect as to damages in that the arbitrator manifestly disregarded the law.

## POINT I

### THE ARBITRATOR MANIFESTLY DISREGARDED SETTLED NEW YORK AND FEDERAL LAW.

The Second Circuit has recognized "manifest disregard [of the law] as a judicial gloss on the specific grounds for vacatur of arbitration awards under 9 U.S.C. § 10."  *T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010).  In order to vacate an award on the ground of "manifest disregard," a court should find both that:  (i) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether; and (ii) the law ignored by the arbitrators was well-defined, explicit and clearly applicable to the case.  *DiRussa* v. *Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir. 1997).

Nevertheless, "[i]n determining an arbitrator's awareness of the law," the court "will *infer* knowledge and intentionality on the part of the arbitrator" where the court identifies "an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator."  *Duferco Int'l Steel Trading* v. *T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (emphasis added); *see also Capo* v. *Bowers*, 2001 WL 36193449, at *4 (S.D.N.Y. Mar. 12, 2001) (vacating award).  And, manifest disregard "is not confined to that rare case in which the arbitrator provides . . . explicit acknowledgment of

wrongful conduct." *Westerbeke Corp.* v. *Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 218 (2d Cir. 2002); *see also Halligan* v. *Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998) ("[W]e doubt whether even under a strict construction of the meaning of manifest disregard, it is necessary for arbitrators to state that they are deliberately ignoring the law."). Rather, an arbitrator's failure to explain her reasoning "may reinforce the reviewing court's confidence that the arbitrators engaged in manifest disregard." *Id.* ("[W]here a reviewing court is inclined to find that arbitrators manifestly disregarded the law or the evidence and that an explanation, if given, would have strained credulity, the absence of explanation may reinforce the reviewing court's confidence that the arbitrators engaged in manifest disregard.").

A.     **The New York Labor Law simply does not apply to Petitioner, an Illinois employee.**

The arbitrator manifestly disregarded the law in awarding damages under the New York Labor Law as to more than two-thirds of the $41 million award. Under clear authority of this Circuit, the New York Labor Law protects *only* New York employees. Consistent with the general proposition that New York laws do not have extraterritorial effect and the specific holding of the New York Court of Appeals applying that general doctrine of no-extraterritorial-reach to out-of-state employees, *Hoffman* v. *Parade Publ'ns*, 15 N.Y.3d 285, 290-92 (2010), the case law is uniform that the statute at issue here — the New York Labor Law — simply does not apply to Petitioner, whose place of employment was incontrovertibly in Chicago. The arbitrator nonetheless awarded quadruple damages under the Labor Law, § 198(1-a), which — where applicable — allows *additional* "liquidated damages [of] up to three hundred percent of the total amount of the wages found to be due for a willful violation" of the equal wage section of the Labor Law, *i.e.*, quadruple damages.

But that statute simply does not apply here. As Your Honor explained in *Warman* v. *Am. Nat'l Standards Inst.*, "[a]s [the New York Labor Law] is silent on its extra-

13

territorial application, courts in this district have held that it does not apply extra-territorially."
2016 WL 3676681, at *2 (S.D.N.Y. July 6, 2016). Indeed, a long line of cases in both federal
and state court have uniformly held that "[t]he purpose . . . of the labor law is clearly to protect
workers laboring in New York. Nothing in the statute suggests that the legislators intended to
give persons who were employed outside New York the right to come to New York to sue their
employers . . . ." *E.g.*, *Hammell* v. *Paribas*, 1993 WL 426844, at *1 (S.D.N.Y. Oct. 22, 1993).[*]

      Put simply, the New York Labor Law has absolutely no applicability to an
employee located in Illinois, like Petitioner. During the period the alleged Labor Law violations
occurred, Petitioner ran Kargo's Chicago office. *See* Award at 2, 5, 9. As a Vice President of
Sales, she had responsibility for seven Midwest states and later the West Coast Territory. *Id.* at
2, 5. In fact, Petitioner's employment agreement is express: "[The] Company shall not relocate
[her] outside of Illinois without [her] consent." S&C Ex. 24 (JX 2 at § 3).

      At the outset of the Award, p. 3, the arbitrator explicitly acknowledged Kargo's
challenge to the applicability of New York employment laws: "[Kargo] also submits that New
York law does not control this case."[**] But one can then search the Award in vain for any
discussion of the issue. At no point does the arbitrator so much as consider or set forth why
Kargo's legal position was unfounded. *Cf. Halligan*, 148 F.3d at 204 ("[W]hen a reviewing
court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the

---

[*]    *See also, e.g.*, *Kassman* v. *KPMG LLP*, 925 F. Supp. 2d 453, 469 (S.D.N.Y. 2013) ("Given the presumption against extraterritoriality, it follows that [equal wage section of the New York Labor Law] does not apply to people who live and work outside of New York State."); *Magnuson* v. *Newman*, 2013 WL 5380387, at *5 (S.D.N.Y. Sept. 25, 2013) (holding that the New York Labor Law does not apply extraterritorially); *O'Neill* v. *Mermaid Touring, Inc.*, 968 F. Supp. 2d 572, 579 (S.D.N.Y. 2013) (holding that New York Labor Law § 198(1-a) does not apply extraterritorially and noting that the "crucial issue is where the employee is 'laboring'"); *Webber* v. *Mut. Life Ins. Co. of N.Y.*, 731 N.Y.S.2d 447, 449 (1st Dep't 2000) ("As to the law to be applied, it is settled that the protection afforded to New York employees by the Labor Law, including Labor Law §§ 200, 240(1) and 241(6), has no application to an accident that occurs outside New York State, even where all parties are New York domiciliaries[.]").

[**]    *See, e.g.*, S&C Ex. 13 at 29 (citing *Hoffman*, 15 N.Y.3d at 291).

arbitrators to explain the award can be taken into account.").  Rather, throughout (*e.g.*, Award at 16 at 14-15, 42, 48-49; 53-54; 60-62; 64; 74; 79; 81; 82-83), the arbitrator repeatedly relies upon the New York State and City Human Rights Laws and the New York Labor Law — none of which, under controlling law, has *any* applicability here.

Thus, in 2010, the New York Court of Appeals examined the reach of the New York State and New York City Human Rights Laws to out-of-state employees.  *Hoffman*, 15 N.Y.3d at 291.  The Court could not have been more explicit:  "The obvious intent of the State Human Rights Law is to protect 'inhabitants' and persons 'within' the state, meaning that those who work in New York fall within the class of persons who may bring discrimination claims in New York."  *Id.*  This is the case even where the employer maintains its headquarters in the State or City and the employment decisions at issue were made here.  *Id.* at 288.  Companies headquartered in New York may have employees nationwide or even worldwide; that does not mean that New York employment statutes govern their employment.  And while, per-*Hoffman* at 290, under New York City and State Human Rights Laws, there is a limited exception for a *non*-resident who is employed in the State if the discriminatory conduct has an "impact" in the State, in *Hoffman* itself — on facts showing contacts in New York more extensive than any found here[*] — the Court deemed such contacts to have only a "tangential connection to the city and state," and accordingly *refused* to let the action go forward, *id.* at 292.  And, of course, Petitioner here was never employed in New York.  So, under *Hoffman*, the New York State and New York City Human Rights Laws are inapplicable.

---

[*]    In *Hoffman*, the plaintiff attended regular quarterly meetings in New York City, 15 N.Y.3d at 288, but here the Award only refers to two isolated visits to New York by Petitioner when difficulties arose in connection with her conduct, Award at 8, which arguably do not even constitute "labor or services" under Labor Law § 190 or "work" under Labor Law § 194.  And, unlike the plaintiff in *Hoffman*, Petitioner's employment contract expressly forbids Kargo from causing her to "relocate . . . outside of Illinois."  S&C Ex. 24 (JX 2 at § 3).

That an out-of-state employee is not covered by the New York Labor Law then follows directly from *Hoffman*'s holding as to the State and City Human Rights Laws. *Cf. Kassman*, 925 F. Supp. 2d at 469.  Nonetheless, no court has suggested that *Hoffman*'s limited "impact" test carries forward to the Labor Law — the statute upon which the Award predicates its grant of quadruple damages.  This is, of course, a subject upon which this Court has written. *See, e.g.*, *Warman*, 2016 WL 3676681, at *2 (explaining that an "interest analysis" does not apply to [Labor Law] claims because the "statute does not have extraterritorial reach"); *In re Stage Presence Inc.*, 559 B.R. 93, 100 (Bankr. S.D.N.Y. 2016) (noting that no case has applied an impact test under the New York Labor Law "or has given such extraterritorial effect to the New York Labor Law").

Finally, the fact that Petitioner's employment agreement contains a New York choice-of-law provision does not operate to overcome the substantive statutory restrictions on the reach of New York's employment laws.  "New York courts construe" choice-of-law provisions "narrowly," and choice-of-law provisions "indicating only that an *agreement* will be governed by New York law will not bind the parties for non-contractual causes of action." *Warman*, 2016 WL 3676681 at *3.  "For the parties to be bound by New York law with regard to *non*-contractual causes of action, the choice-of-law provision would have had to include much broader language, indicating that any controversy 'arising out of or relating to' the agreement would be governed by the laws of New York." *Rice* v. *Scudder Kemper Invs, Inc.*, 2003 WL 21961010, at *4 (S.D.N.Y. Aug. 14, 2003) *aff'd sub nom. Rice* v. *Wartsila NSD Power Dev., Inc.*, 183 Fed. App'x 147 (2d Cir. 2006) (emphasis added).

Here, the choice-of-law clause in the employment agreement is a narrow one — requiring only that "[t]his Agreement shall be construed, interpreted and enforced in accordance

16

with the laws of the State of New York."  S&C Ex. 24 (JX 2 at § 8.13).  This is thus precisely the type of narrow choice-of-law provision that courts have repeatedly found does not implicate statutory causes of action.  *See Warman*, 2016 WL 3676681, at *3 (choice-of-law provision providing that "[t]his Agreement shall be governed by the laws of the State of New York" did not allow employee working outside of New York to bring New York Labor Law claims); *Rice*, 2003 WL 21961010, at *4 (non-New York employee could not bring claim for violation of New York Human Rights Law where choice-of-law provision provided that "[t]he validity, interpretation, construction, and performance of this Agreement shall be governed by the law of the state of New York" because "[i]t is settled New York law that language such as this creates New York common law contractual claims but not statutory ones").[*]

       Moreover, even putting aside the clear distinction between statutory claims on the one hand and contractual claims on the other — even if the choice-of-law clause had been written to encompass statutory claims — it would avail Petitioner nothing.  Because, as set forth above, as a matter of substantive law, the New York Labor Law applies *only* to employees based in New York, and Petitioner is not such an employee.

       This is not to say that no statutory recourse exists if satisfied by the evidence. Indeed, Petitioner here brought federal Title VII and equal pay claims — albeit the latter are plainly inapposite.  *See* Point I(C), *infra*.  And she could have brought claims under Illinois

---

[*]   *See also Krock* v. *Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract."); *Burnett* v. *Physicians' Online, Inc.*, 1997 WL 470136, at *12 (S.D.N.Y. Aug. 15, 1997) (emphasis omitted) (finding choice-of-law provision that says "Agreement shall be governed and construed in accordance with the law of the State of New York" did not "bar[] a cause of action for gender discrimination under California law"); *cf. Plymack* v. *Copley Pharm., Inc.*, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995) (Under New York law, "A contractual choice-of-law provision . . . does not bind the parties with respect to non-contractual causes of action."); *Hammell*, 1993 WL 426844, at *1 n.3 ("The fact that the Court decided that principles of New York contract law apply to the parties does not mean that New York labor law also applies."); *Klock* v. *Lehman Bros. Kuhn Loeb Inc.*, 584 F. Supp. 210, 215 (S.D.N.Y. 1984) ("[A] contractual choice of law provision governs only a cause of action sounding in contract.").

employment laws.  But, as Petitioner chose not to do so — presumably recognizing that Illinois does not permit the same multiple damages as New York does[*] — she cannot now claim to be without a remedy.

The arbitrator thus exceeded her authority by manifestly disregarding the plainly clear applicable scope of the New York Labor Law and applying it extraterritorially to a Chicago employee.  The arbitrator offers utterly no explanation for this ruling, and it cannot stand.  *See Jock*, 143 F. Supp. 3d at 133-34 (overturning arbitrator's "ruling lacking 'barely colorable justification' in black-letter law or common sense"); *Porzig*, 497 F.3d at 142 (considering "absence of explanation when deciding whether [an arbitration] Panel has acted in manifest disregard of the law"); *Capo*, 2001 WL 36193449, at *4 (vacating award that would otherwise be "prohibited under clear authority in this Circuit").

Accordingly, at a minimum, the award of all liquidated damages premised on the New York Labor Law must be vacated, including $27.5 million in 300% liquidated damages, and single damages of $8.86 million and $305,131, respectively, for the lost options and commissions, *see* Award at 82, unless some portion of such damages can be supported on grounds other than the New York Labor Law.

**B.      Options are not "wages" covered by the New York Labor Law.**

Even if Petitioner had been a New York employee, the arbitrator likewise manifestly disregarded New York law by including stock options — which are plainly not "wages" under the New York Labor Law — when calculating Petitioner's quadruple damages. Yet again, the arbitrator ignored this critical issue.

---

[*]     *See* 775 ILCS 5/8A-104; 820 ILCS 112/30 (not providing liquidated damages under Illinois law for civil rights or equal pay violations).

The federal courts have construed the federal equal pay statute as including "options."  The New York courts — dealing with different statutory language — have held to the contrary.  The Award — here without any analysis — accepts the proposition that the "value [of stock options] is recoverable as damages under the discrimination, retaliation, and equal pay statutes."  Award at 64 n.**.  In support of that view, the arbitrator cites solely to *Greene* v. *Safeway Stores, Inc.*, which held that stock options can be the basis for *federal* Age Discrimination in Employment Act damages.  210 F.3d 1237, 1243-44 (10th Cir. 2000).

But neither *Greene*, nor any other aspect of the arbitrator's decision, addresses the New York Labor Law or the specific, and limited, definition of "wages" contained therein.[*]  It is black-letter law that the New York Labor Law definition of "wages" *excludes* "incentive compensation . . . dependent, at least in part, on the financial success of the business" and granted to give "employees an incentive to stay with the firm."  *See, e.g.*, *Guiry* v. *Goldman, Sachs & Co.*, 814 N.Y.S.2d 617, 618-19 (1st Dep't 2006) (internal quotation marks omitted); *Truelove* v. *Ne. Capital & Advisory, Inc.*, 95 N.Y.2d 220, 223-24 (2000) ("Courts have construed this statutory definition [of wages] as excluding certain forms of 'incentive compensation' that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise.").  As the First Department explained, "[d]eferred awards of stock and stock options . . . constitute incentive compensation, since they plainly serve the function of giving employees an incentive to stay with the firm and to maximize the value of the firm's business."  *Guiry*, 814 N.Y.S.2d at 619.

---

[*]    Unlike federal law, which defines wages broadly in the Equal Pay Act to include "all payments made to [or on behalf of] an employee as remuneration for employment," 29 C.F.R. § 1620.10, the definition of wages under the parallel section of the New York Labor Law is narrow, including only "the earnings of an *employee for labor or services rendered*," NYLL § 190 (emphasis added).

Accordingly, court after court has held that options are not "wages" and therefore cannot support a claim under the equal wage section of the New York Labor Law.[*] *See, e.g.*, *Guiry*, 814 N.Y.S.2d at 617 ("[R]estricted shares of the employer's stock, and options to purchase such stock . . . constitutes, as a matter of law, 'incentive compensation . . . not included in the definition of 'wages' under Labor Law § 190(1)'"); *Gilman* v. *Marsh & McLennan Companies, Inc.*, 868 F. Supp. 2d 118, 135 (S.D.N.Y. 2012), *aff'd*, 654 F. App'x 16 (2d Cir. 2016) ("Equity-based awards to incentivize employees to remain with an employer do not constitute 'wages' under the NYLL."); *Econn* v. *Barclays Bank PLC*, 2010 WL 9008868, at *5 (S.D.N.Y. June 10, 2010) (claim for violation of Labor Law premised on unvested options "dismissed as a matter of law because [they] did not constitute 'wages' under New York law").

And while, to date, the case law has arisen in the context of unvested options, the outcome is no different with respect to certain of those here that have vested but are subject to defeasance. Vested options, no less than unvested, are dependent upon "the financial success of the business." *Guiry*, 814 N.Y.S.2d at 619. And where, as here, per the Stock Incentive Plan, vested options are subject to being voided when an employee refuses to perform called-for services, S&C Ex. 23 (JX 1 at §§ 5.6.1, 8), the incentive to the employee to properly perform such obligations in order to "stay with the firm and to maximize the value of the firm's business" is the same as with unvested options. *Guiry*, 814 N.Y.S.2d at 619.

Here, this is no theoretical point. At the time of her termination, Petitioner held 72,840 unvested and 127,160 vested options, whose value was completely dependent on Kargo's success. *See* Award at 69; S&C Ex. 13 at 60. The arbitrator first valued these options at $8.86 million and then proceeded to add treble damages of $26.6 million. Thus, over $35 million of

---

[*]  *See* NYLL § 194 ("No employee shall be paid a *wage* at a rate less . . .") (emphasis added).

the $41 million Award was based on a form of remuneration that did not constitute "wages" under New York law.

In doing so, the arbitrator completely ignored Kargo's briefing that, under *Guiry*, stock options "are incentive compensation" that "do not constitute wages under New York Labor Law."  S&C Ex. 13 at 62.  Courts have, in the past, condemned similar instances where arbitrators ignore and fail to explain departures from settled law.  *See Halligan*, 148 F.3d at 204 ("when a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrators to explain the award can be taken into account"); *Neary* v. *Prudential Ins. Co. of Am.*, 63 F. Supp. 2d 208, 210 (D. Conn. 1999) ("The failure of the arbitration panel to explain its decision in this case also buttresses this Court's determination.").

In sum, even if Petitioner had been a New York employee, there was not even a "barely colorable justification" for the award of quadruple damages with respect to options under the Labor Law.[*]

**C.    No equal pay damages with respect to the options are available under federal or state law, as Petitioner's termination was not a "pay" decision.**

Putting aside the impropriety of awarding quadruple damages under the New York Labor Law — no damages with respect to Petitioner's "termination" and stock options cancellation are sustainable because these were not "pay" decisions under either federal or New York law.  At most, the federal Equal Pay Act, if violated, could give rise to double damages. 29 U.S.C. §§ 216, 260.

The federal Equal Pay Act is violated if an employer "pay[s] wages to that employee . . . at *a rate less than the rate* at which he pays wages to employees of the opposite

---

[*]    The arbitrator also purported to award damages for the terminated options based on violations of Title VII and breach of contract.  Award at 64.  Nevertheless, for the reasons set forth in Points II and III, *infra*, such determinations cannot stand.

sex . . ." 29 U.S.C. § 206(d) (emphasis added).[*]  As is clear from the plain language of the

statute, "the [Equal Pay Act] is limited to certain sex-based differentials in wages.  The [Equal

Pay Act] does not prohibit discrimination in other aspects of employment, even those that have

compensation-related consequences, such as hiring, firing, promotion, transfer, or other issues."

*Moehle* v. *Mineta*, EEOC DOC 01A51030 (E.E.O.C.), 2005 WL 1903531, at *1 (2005); 29

C.F.R. § 1620.27 ("Under the [Equal Pay Act] a prima facie violation is established upon a

showing that an employer pays *different wages* to employees of opposite sexes for equal work on

jobs requiring equal skill, effort and responsibility, and which are performed under similar

working conditions.") (emphasis added); Barbara T. Lindemann & Paul Grossman, Employment

Discrimination Law 19-4-1 (C. Geoffrey Weirich, ed., 5th ed. 2012) ("The [Equal Pay Act] is

limited to certain sex-based differentials in wages.  It does not prohibit pay discrimination based

on other protected characteristics, or in other aspects of employment . . . such as hiring, firing,

promotion, transfer, or other issues.").

      Options aside, Petitioner — the highest paid employee at Kargo, Award at 2 —

cannot prevail under the Equal Pay Act.  As the Ninth Circuit has noted, "[i]f it should turn out

that [plaintiff] earns *more* than males performing substantially equal work, it is axiomatic that

the Equal Pay Act does not afford her relief."  *Hein* v. *Oregon Coll. of Educ.*, 718 F.2d 910, 916

(9th Cir. 1983); *Mitchell* v. *Developers Diversified Reality Corp.*, 2010 WL 3855547, at *5 (E.D.

Tex. Sept. 8, 2010) ("The [EPA] does not regulate raises or bonuses directly.  The statute merely

requires that Plaintiff receive total compensation at least equal to male employees with equal

performance.  Defendant paid Plaintiff more in total wages for 2006 than either of these two

---

[*]   While the definition of "wage" and "wages" are different for the federal Equal Pay Act and equal wage section
of the New York Labor Law, the elements of their cause of action are the same.  *See Talwar* v. *Staten Island Univ.
Hosp.*, 610 F. App'x 28, 31 (2d Cir. 2015) ("An equal pay claim under New York Labor Law § 194 'is analyzed
under the same standards applicable to the federal Equal Pay Act.'").

male employees.") (internal citations omitted); *Price* v. *N. States Power Co.*, 664 F.3d 1186, 1195 (8th Cir. 2011) ("Since [plaintiff] is the highest paid employee at [her employer], she has not stated a prima facie case of wage discrimination under the EPA."); *Lopez-Mendez* v. *Lexmark Int'l, Inc.*, 680 F. Supp. 2d 357, 381 (D.P.R. 2010) ("[P]laintiff cannot establish a prima facie case of wage discrimination" as the "highest paid employee" in her position).

The Award, however, gives damages based upon two factually flawed and legally unsound reasons.  First, the arbitrator awarded "equal pay" damages because Petitioner was offered a position that lowered her base compensation, while her co-worker, Kevin Canty, who "held the same position as Ms. Berger and [had] numerous sexual discrimination complaints" lodged against him, did not have his base compensation cut.  Award at 54.

But the Award itself sets forth that, in offering Petitioner a job that would cut her base pay, Kargo "stripped" Petitioner of her "title, pay, sales, etc. . . . specifically, taking away "her 'Senior Vice President'" title.  *Id.* at 43.  And, it is undisputed that Petitioner never *accepted* the new position and, consequently, did not end up with lesser pay than Canty in any *like* position. During the time periods in question, Petitioner never held a job at Kargo at which she was paid less than *any* male co-worker.  Here there is a total absence of a claim that the new compensation plan was inferior to any male occupying a like position:  any issue of "equal pay" is academic. Moreover, the law is clear that an equal pay claim can only be based on "pay" decisions, not collateral employment decisions that affect compensation — even if discriminating.

This, for example, is the precise holding of the Sixth Circuit in *Grant* v. *Gen. Motors Corp.*, 908 F.2d 1303 (6th Cir. 1990).  There, all women were reassigned to lower paying positions than previously held by them.  *Id.* at 1305.  Nevertheless, even if such reassignments were deemed discriminatory under Title VII, the Court was explicit:  it would not give rise to an

Equal Pay Act claim, absent a showing that the females in question received lesser compensation than like male employees in the *reassigned* position.  *See id.* at 1311.[*]  Indeed, the Code of Federal Regulations Rule promulgated pursuant to the Equal Pay Act is clear:  "The right to equal pay under the Equal Pay Act has no relationship to whether the employee is in the lower paying job as a result of discrimination in violation of title VII."  29 C.F.R. § 1620.27.

      The Award's second basis for invoking the Equal Pay Act is that Kargo cancelled Petitioner's options when she applied for a job at Emogi, but allowed its male President and Chief Operating Officer, McConville, to keep his options, though he sat on Emogi's advisory board.  Award at 55.  But their circumstances were far from "equal."

      It is incontrovertible that McConville had an advisory role with Emogi that was fully consistent with his employment status at Kargo.  Indeed, at all times that he had any role at Emogi, Kargo and Emogi were cooperating together pursuant to a joint venture agreement.  S&C Ex. 26 (JX 19 at 2-6).  McConville then *left* his advisory position when that agreement was being cancelled in October 2016.  S&C Ex. 61 (McConville Dep. Tr. 77:13-15); S&C Ex. 52 (RX 75 at 1).  McConville, thus, never failed to perform services for Kargo, never acted contrary to its interests, and was never terminated.  In contrast, Petitioner approached Emogi for a job after having refused for months to perform required services for Kargo, and — even prior to her termination — attempted to solicit a Kargo employee to work at Emogi.  S&C Ex. 50, 51 (RX 65 at 2; RX 66 at 1-2).  In no way were these activities consistent with or in furtherance of Kargo's interests.  In no rational way could they be deemed to be "equal" to those of McConville.

      Thus, even if petitioner's "demotion" and subsequent termination were an improper result of "discrimination" — *but see* Point II, *infra* — the loss of her stock options did

---

[*]    Here, of course, as an at-will employee, Petitioner could be demoted or discharged for any or no reason. *See Matter of Pitchford*, 268 A.D.2d at 286-87.

not create an equal pay claim.  To be sure, Petitioner's termination had a compensation-related consequence — as do all terminations.  But the Equal Pay Act protects wage differentials when equal work is being performed, "not . . . discrimination in other aspects of employment, even those that have compensation-related consequences, such as hiring, firing, promotion, transfer, or other issues." *Moehle*, 2005 WL 1903531, at *1; *see Barrett* v. *Forest Labs., Inc.*, 39 F. Supp. 3d 407, 452 (S.D.N.Y. 2014) (dismissing equal pay act claim where a female's salary increase was lower than males received because that did not show she was paid less than men).

Indeed, if the arbitrator's view of the law were accepted, any wrongfully terminated employee could potentially bring an equal pay claim based solely upon lost income and, under federal law, collect double damages therefrom.  *See* 29 U.S.C. §§ 216, 260.  That is not the law.  Courts have made clear that the "loss of salary as a result of [plaintiff's] termination cannot form the basis for an Equal Pay Act claim." *Grabovac* v. *All-State Ins. Co.*, 2004 WL 3583989, at *5 (E.D. Mo. Sept. 23, 2004) (rejecting Equal Pay Act claim where plaintiff was unable to obtain a bonus after being terminated for not passing qualifying exam even though men were allegedly given more time to pass exam).

An individual, like Petitioner, challenging an employment decision that has a collateral consequence on income may have recourse — but not under the federal or state equal pay laws.  For example, Title VII cases cover employment-related discrimination that has collateral consequences on compensation.  *See Gen. Motors*, 908 F.2d at 1311-12 ("While the plaintiff's transfer to a lower paying job pursuant to GM's fetal protection policy may have violated Title VII, her reassignment in and of itself cannot support an Equal Pay Act claim.").  However, what matters here, and what the arbitrator never addressed, is that no authority exists for a *multiple* damages award premised on an equal pay violation when there was never any

25

inferiority in Petitioner's pay to any equivalent male employee, and the multiple damages claimed related to her termination, not her compensation for "equal work."

During the proceedings, Kargo made this clear to the arbitrator, explaining that the Equal Pay Act is a "narrowly tailored statute [that] 'merely requires that Plaintiff receive total compensation at least equal to male employees with equal performance.'"  S&C Ex. 13 at 50 (quoting *Mitchell*, 2010 WL 3855547, at *5).  The arbitrator paid that governing law no heed: it goes unmentioned in the Award.

This is a textbook case of manifest disregard of the law — the arbitrator "knew of a governing legal principle" that was "well defined, explicit, and clearly applicable," yet "refused to apply it or ignored it altogether."  *See DiRussa* v. *Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir. 1997).  As a result, the arbitrator's Award of $27.5 million in liquidated damages under the equal wage section of the New York Labor Law must be vacated and double damages under the federal Equal Pay Act are impermissible.[*]

## POINT II

### THE ARBITRATION WAS FUNDAMENTALLY UNFAIR BECAUSE THE ARBITRATOR EFFECTIVELY EXCLUDED RESPONDENT'S EVIDENCE.

The injustice of the arbitration was not limited to repeated manifest disregard of law.  In addition to applying inapplicable legal standards that allowed Petitioner's initial $3 million claim to improperly escalate into a $41 million Award — more than two-thirds of which constituted "liquidated damages" which plainly did not lie under controlling law — the arbitrator reached this fundamentally unfair result while adopting verbatim (or close paraphrasing) unsupported arguments offered by Petitioner in her post-hearing briefing.  *See* Szczerban Ex. 1

---

[*]    To the extent Petitioner's lost commission and options are compensable under Title VII and breach of contract, *see* Award at 64, those grounds can only support an award of single damages.  In any event, as set forth in Points II and III, *infra*, such single damages should be vacated as well.

(showing copying even of a typo at 3).  Such a cut-and-paste job undermines the deference that is

typically afforded to an adjudicator's assessment of the facts and law.  *See Counihan* v. *Allstate*

*Ins. Co.*, 194 F.3d 357, 363 (2d Cir. 1999) ("criticiz[ing]" verbatim copying and noting that such

opinions "will stand [only] if supported by evidence"); *In re T.H. Richards Processing Co.*, 910

F.2d 639 (9th Cir. 1990) (internal quotation marks omitted) (reviewing "findings with special

scrutiny" where "bankruptcy court [] engaged in the regrettable practice of adopting the findings

drafted by the prevailing party wholesale").

But not even "special scrutiny" is necessary to determine that the arbitrator only

reached her Award by effectively excluding the evidence Kargo presented in its defense.  As

such, Kargo was denied a full and fair adjudication of its case on the merits.

Section 10(a)(3) of the FAA provides that an award may be vacated  "where the

arbitrators [are] guilty of misconduct . . . in refusing to hear evidence pertinent and material to

the controversy; or of any other misbehavior by which the rights of any party have been

prejudiced."  9 U.S.C. § 10(a)(3).  The Second Circuit has applied this section to review and

vacate arbitration awards "where fundamental fairness is violated," *Bertek*, 120 F.3d at 20,

including where the arbitrator improperly excluded evidence.  *See, e.g.*, *id.* at 16; *Teamsters,*

*Chauffeurs, Warehousemen, and Helpers, Local Union No. 506* v. *E.D. Clapp Corp.*, 551 F.

Supp. 570 (N.D.N.Y. 1982); *Cofinco, Inc.* v. *Bakrie & Bros., N.V.*, 395 F. Supp. 613 (S.D.N.Y

1975).  Awards thus may be vacated for an arbitrator's "refusal to give any weight to the

evidence presented at hearing," *Hoteles Condado Beach* v. *Union de Tronquistas Local 901*, 763

F.2d 34, 42 (1st Cir. 1985), or improper restrictions on a party's right to "confront and cross-

examine witnesses," *Konkar Maritime Enters.* v. *Compagnie Belge D'Affretement*, 668 F. Supp.

267, 271 (S.D.N.Y. 1987).

In this case, the arbitrator failed to consider and thus effectively refused to hear pertinent and material evidence of Petitioner's acknowledged managerial problems and unprofessional behavior.  The arbitrator systematically ignores this evidence as if it had never been presented.  As a result, Kargo has been prejudiced with a decision far outside the bounds of any fair adjudication.  Such an Award could only be reached by an unfair process or an arbitrator predisposed to render an unfair result.  Fundamental fairness requires that it be set aside.

In contrast to the lurid story told by Petitioner and adopted by the arbitrator, the factual record developed by Kargo — notwithstanding being hampered by the arbitrator's adverse rulings — showed that the company acted scrupulously in regards to Petitioner, while at the same time and as required by law, giving heed to the needs and concerns of its other employees who complained of a hostile work environment created by Petitioner's mismanagement and abuse — claims that Respondent was obliged to address.  *See Faragher* v. *City of Boca Raton*, 524 U.S. 775, 789 (1998) (noting with approval case law holding "employers liable on account of actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop").  The arbitrator nevertheless — making no mention of Respondent's legal obligations in this regard — describes a "collaborative orchestration carried out in the a malicious, insidious, and humiliating manner" to "run [Petitioner] out of the company" that was purportedly fraught with "clandestine meeting[s]" to "collect nefarious information," "double standards" and a "conspir[acy] . . . to concoct a 'fake' cover story."  Award at 42-43, 56, 75.  But that picture only emerges when critical contrary evidence is excluded, disregarded or otherwise not heard, as further described below.

Specifically, Kargo demonstrated in the arbitration that, far from discriminating against Petitioner, she was the company's highest paid employee and had a close relationship with the CEO.  *See* Award at 2 ("Mr. Kargman and Ms. Berger enjoyed a very close, synergistic relationship, personally and professionally, based on mutual respect, business values, and trust.").  And indeed — far from being suddenly surprised and "blindsided" in February 2016, as the arbitrator falsely concluded, *id.* at 5 — for more than a year previous Petitioner was admittedly aware of and had been given multiple chances to alter the improper conduct of which subordinates were complaining.  *See* S&C Ex. 55 (Berger Dep. Tr. 246:4-13) (admitting feedback was provided in 2015 and 2016 that Petitioner "needed to increase [her] personal effectiveness as a manager").

Beginning all the way back in February 2015, Petitioner met with Ryan McConville in Chicago to discuss areas for her to "address/evolve" including "buttoning up professionalism in office."  S&C Ex. 46 (RX 26 at 2).  After that meeting, Petitioner herself emailed Amanda Katz in Kargo's Human Resources department to say that Petitioner "[s]pent a good amount of time with Ryan" and his message had been heard and acknowledged:

> Please know that *I'm aware that I need to button it up and I am going to make a conscious effort to do so*.  I would never want to offend anyone ever and perhaps my humor is misinterpreted as such.  As we grow, I need to be careful of this.  *I'm on it*.

S&C Ex. 46 (RX 26 at 1) (emphasis added).  One can search the Award in vain for any mention of this documented admission by Petitioner of her inappropriate behavior.

The following month, back in March 2015, when Petitioner sought a promotion, Kargo's CEO, Harry Kargman, sent her a multipage email detailing a "Tactical Plan" for her improvement—particularly with respect to behavioral issues — including the "Pro's and Con's" of her past performance, "major challenges that [she] needed to work on," and specific "goals"

and "metrics" to help her address these issues and "[p]rove that [she] can project a change in [her] approach."  S&C Ex. 27 (JX 20 at 2-4).  When presented with this email at her deposition, Petitioner acknowledged these written concerns of Kargo's CEO.  S&C Ex. 55 (Berger Dep. Tr. 177:21-183:22).  In a response email, she also noted the "major hesitations" that senior executives had concerning her advancement.  S&C Ex. 27 (JX 20 at 1).  Once again, this incontrovertible evidence goes unmentioned in the Award.

Despite these acknowledged shortcomings and interventions, by the following year — in early 2016 — things had only gotten worse.  By then, three female employees had come forward with written and verbal complaints of problems with Petitioner.  The two most senior and high-performing individuals on Petitioner's Chicago team, Stephanie Biegel and Aly Gossman, S&C Decl. ¶ 14, expressed deep dissatisfaction with their jobs and an unwillingness to continue to work under Petitioner.  Biegel did in fact resign and then only agreed to stay on with the company in a different role in which she was not required to report to Petitioner.  S&C Ex. 56 (Biegel Dep. Tr. 44:23-46:14).  Gossman likewise was prepared to resign.  *See* S&C Ex. 58 (Gossman Dep. Tr. 43:18-44:24).  In fact, she sent Kargo's Chief Strategy Officer, Doug Rohrer, a lengthy email stating that working with Petitioner had "reached an unbearable place for myself and a number of individuals within the Chicago and West coast offices" and detailing dozens of instances of Petitioner's unprofessional and disrespectful conduct.  S&C Ex. 54 (RX 91 at 1-5).  As a result, management feared the loss of its top performers and a "large scale mutiny" in its Chicago office.  Award at 10.

A third female employee who had worked in the Los Angeles office, Alexa Geistman, reported that Petitioner was "erratic," "very polarizing" and "abusive," S&C Ex. 30 (JX 32 at 1), S&C Ex. 49 (RX 63 at 1) (also reporting Petitioner's "crude, racist, sexually

inappropriate and offensive comments").  Geistman's report was confirmed by Kargo's Director

of HR when she investigated Petitioner's management style; as she summarized:

"Unfortunately, *abusive* is a word that has come up several times."  S&C Ex. 30 (JX 32 at 1)

(emphasis in original).  After making her complaint to Human Resources, Geistman was fired by

Petitioner.  *See* S&C Ex. 49 (RX 63 at 1); S&C Ex. 54 (RX 91 at 3).

        All three women's testimony found substantial support in the record, but the

arbitrator refused to credit any of it, much less consider the untenable position these charges by

Petitioner's subordinates created for the company.  Among other things, they reported that

Petitioner used racialized and harassing language.  *See* S&C Ex. 54 (RX 91 at 4) ("She used to

call us her 'monkeys' but then stopped because 'she got reported to HR and needed to be better

about her nicknames'"); S&C Ex. 53 (RX 80 at 1) ("the asian is driving me insane[;] i don't

know if i can work with him[;] he is a little too gay"); S&C Ex 54 (RX 91 at 4) ("not hiring

anymore vaginas in this office, only penises").  Further, Gossman reported in an email that

Petitioner had told her "you're going to want to make out with me when you see the raise I got

you" and, in another instance, that Gossman could only attend an industry conference if she were

to sleep in the same room with Petitioner and share a king-sized bed.  S&C Ex. 54 (RX 91 at 3,

5).  Indeed, when Kargo's counsel tried to question Petitioner about this email, and Petitioner's

unprofessional comments in particular, the arbitrator refused to permit such questioning and

instructed counsel to move on.  S&C Decl. ¶ 24.

        That is particularly striking as Petitioner herself wrote in February 2016 — when,

per the arbitrator she was "blindsided," Award at 5, that others thought "working with [her] was

like being in an abusive relationship" and professed to be "eager to work on ways of helping

with [her] stress" and to have "identified some relationships . . . to work on internally," S&C Ex.

48 (RX 48 at 1). Petitioner explained that, among other things, the trauma from her divorce and other personal problems had impacted the way she treated others. *Id.* Yet again, an acknowledgement that goes unmentioned by the arbitrator.

Indeed, in another February 2016 email to Kargman, Petitioner set forth that she had been thinking about taking a leave of absence and "should of done one last year," although she was "[c]onfident through some programs and just being more aware," she could still "overcome this." S&C Ex. 47 (RX 46 at 1). And when the company honored the concept of her "taking a leave of absence" — fully paid and described, at Petitioner's request, as a well-deserved vacation, S&C Ex. 55 (Berger Dep. Tr. 17:9-13; 206:2-22) — it is viewed in the Award as evidence of having "betrayed and humiliated" Petitioner. Award at 75.

Faced with these complaints, Kargo took them seriously — as it was *required* to do by law — and worked hard to try to find a solution that would resolve the problem between Petitioner and her subordinates. Among other things:

- On February 13, 2016, Kargman wrote to Petitioner personally to surface the concerns that had been raised — including that her behavior "appears abusive at times" — and to offer to pay for Petitioner to "get some help / mentoring with this outside the company." S&C Ex. 31 (JX 34 at 1).

- Senior executives met with Petitioner in person on February 17, 2016. Award at 4-5; S&C Ex. 32 (JX 38 at 1) (reporting "internal and external complaints about [Petitioner's] behavior in both [her] markets that are serious in nature").

- Kargo reiterated its concerns in a written performance improvement plan and revised that document at Petitioner's request. S&C Ex. 36 (JX 52 at 3) (identifying "[u]nprofessional behavior," an "[i]nconsistent approach to management" and "[w]ithholding information from [her] team" as "areas of performance concern").

- Kargo's HR directors met with Petitioner on March 9, 2016, to provide a formal warning, at which time, Petitioner again acknowledged that she "needs to be more buttoned up" and to "recalibrate." S&C Ex. 35 (JX 51 at 1).

- Kargo provided Petitioner with paid time off at her then-current $375,000 salary — characterizing it as a vacation at Petitioner's request, *see* S&C Ex. 55 (Berger Dep. Tr. 256:22-257:7); S&C Ex. 29 (JX 29 at 1) — and designed a new position for her

during that period that would alleviate the strain of her managerial responsibilities and allow her to focus on her strength in sales.  S&C Ex. 38 (JX 69 at 2).

- The new position included the potential for Petitioner to earn enhanced commissions such that her overall compensation would not decrease — and, as Kargman testified, by the time of the arbitration hearing, Kargo had already obtained a major new client, which would alone generate over $900,000 in annual commissions.  S&C Decl. ¶ 15.

- Petitioner initially requested more paid time off to consider the position, S&C Ex. 39 (JX 70 at 1), which Kargo agreed to, writing on April 19, 2016 that the company was still "hopeful that [Petitioner] will continue [her] employment with Kargo" and that the structure proposed was an attempt to "maximize [her] and the Company's prospects for success."  S&C Ex. 40 (JX 75 at 2).

- Nevertheless, the next day, Petitioner categorically rejected the new position and said she intended unilaterally to "return to the office and [her] existing position on April 25, 2016."  S&C Ex. 41 (JX 76 at 1).  Her attorney then followed up with a letter and threat to file an EEOC charge on April 22, 2016, S&C Ex. 21 (CX 22 at 2), and an email rejecting Kargo's offer to discuss the new role, S&C Ex. 42 (JX 77 at 2).

- Petitioner never did return to work at Kargo on April 25, 2016, nor on any day thereafter.  As a result, she was put on unpaid leave (but still received health benefits) as of May 2, 2016, S&C Ex. 43 (JX 80 at 1), and then terminated for cause on July 22, 2016 based on a "continuous abandonment of her position for the past three months" and concerns of potential breaches of her non-disclosure and non-compete obligations, S&C Ex. 44 (JX 97 at 1).

Nonetheless, the arbitrator refused to address, and in some cases hear at all, this critical evidence.  The arbitrator flatly ignored Petitioner's own admissions over the course of more than a year that she needed to "button up" her performance and professionalism.[*]  *See* S&C Ex. 46 (RX 26 at 1); S&C Ex. 27 (JX 20 at 1); S&C Ex. 48 (RX 48 at 1) (none of these admissions are so much as mentioned in the Award).  As already previewed, these deficiencies were corroborated by testimony and contemporaneous written documents, which made clear that Kargo was dealing with serious allegations of mismanagement and abuse — all of which were de facto excluded by the arbitrator and never factored into the Award.

---

[*]    The arbitrator cut off Kargman's testimony at the arbitration hearing when has was explaining what a "disaster" Petitioner's conduct was causing for the company, saying "I know what you're going to say."  S&C Decl. ¶ 14.

*First*, the arbitrator refused to consider written evidence in the record from Alexa Geistman, who worked as an account manager in Kargo's Los Angeles office.  Geistman reached out to Human Resources twice in 2015 to complain about Petitioner's unprofessional behavior, including "her crude, racist, sexually inappropriate and offensive comments."  S&C Ex. 49 (RX 63 at 1).  Yet again, the arbitrator totally ignored this evidence, only mentioning Geistman to say that she "had been terminated for [her] poor performance and [] had not worked for Ms. Berger," Award at 22 — while ignoring evidence of record that Petitioner fired Geistman after she complained about Petitioner's actions to Human Resources, *see* S&C Ex. 54 (RX 91 at 3); S&C Ex. 49 (RX 63 at 1), and failing to address the reality that Petitioner managed the Los Angeles office, attended Geistman's review, and interacted with Geistman.  *See id*; *see also* S&C Ex. 55 (Berger Dep. Tr. 172:16-173:15) (admitting it was possible that, on Geistman's first day of work, she [Petitioner] told a story of getting drunk, giving a blowjob, vomiting, then making out with her girlfriend); *id.* at 279:16-280:4 (agreeing with Geistman's depiction that Berger was not "always as buttoned up as [she] probably should have been").

*Second*, the arbitrator effectively excluded Stephanie Biegel's testimony about Petitioner's managerial deficiencies, saying that "Ms. Biegel never brought up Ms. Berger" in discussing her resignation with Kargo's CEO.  Award at 39.  But this blanket dismissal completely ignores Biegel testimony that "a lot" of the reason for her decision to quit "ha[d] to do with [Petitioner]."  S&C Ex. 56 (Biegel Dep. Tr. 39:13-40:7).

And, then, the arbitrator effectively gave no weight to Biegel's testimony because Biegel, a non-lawyer, displayed confusion during the arbitration proceedings as to whether she had been personally represented in deposition preparation by Kargo's counsel.  Award at 33.  Not only did this hardly set forth a reasonable basis for discounting this witness's crucial

testimony as to Petitioner's behavior — making "crude" and "condescending" comments, stating

she "wanted more dicks than chicks" in the Chicago office, throwing her phone, calling her

subordinates "little monkeys" and her team a "dictatorship," and showing a consistent lack of

gratitude for her subordinate's work (S&C Decl. ¶¶ 16-17) — but, the fact that the arbitrator

professed to be troubled by the witness's testimony *during the arbitration* on this issue of

representation by counsel of course tells one nothing as to whether *Kargo* had any reason to

doubt her claims of Petitioner's unprofessional behavior *at the time of the events in question*.

      *Third*, the arbitrator dismissed Aly Gossman's testimony of abuse saying "[t]here

is no credible evidence that Ms. Gossman told Mr. Rohrer" that she would "quit if Ms. Berger

were not removed." Award at 39. Not true. In fact, Gossman made a lengthy,

contemporaneous written complaint that she would quit if Petitioner remained in her managerial

role — stating that "it has reached an unbearable place for myself." S&C Ex. 54 (RX 91 at 1).

Indeed, she testified that she told Rohrer that "it would be very hard for me to stay working

there if [Petitioner] was also working there in the same office" — a fact that Rohrer confirmed.

S&C Ex. 58 (Gossman Dep. Tr. 34:22-35:4); S&C Ex. 62 (Rohrer Dep. Tr. 83:16-84:5).

      Respondent is fully cognizant of the fact that Petitioner claimed and the Award

found that — even if Petitioner were guilty of the improper behavior detailed above —

comparable behavior existed on the part of certain male executives at the company and yet went

unrebuked. *E.g.*, Award at 23-27. Without seeking to debate the precise nature of

comparability, Respondent simply notes: (i) the instances of inappropriate behavior alleged

against male employees by witnesses other than by Petitioner herself pale in comparison to those

raised by other females against her, *id.* at 35-36; (ii) with respect to Petitioner's allegations

against Canty, they are supported by her testimony alone and are uncorroborated by any other

evidence written or oral, *id.* at 27; and (iii) any such claimed misbehavior did not rise to the level

of bringing about threatened or actual resignations by key subordinates based on that conduct, as

was the case with Petitioner, *see* S&C Ex. 60 (Kargman Dep. Tr. at 56:21-57:6).

Ultimately here, the Award reads as if the serious concerns that these women

raised never existed.  The arbitrator's blatant disregard of this evidence and numerous other facts

in the record — coupled with the arbitrator's "cut and paste" approach to the Award — amount

to an effective exclusion of critical proof in Kargo's favor and a failure by the arbitrator "to

execute [her] duty to evaluate the proof submitted by the parties during the arbitration hearing

and to reach [her] own conclusions."  *Hoteles*, 763 F.2d at 37.  They also give rise to an

inference of "evident partiality" from the outset.  *See* Point III, *infra*.  Vacatur is proper in these

circumstances, as the arbitrator "effectively exclude[ed]" evidence that was "central and decisive

to the Company's position."  *Hoteles*, 763 F.2d at 37, 40.[*]  Such misconduct ultimately deprived

Kargo of a full and fair hearing and resulted in a $41 million fundamentally unfair Award.  *See*

*id.* (vacating award that effectively excluded evidence); *Konkar Maritime Enters.*, 668 F. Supp.

at 271 (vacating award not premised on a "full and fair" hearing on the merits).

## POINT III

**THERE ARE SERIOUS QUESTIONS OF (1) EVIDENT PARTIALITY ON THE PART OF THE ARBITRATOR; (2) WHETHER THE ARBITRATOR WAS QUALIFIED TO SIT; AND (3) WHETHER THE ARBITRATOR WAS GUILTY OF "MISBEHAVIOR."**

This is an arbitrator who — in retrospect, *ab initio* — demonstrated "evident

partiality" in favor of Petitioner:  by permitting a $3 million initial claim to transform into a $41

million Award; by electing to ignore settled law in order to reach such a result; by curtailing the

efforts of Respondent's counsel to conduct meaningful examination of witnesses; by choosing to

---

[*]    Additional examples of instances in which Respondent's evidence was excluded are set forth in the accompanying S&C Declaration.  See S&C Decl. ¶¶ 13-26.

ignore critical testimony and documentary evidence central to refuting Petitioner's claim of

"discrimination";  and then in writing an Award remarkable for its liberal "cut and paste"

borrowings from Petitioner's briefing, even down to a typographical error.

But this pattern of "evident partiality" did not end with the hearing.  Even as this

memorandum was being prepared, on July 26, 2017, the arbitrator — unprompted — unilaterally

reached out to the AAA to attempt to reopen the proceedings in favor of Petitioner by inviting

Petitioner to request "interest."  *See* Szczerban Ex. 4 at 2 ("[T]he Arbitrator asks Claimant for

clarification as to her intent; namely, is she abandoning her claim for interest?  If so, the

Arbitrator asks Claimant to provide her position regarding it, along with supporting authority.").

And this, notwithstanding that Petitioner had not pursued the issue:  not requesting interest at the

hearing, S&C Decl. ¶ 31; in her post-hearing briefing, simply reserving "fees and costs" for post-

Award motion practice, S&C Ex. 12 at 83; S&C Ex. 14 at 52; and then ignoring "interest" in her

post-hearing briefing on "attorney fees and costs," S&C Ex. 17; S&C Ex. 20.

Further, the arbitrator — uninvited — took this highly unusual step in the face of:

(i) her own express Award:  "This Award is in full settlement of all claims . . . except for

attorney fees and costs" and "All claims/counterclaims not expressly granted herein are hereby

denied with prejudice," Award at 83; and (ii) the explicit Employment Arbitration Rules of the

AAA:  "The arbitrator is not empowered to redetermine the merits of any claim already

decided," *see* Szczerban Ex. 11 (Rule 40); "The hearing may be reopened by the arbitrator upon

the arbitrator's initiative, or upon application of a party for good cause shown, at any time *before*

the award is made," Szczerban Ex. 11 (Rule 34) (emphasis added).

It was improper for the arbitrator to reach out and endeavor to reopen proceedings

in favor of Petitioner on a claim that Petitioner was not pursuing.  *See* Szczerban Decl. ¶ 8;

Szczerban Ex. 5, 6, 8.  This conduct on the part of the arbitrator is troubling in the extreme and coupled with the arbitrator's pattern of conduct throughout strongly reads of "evident partiality" to Petitioner and is grounds for vacatur, *see* 9 U.S.C. § 10(a)(2).  *See also* S&C Decl. ¶¶ 7-10.

But that is not all.  Post-Award, it has come to Respondent's attention that a Justice of the New York Supreme Court, back in 2012, issued an opinion in which she found "troubling" a lack of candor by Arbitrator Colombaro in the representations made by her as plaintiff in a sworn affidavit in a private litigation.  *Colombaro* v. *Gilad*, Index No. 650609/11, No. 17, at 7 (Sup. Ct. N.Y.  Aug. 31, 2012) (Kapnick, J.) (Szczerban Ex. 6).[*]  This opinion — not disclosed to the parties in this proceeding and presumably never disclosed to the AAA by the arbitrator in setting forth her "Qualification[s]" (*see* S&C Decl. ¶ 5) — is plainly at odds with the requirements of the AAA's "Qualification Criteria," that all AAA arbitrators be "[h]eld in the highest regard by peers for integrity, fairness and good judgment."  *See* Szczerban Decl. ¶ 11; Szczerban Ex. 12.  It is submitted that the characterization of the arbitrator's sworn conduct by a Justice of the New York Supreme Court is diametrically inconsistent with that "highest regard."

The arbitration agreement here calls for arbitration before the AAA.  S&C Ex. 24 (JX 2 at § 8.12).  The FAA is clear that, where a method for appointment is defined in the arbitration agreement, that method "shall be followed."  9 U.S.C. § 5.  That is not the case here.  Vacatur is the proper remedy.[**]  *See Avis Rent A Car Sys., Inc.* v. *Garage Employees Union*, 791 F.2d 22, 25 (2d Cir. 1986) (vacatur proper for "awards entered by arbitrators whose qualifications or method of appointment fail to conform to arbitration clauses"); *Move, Inc.* v.

---

[*]    Per Kapnick, J.:  "It is troubling to this Court that the initial papers submitted by plaintiff, who is 'a member of the Bar and a former member of the judiciary' make no mention of the Baltic project to which she made a capital contribution of $250,000 apparently prior to March 2008, for which she received a 9.10% membership interest, and which mailed her K-1's for several years."  *Id.*

[**]    While a court may instinctively hesitate to vacate an arbitration award on such grounds after the arbitration has concluded, it should be noted that under Second Circuit precedent it is only post-arbitration that such grounds may be raised.  *Aviall, Inc.* v. *Ryder System, Inc.*, 110 F.3d 892, 895-96 (2d Cir. 1997).

*Citigroup Global Markets, Inc.*, 840 F.3d 1152, 1159 (9th Cir. 2016) (Party was "prejudiced by the inclusion of an arbitrator" who "should have been disqualified from arbitrating the dispute in the first place").

Moreover, the arbitrator's résumé of her qualifications as presented to the parties contained no mention of this negative commentary by Justice Kapnick.  S&C Decl. ¶ 5; S&C Ex. 1.  Presumably, the same is the case with respect to whatever data the arbitrator presented to the AAA.  It would seem plain that this negative information was material to the AAA's election to approve her as an arbitrator as well as the parties' choice of her as acceptable for that role for this arbitration.  S&C Decl. ¶ 5.[*]  As set forth in the S&C Decl. ¶ 5, under no circumstance would Respondent's counsel have included Ms. Colombaro in their rankings of acceptable arbitrators had they been aware of this issue of her probity.  The arbitrator thus "omitted to disclose" material negative information going toward her qualifications, which omission constitutes "misbehavior," 9 U.S.C. § 10(a)(3), and compels vacatur.

## CONCLUSION

For all of the forgoing reasons, the petition to confirm should be denied and the Award should be vacated or modified as indicated.

---

[*]    Nevertheless, Respondent notes that on the morning of this filing, the AAA notified the parties, without explanation, that it was declining to disqualify the arbitrator.  *See* Szczerban Decl. ¶ 10; Szczerban Ex. 10.

Dated:  New York, New York
        August 4, 2017

Respectfully submitted,

WACHTELL, LIPTON, ROSEN & KATZ


By:    /s/ Herbert M. Wachtell
            Herbert M. Wachtell

Herbert M. Wachtell
S. Christopher Szczerban[*]
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Respondent Kargo Global, Inc.*

---

[*]    Adam Sowlati, a newly admitted member of the New York bar, but not yet a member of this Court, participated in the preparation of this memorandum.