UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
In the Matter of Arbitration between,                          :
                                                               :
ALEXIS BERGER,                                                 :
                                                               :
                              Petitioner,                      :
                                                               :        Case No. 17-cv-04288 (RA)
               -and-                                           :
                                                               :
KARGO GLOBAL, INC.,                                            :
                                                               :
                              Respondent.                      :
-------------------------------------------------------------- X

### RESPONDENT'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO VACATE OR MODIFY THE ARBITRATION AWARD

WACHTELL, LIPTON, ROSEN & KATZ

Herbert M. Wachtell
S. Christopher Szczerban
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000
*Attorneys for Respondent Kargo Global, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT .....................................................................................................2

POINT I   THERE IS NO BASIS FOR LIQUIDATED DAMAGES UNDER STATE
OR FEDERAL LAW. ............................................................................ 2

      A.   The New York Labor Law does not apply to Petitioner, an Illinois
employee. ........................................................................................ 3

      B.   Options are not "wages" covered by the New York Labor Law. ................ 6

      C.   Petitioner's termination — and consequent loss of options — was
not a "pay" decision, Petitioner has not contested this, and
accordingly there is no basis for a violation of the equal pay laws. ............. 8

POINT II   THE ARBITRATION WAS FUNDAMENTALLY UNFAIR BECAUSE
THE ARBITRATOR EFFECTIVELY EXCLUDED RESPONDENT'S
EVIDENCE ...................................................................................... 9

POINT III   THE ARBITRATOR SHOULD NEVER HAVE BEEN SEATED IN THE
FIRST INSTANCE AND HER SUBSEQUENT CONDUCT
DEMONSTRATES HER EVIDENT PARTIALITY............................................ 13

CONCLUSION..................................................................................................18

# TABLE OF AUTHORITIES

<u>Cases</u>

*Asturiana De Zinc Mktg., Inc.* v. *LaSalle Rolling Mills, Inc.*,
  20 F. Supp. 2d 670 (S.D.N.Y. 1998) ............................................................... 4

*Aviall, Inc.* v. *Ryder Sys., Inc.*,
  110 F.3d 892 (2d Cir. 1997) ........................................................................... 15

*Avis Rent A Car Sys., Inc.* v. *Garage Emps. Union, Local 272*,
  791 F.2d 22 (2d Cir. 1986) ............................................................................. 14

*Cellu-Beep, Inc.* v. *TeleCorp Commc'ns, Inc.*,
  2014 WL 3585515 (S.D.N.Y. July 18, 2014) .................................................. 17

*Chen-Oster* v. *Goldman, Sachs & Co.*,
  2017 WL 1378265 (S.D.N.Y. Apr. 12, 2017) ............................................ 5 n**

*Colombaro* v. *Gilad*,
  Index No. 650609/11, No. 17 (Sup. Ct. N.Y. Aug. 31, 2012) ...................... 14

*Duferco Int'l Steel Trading* v. *T. Klaveness Shipping A/S*,
  333 F.3d 383 (2d Cir. 2003) ..................................................................... 3, 9 n*

*Econn* v. *Barclays Bank PLC*,
  2010 WL 9008868 (S.D.N.Y. June 10, 2010) .................................................. 7

*Gilman* v. *Marsh & McLennan Cos., Inc.*,
  868 F. Supp. 2d 118 (S.D.N.Y. 2012) ....................................................... 7 n*

*Guiry* v. *Goldman, Sachs & Co.*,
  814 N.Y.S.2d 617 (1st Dep't 2006) .................................................... 7 & n*, 8

*Halligan* v. *Piper Jaffray, Inc.*,
  148 F.3d 197 (2d Cir. 1998) ............................................................................ 4

*Hammell* v. *Paribas*,
  1993 WL 426844 (S.D.N.Y. Oct. 22, 1993) .................................................... 5

*Hoffman* v. *Parade Publ'ns*,
  15 N.Y.3d 285 (2010) ......................................................... 3, 4, 5 & n**

*Hooks* v. *Forman Holt Eliades & Ravin LLC*,
  2012 WL 3322637 (S.D.N.Y. Aug. 13, 2012) ................................................ 8

*Hoteles Condado Beach* v. *Union de Tronquistas Local 901*,
  763 F.2d 34 (1st Cir. 1985) ........................................................................... 13

*In re Stage Presence Inc.*,
  559 B.R. 93 (Bankr. S.D.N.Y. 2016) .............................................................. 6

*Kassman* v. *KPMG LLP*,
  925 F. Supp. 2d 453 (S.D.N.Y. 2013) ......................................................... 3, 5

*Magnuson* v. *Newman*,
  2013 WL 5380387 (S.D.N.Y. Sept. 25, 2013) ................................................ 5

*NYKCool A.B.* v. *Pac. Fruit, Inc.*,
    2013 WL 163621 (2d Cir. Jan. 16, 2013) .................................................................. 9 n*

*O'Neill* v. *Mermaid Touring, Inc.*,
    968 F. Supp. 2d 572 (S.D.N.Y. 2013) ...................................................................... 5

*Rodal* v. *Anesthesia Grp. of Onondaga, P.C.*,
    369 F.3d 113 (2d Cir. 2004) ................................................................................. 5 n*

*Ryan* v. *Kellogg Partners Institutional Servs.*,
    19 N.Y.3d 1 (2012) ............................................................................................. 7

*Scandinavian Reinsurance Co. Ltd.* v. *Saint Paul Fire & Marine Ins. Co.*,
    668 F.3d 60 (2d Cir. 2012) .................................................................................. 17

*Talwar* v. *Staten Island Univ. Hosp.*,
    610 F. App'x 28 (2d Cir. 2015) ............................................................................ 9

*Truelove* v. *Ne. Capital & Advisory, Inc.*,
    95 N.Y.2d 220 (2000) ................................................................................... 7 & n*

*United States* v. *Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ............................................................................. 5 n*

*Warman* v. *Am. Nat'l Standards Inst.*,
    2016 WL 3676681 (S.D.N.Y. July 6, 2016) .................................................. 4, 5, 6

Statutes

CPLR § 3213 ....................................................................................................... 14

9 U.S.C. § 10(a)(3) ............................................................................................... 14

9 U.S.C. § 10(a)(4) ............................................................................................... 14

29 U.S.C. § 216 ................................................................................................. 9 n*

29 U.S.C. § 260 ................................................................................................. 9 n*

NYLL § 190(1) ........................................................................................... 6, 7 & n*

NYLL § 193 ................................................................................................. 7 & n*

NYLL § 194 ...................................................................................................... 7, 9

Other Authorities

28 Am. Jur. 2d Estoppel and Waiver § 68 ............................................................. 5 n*

## PRELIMINARY STATEMENT

This case presents a confluence of circumstances that individually and collectively require the extraordinary $41 million arbitration award at issue to be vacated entirely or, at a minimum, substantially modified.  As previously set forth, the Award is predicated on a manifest disregard of the reach of state and federal employment laws; the arbitration process was fundamentally unfair; the arbitrator has plainly demonstrated evident partiality to Petitioner; and the arbitrator would not have been permitted to sit in these proceedings, *ab initio*, but for her wrongful misbehavior in misleading the parties about her qualifications.[*]

Indeed, Petitioner's answering papers are most notable for what they do not dispute.  Among other things:

- Petitioner cites no authority to counter Respondent's argument that, as a matter of settled substantive law, the New York Labor Law — the predicate for the award of quadruple damages — does not apply to an out-of-state employee like Petitioner;

- Petitioner further does not contest that that Labor Law's definition of "wages" has been authoritatively held not to extend to "options," and is unable to offer any authority that this is not true of Petitioner's defeasible options, vested or unvested;

- Petitioner does not even contest Respondent's showing that federal as well as state equal pay laws — which offer the only grounds for multiple damages — do not apply to a "non-pay" decision like the employment termination resulting in the defeasance of those options, thus essentially now rendering the first two issues academic;

- Petitioner does not dispute the accuracy of Respondent's recitation of the wealth of evidence of Petitioner's abusive managerial conduct — evidence largely ignored by the arbitrator;

- Petitioner admits — by reason of an improper disclosure by Petitioner's own counsel — that pre-hearing the arbitrator became aware that it was Respondent that had sought to have her removed for, among other things, failing to show up at the commencement of the scheduled hearing — which circumstance, including the arbitrator's subsequent conduct, gave rise to "evident partiality"; and

[*]   "Resp. Br." refers to Respondent's brief in opposition to the petition to confirm and in support of its motion to vacate or modify.  Defined terms from that briefing are incorporated herein.  "Pet. Reply" refers to Petitioner's reply brief submitted on August 25, 2017.  Submitted herewith are the Reply Declaration of Tracy Richelle High of Sullivan & Cromwell ("S&C Reply Decl.") and Respondent's response to Petitioner's evidentiary objections.

- Petitioner is unable to contest that it was first learned post-hearing that a respected Justice of the New York Supreme Court had sharply chastised the arbitrator for submitting a misleading sworn affidavit in a private litigation; that the arbitrator never disclosed this material fact to the parties; and that, if disclosed, the arbitrator would not have been seated in the first instance.

These concessions — even standing alone — are fatal to Petitioner's confirmation petition.  An award cannot be confirmed, under the FAA and controlling case law, if it is based on "manifest disregard of law," "fundamental unfairness," "evident partiality," or if it was delivered by an arbitrator who, but for her own "misbehavior," would not have been permitted to preside over the proceedings in the first instance.  The Award should be vacated in its entirety or, at a minimum, substantially modified.

## ARGUMENT

## POINT I

### THERE IS NO BASIS FOR LIQUIDATED DAMAGES UNDER STATE OR FEDERAL LAW.

The arbitrator purported to award quadruple damages under the equal wage section of the New York Labor Law — trebled liquidated damages of $27 million in addition to single damages of $9 million — for claimed wrongful deprivation of options.  There are three independent grounds why such an award of quadruple damages is unsustainable:  (1) the New York Labor Law has no applicability to an out-of-state employee such as Petitioner; and (2) the New York Labor Law does not treat options as "wages."  Thus, as previously shown, and further discussed below, *see* Points I(A) and I(B), *infra*, the arbitrator's invocation of that New York statute to provide such quadrupling resulted from manifest disregard of law.  Additionally — and essentially now rendering the first two academic — (3) whether under that Labor Law or the federal Equal Pay Act, there is no valid claim in that — as goes *un*addressed by Petitioner — the termination of Petitioner's options was not a "pay" decision.  *See* Point I(C), *infra*.

2

**A.      The New York Labor Law does not apply to Petitioner, an Illinois employee.**

Petitioner challenges Respondent's first ground for overturning the arbitrator's award of quadruple damages, arguing that the absence of extraterritoriality of the Labor Law was not brought to the arbitrator's attention.  Pet. Reply at 13-15.  That is not quite the case.

*First*, as Petitioner concedes, *see* Pet. Reply at 13-16, Respondent explicitly brought to the arbitrator's attention the New York Court of Appeal's seminal decision in *Hoffman* v. *Parade Publ'ns*, 15 N.Y.3d 285, 290-92 (2010).  *See, e.g.*, S&C Ex. 13 at 29.  The Court in *Hoffman* made clear the absence of extraterritorial reach of New York's employment laws — in that case, the New York State and City Human Rights Laws — holding that only "those who work in New York fall within the class of persons *who may bring discrimination claims in New York*."  15 N.Y.3d at 291 (emphasis added).

Nothing in the Court's opinion suggests that such a rule of law as to "discrimination claims in New York" would not apply to a case such as this under the Labor Law.  Under New York statutes generally, there is a "presumption against extraterritoriality." *See, e.g.*, *Kassman* v. *KPMG LLP*, 925 F. Supp. 2d 453, 469 (S.D.N.Y. 2013).  As the Court explained in *Hoffman*, New York statutes do not apply extraterritorially where they were "enacted" through "the police power of [New York State] for the protection of the public welfare, health and peace of the people of this state," *see id.* at 291 — a doctrine that squarely includes the Labor Law.  The arbitrator, a former appellate judge, was therefore clearly on notice that the Labor Law, as well as the Human Rights Laws, had no extraterritorial effect.  *See Duferco Int'l Steel Trading* v. *T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (manifest disregard applies to "an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator").

*Second*, the arbitrator herself understood and states in her Award that Respondent "submits that *New York law* does not control this case," Award at 3 (emphasis added), not that "the *New York Human Rights Laws* do not control this case."

*Third*, concededly — and necessarily — it cannot be disputed that *Hoffman* explicitly brought the *Human Rights Laws*' inapplicability to out-of-state employees to the arbitrator's attention. Yet, the Award proceeded totally to ignore *Hoffman* and its holding, and, instead — without explication — repeatedly relies throughout (*e.g.*, Award at 14-16; 42; 48-49; 53-54; 60-62; 64; 79; 81; 82-83) upon those very Human Rights Laws in support of its conclusions. Manifest disregard indeed. There is no reason whatsoever to deem that the arbitrator would not have done likewise even had there been express reference to the Labor Law.

*Fourth*, nowhere in the Award is there any discussion or analysis — Human Rights Laws and Labor Law alike — as to how such laws could apply in the face of *Hoffman* to an out-of-state employee such as Petitioner. More is required to uphold an award under the Labor Law, especially where, as here, the arbitrator was required to make a "Reasoned Award." *See* S&C Ex. 5 at ¶ 14. Indeed, "when a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrator[ ] to explain the award can be taken into account." *Halligan* v. *Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998); *see Asturiana De Zinc Mktg., Inc.* v. *La Salle Rolling Mills, Inc.*, 20 F. Supp. 2d 670, 675 (S.D.N.Y. 1998) (finding manifest disregard of law where "the arbitrator gave no explanation for the award" and petitioner "has offered none that remotely squares with New York law").

*Finally*, it is beyond cavil that the Labor Law has no extraterritorial reach. *E.g.*, *Warman* v. *Am. Nat'l Standards Inst.*, 2016 WL 3676681, at *2 (S.D.N.Y. July 6, 2016) ("As [the Labor Law] is silent on its extraterritorial application, courts in this district have held that it

4

does not apply extraterritorially."); *Kassman*, 925 F. Supp. 2d at 469 (holding that the New York

Labor Law "does not apply to people who live and work outside of New York State");

*Magnuson* v. *Newman*, 2013 WL 5380387, at *5 (S.D.N.Y. Sept. 25, 2013) (holding that the

New York Labor Law does not apply extraterritorially); *O'Neill* v. *Mermaid Touring, Inc.*, 968

F. Supp. 2d 572, 579 (S.D.N.Y. 2013) (holding that the Labor Law does not apply

extraterritorially; the "crucial issue is where the employee is 'laboring'"); *Hammell* v. *Paribas*,

1993 WL 426844, at *1 (S.D.N.Y. Oct. 22, 1993) ("The purpose of this area of the labor law is

clearly to protect workers laboring in New York.  Nothing in the statute suggests that the

legislators intended to give persons who were employed outside New York the right to come to

New York to sue their employers and thus collect attorney's fees.").[*]

       Petitioner argues that the Labor Law's applicability depends on some species of

an "impact" test.  Pet. Reply at 15-16.  Not so.  Whatever *Hoffman*'s "impact" test may be under

the Human Rights Laws — and even there, per the Court, it only applies to "nonresidents who

work" in New York, 15 N.Y.3d at 290-91, a standard that would not include Petitioner who

admittedly worked in Illinois[**] — it is clear the impact test has no role under the New York

Labor Law.  *See, e.g.*, *Warman*, 2016 WL 3676681, at *2 (explaining that an "interest analysis"

---

[*]    Petitioner argues that the "law of the case doctrine" and "judicial estoppel" preclude Respondent from "arguing New York law does not apply."  Pet. Reply at 12.  Respondent makes no such argument:  New York law — including the Labor Law — most definitely does "apply" to, and govern, this litigation.  However, as a matter of substantive New York law, it does not "apply" to Petitioner, an out-of-state employee.  Moreover, the "law of the case doctrine" has no applicability to a reviewing court, *United States* v. *Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002), and "judicial estoppel" applies only where a party has succeeded in asserting a position before a court, and then attempts to maintain the contrary position.  *Rodal* v. *Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  That is not remotely the case here.  Moreover, judicial estoppel "does not extend to inconsistent opinions or legal positions."  *See* 28 Am. Jur. 2d Estoppel and Waiver § 68.

[**]    Further, as previously set forth, in *Hoffman*, the Court held that the facts at issue there did not amount to "impact" on New York, and, here, Petitioner's contacts with the State fall short of even those in *Hoffman*.  Resp. Br. at 15.  Similarly, in *Chen-Oster* v. *Goldman, Sachs & Co.* — likewise a Human Rights Law case — unlike here, the plaintiff "'regularly travel[ed] to and work[ed] from Goldman Sachs's New York, New York office'" and serviced New York clients.  2017 WL 1378265, at *9 (S.D.N.Y. Apr. 12, 2017).  Neither of these cases even remotely suggests — as Petitioner does, Pet. Reply at 16-17 — that New York law would apply merely because an out-of-state employee moved to New York after being terminated.

does not apply to [Labor Law] claims because the "statute does not have extraterritorial reach");
*In re Stage Presence Inc.*, 559 B.R. 93, 100 (Bankr. S.D.N.Y. 2016) (noting that no case has
applied an impact test under the New York Labor Law "or has given such extraterritorial effect
to the New York Labor Law").

   Finally, Petitioner argues that Respondent consented to the Labor Law's
applicability.  In the face of Respondent's showing that the choice-of-law provision in
Petitioner's employment agreement did not "operate to overcome the substantive statutory
restrictions on the reach of New York's employment laws," Resp. Br. at 16-17,  Petitioner first
argues that Respondent impliedly consented to the Labor Law's applicability by raising
affirmative defenses under that law.  But "the assertion of affirmative defenses" under the Labor
Law "does not amount to consent" to its applicability.  *Warman*, 2016 WL 3676681 at *4.
Petitioner then argues that a stipulation in the arbitration proceeding between the parties that
"[a]ll substantive issues shall be governed by New York law" somehow excuses the arbitrator
from manifestly disregarding the inapplicability of the New York Labor Law.  *See* Pet. Reply at
4, 10.  It does not.  While the Labor Law indeed "governed," its provisions, as a matter of
substantive law, do not extend to out-of-state employees.

## B. Options are not "wages" covered by the New York Labor Law.

   The second independent ground precluding the grant of quadruple damages for
terminated options is that settled New York law holds that options are not "wages" under the
equal wage section of the New York Labor Law.  Petitioner's contrary arguments are unavailing.

   Petitioner argues that, because courts generally interpret Labor Law § 194
consistent with the federal Equal Pay Act, the definition of "wages" under the Labor Law should
likewise track the federal *definition*.  Pet. Reply at 25.  This argument flies in the face of the fact
that, as to the predicate requirement that the claim involves "wages," Labor Law § 190(1)

contains its own distinct and different definition — a definition that the New York courts have been uniform in holding does *not* include options.  Thus, the Court of Appeals has explicitly held that this "wages" definition *excludes* "certain forms of 'incentive compensation' that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise."  *Truelove* v. *Ne. Capital & Advisory, Inc.*, 95 N.Y.2d 220, 223-24 (2000).  As a result, "[d]eferred awards of stock and stock options" — which "plainly serve the function of giving employees an incentive to stay with the firm and to maximize the value of the firm's business" — are not "wages."  *E.g.*, *Guiry* v. *Goldman, Sachs & Co.*, 814 N.Y.S.2d 617, 618-19 (1st Dep't 2006); *Econn* v. *Barclays Bank PLC*, 2010 WL 9008868, at *5 (S.D.N.Y. June 10, 2010) (claim for violation of Labor Law premised on options "dismissed as a matter of law because [they] did not constitute 'wages' under New York law").

Next, Petitioner argues that *Guiry* and other cases were decided under Labor Law § 193 and therefore should not apply to Labor Law § 194, the equal wage section.  Pet. Reply at 23-24.  Patently not so.  Both § 193 and § 194 are located in Article 6 of the Labor Law — and § 190(1) explicitly defines "[w]ages" "[a]s used in this article."  As a result, there is zero reason to think that § 190(1)'s definition of "wages" should have two different meanings.[*]

Petitioner then, in a footnote, argues that vested options should not be deemed "incentive compensation."  Pet. Reply at 23 n.3.  Petitioner offers no authority supporting any such distinction between vested and unvested options.  Indeed, the single case cited by Petitioner — *Ryan* v. *Kellogg Partners Institutional Servs*. — dealt with a bonus whose payment was "guaranteed" and never subject to defeasance.  19 N.Y.3d 1, 11 (2012).  In contrast, Kargo's

---

[*]     Nothing in *Guiry* or related cases purports to limit their interpretation of "wages" as defined in § 190(1) to only cases under § 193.  *See Guiry*, 814 N.Y.S.2d at 619; *Truelove*, 95 N.Y.2d at 223 ("The dispositive issue in this case is whether plaintiff's bonus constitutes 'wages' within the meaning of the Labor Law."); *Gilman* v. *Marsh & McLennan Cos., Inc.*, 868 F. Supp. 2d 118, 135 (S.D.N.Y. 2012), *aff'd*, 654 F. App'x 16 (2d Cir. 2016) ("Equity-based awards to incentivize employees to remain with an employer do not constitute 'wages' under the NYLL.").

Stock Incentive Plan explicitly allows options — vested and unvested alike — to be voided when an employee refuses to perform called-for services, S&C Ex. 23 (JX 1 at §§ 5.6.1, 8), *i.e.*, these vested options were not "guaranteed" but rather structured to ensure that Respondent was incentivized to perform future services, to "stay with the firm and to maximize the value of the firm's business." *Guiry*, 814 N.Y.S.2d at 619.

Finally, contrary to Petitioner's assertion that "Kargo never raised the argument that it does now," Pet. Reply at 21, this rule of law was expressly cited to the arbitrator — but completely ignored. *See* S&C Ex. 13 at 62 (noting that stock options "are incentive compensation" under *Guiry* and "do not constitute wages under New York Labor Law").

**C.     Petitioner's termination — and consequent loss of options — was not a "pay" decision, Petitioner has not contested this, and accordingly there is no basis for a violation of the equal pay laws.**

The showing in Point I(C) in Respondent's Opening Brief — that those federal and state laws providing for multiple damages did not apply to non-"pay" decisions like the defeasance of Petitioner's options here — goes undisputed in Petitioner's papers.

The federal Equal Pay Act provides for double damages in the case of a willful violation.  Nonetheless, as shown in Respondent's Opening Brief, uniform case law holds that equal pay claims under that statute must be premised upon "*pay*" decisions, not employment decisions that may have the collateral effect of depriving an employee of "pay," such as the decision here to terminate Petitioner's employment with consequent defeasance of her options. Resp. Br. 21-26.  Respondent made this abundantly clear to the arbitrator — noting in its briefing that the Equal Pay Act is a "narrowly tailored statute."  S&C Ex. 13 at 50.

Petitioner in her briefing offers no rebuttal whatsoever to this controlling law. Accordingly, no valid claim may be asserted here under that federal statute.  *See Hooks* v. *Forman Holt Eliades & Ravin LLC*, 2012 WL 3322637, at *7 (S.D.N.Y. Aug. 13, 2012) ("[T]o

the extent Plaintiffs have failed to respond to the arguments raised by Defendants in their briefing . . . Plaintiffs have effectively waived this claim.").[*]

Moreover, as the Award recognizes, the New York Labor Law is to be construed likewise.  *See* Award at 54 (citing *Talwar* v. *Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 n.2 (2d Cir. 2015) ("An equal pay claim under New York Labor Law § 194 'is analyzed under the same standards applicable to the federal Equal Pay Act.'")).  This is thus a *third* independent reason why the award of quadruple damages under the Labor Law must be vacated and, accordingly, it is now clear that it is actually unnecessary for this Court to consider the first two in voiding quadruple damages under the New York statute.

Accordingly, as set forth in Respondent's opening brief — if not otherwise precluded, *see* Points II and III, *infra* — single damages *could* lie under federal Title VII,[**] but there is no basis for doubling such damages under the federal Equal Pay Act, or quadrupling them under the New York Labor Law, and Petitioner fails to show otherwise.

## POINT II

## THE ARBITRATION WAS FUNDAMENTALLY UNFAIR BECAUSE THE ARBITRATOR EFFECTIVELY EXCLUDED RESPONDENT'S EVIDENCE.

Petitioner does not at all address the multitude of evidence that the arbitrator ignored and thereby effectively excluded.  As previously set forth, this evidence shows that

---

[*]    One further point may be worth mention.  Although the arbitrator found a violation of the federal statute — a ruling that, as noted, Petitioner does not even attempt to defend — the Award nonetheless does not then grant any relief predicated upon that statute.  Award at 82-83.  If violated without "good faith" and "reasonable grounds," the federal Equal Pay Act provides for a single addition of liquidated damages over actual.  *See* 29 U.S.C. §§ 216, 260.  Respondent recognizes that, in an appropriate case, it would be within the power of a court to grant relief not awarded by an arbitrator.  But, in doing so, it would be the Court itself that would then be providing relief, and, accordingly, the "manifest disregard of law" that would apply to actions by the arbitrator does not apply.  Rather, the standard would be one of "'proper application of law.'"  *See, e.g.*, *NYKCool A.B.* v. *Pac. Fruit, Inc.*, 2013 WL 163621, at *3 (2d Cir. Jan. 16, 2013); *Duferco*, 333 F.3d at 390-92 (noting that, "[e]ven absent a plausible reading free of error, we would confirm the award if we *independently* found legal grounds to do so") (emphasis added).

[**]    This is, of course, the answer to Petitioner's complaint that, if denied a remedy under the New York statutes, she would be without recourse.  And then there are also the common law claims asserted by Petitioner and endorsed by the Award.  *E.g.*, Award at 59-60.

9

Petitioner acted unprofessionally and abusively toward her subordinates, forcing Respondent to intervene to remedy a hostile work environment and avoid the potential mutiny that Petitioner fomented.  *See* Resp. Br. at Point II.  Indeed, one can search the Award in vain for any recognition of management being required by law to deal with a hostile work environment.

Petitioner's sales prowess was undoubtedly impressive — CEO Harry Kargman praised Petitioner for being a "force" on his "side," Award at 6, and had promoted her based on her success, S&C Ex. 28 (JX 22 at 1) — but the counterpoint was that, in her managerial role, Petitioner had severe deficiencies that she herself repeatedly acknowledged, including:

- In February 2015, Petitioner admitted in writing:  "Please know that I'm aware that I need to button it up and I am going to make a conscious effort to do so.  I would never want to offend anyone and perhaps my humor is misinterpreted as such.  As we grow, I need to be careful of this.  I'm on it."  S&C Ex. 46 (RX 26 at 1).

- In March 2015, Petitioner acknowledged senior management's "major hesitations" concerning her advancement at the Company.  S&C Ex. 27 (JX 20 at 1).

- In February 2016, Petitioner wrote that she was aware of complaints that "working with [her] was like being in an abusive relationship," that she "had a very rough year" in her personal life (among other things she noted her divorce) and "being [a] work-aholic . . . it affected those around [her]," and that she was "eager to work on ways of helping with [her] stress" and had "identified some relationships . . . to work on internally."  S&C Ex. 48 (RX 48 at 1).

- In March 2016, HR notes show that Petitioner "acknowledges" her "[u]nprofessional behavior — as [the] company grows she needs to be more buttoned up" and that she needed to "recalibrate."  S&C Ex. 35 (JX 51 at 1).  Indeed, on multiple occasions, Petitioner further recognized that she needed to "take more time off."  *Id.*; *see also* S&C Ex. 47 (RX 46 at 3-4) (disclosing that in 2015 she had contemplated taking a leave of absence); S&C Ex. 48 (RX 48 at 1) (acknowledging that she had "marched forward as if nothing was going on").

- In her deposition, Petitioner admitted receiving feedback throughout 2015 and 2016 that she "need[ed] to increase [her] personal effectiveness as a manager."  S&C Ex. 55 (Berger Dep. Tr. 246:4-13).  She recognized the written concerns of Kargo's CEO, saying she "wanted to alleviate any concerns that [senior management] had about [her]."  *Id.* at 206:4-6.  She also agreed with a subordinate's depiction that she was not "always as buttoned up as [she] probably should have been."  *Id.* at 279:16-280:4.  Finally, she could not deny telling subordinates a story of getting drunk, giving a blowjob, vomiting, and then making out with her girlfriend.  *Id.* at 173:8-20.

10

All of this was ignored or dismissed by the arbitrator.

      Senior management's contemporaneous concerns about Petitioner are likewise well documented.  In February 2015, Petitioner was told she needed to begin "buttoning up [her] professionalism in office."  S&C Ex. 46 (RX 26 at 2).  In March 2015, Kargo's CEO, Harry Kargman, explained to Petitioner that she needed to "project a change in [her] approach" in order to get a promotion, S&C Ex. 27 (JX 20 at 2-4).  She was "quick to point blame on others" and her conduct was "[t]hreatening."  S&C Ex. 27 (JX 20 at 2-3).  Indeed, Petitioner did not then get the desired promotion.  *See* S&C Ex. 28 (JX 22 at 1).  All of this is uncontested by Petitioner and goes unmentioned in the Award, which rather states that in February 2016 Petitioner was supposedly "blindsided" by criticism.  *See* Award at 5.

      Moreover, Petitioner does not at all dispute contemporaneous documented evidence of acute complaints of her behavior:  that Petitioner was "unprofessional," "erratic," "very polarizing" and "abusive"; that Petitioner frequently made "crude, racist, sexually inappropriate and offensive comments"; that Petitioner verbally abused her subordinates, including calling them "monkeys"; that she declared "the asian . . . is a little too gay"; that Petitioner told a subordinate that she would want to "make out with" Petitioner and could only attend a conference if she slept in the same bed as Petitioner; that Petitioner declared she would "not [be] hiring anymore vaginas in this office, only penises.  There's too much estrogen around here"; and that Petitioner had created an environment that "reached an unbearable place for . . . a number of individuals within the Chicago and West coast offices."  Resp. Br. at 4-6, 30-35.

      Similarly, Petitioner does not dispute the testimony of Petitioner's subordinates, who averred that Petitioner termed her team a "dictatorship," showed a consistent lack of gratitude for subordinates' work, threw her phone while at the office, made subordinates feel

"siloed" and "stunted" and "scared," said she "wanted more dicks than chicks" in the Chicago

office, and caused subordinates to threaten to, or actually, resign.  Resp. Br. at 5-6, 30, 35.

And there can be no dispute that the Company sought to accommodate Petitioner,

including by designing for her a new sales-only position, giving her a month of paid leave, and

refraining from terminating her for months despite her refusal to work.  Resp. Br. at 32-33.

Petitioner in her papers does not dispute the accounts of three of her female

subordinates, *see* Resp. Br. at 4-6, 30-31, 34-35, but rather raises a number of baseless objections

and argues that the arbitrator was correct to ignore this evidence, Pet. Reply 27-29, 31.  These

critiques are unsupported:  there was no basis to exclude the evidence from these women.[*]

Likewise, Petitioner attempts to dismiss the egregiousness of her conduct towards

these and other subordinates by claiming that there was a double standard under which male

colleagues were not disciplined for the same conduct.  Pet. Reply at 32-33.  While Petitioner

maintains that her "problematic traits were precisely the same shared by (and even prized) in her

male colleagues," Pet. Reply at 32, in support of this, Petitioner points only to snippets from the

Award where male colleagues used "profane, inappropriately suggestive, and politically

incorrect offensive language" or exhibited "emotional erratic behaviors."  *Id.* at 32-33 (citing

Award at 24-25).  But, with one exception — a claim by Petitioner that a male colleague

proposed sexual conduct to her, Award at 27 — none of the conduct of Petitioner's male

---

[*]    For example, Petitioner's only challenge to Alexa Geistman's account was that she did not report to Petitioner, Pet. Reply at 31, but Petitioner does not dispute that Petitioner managed the Los Angeles office, was with Geistman on her first day of work, attended Geistman's review, and was the person to fire Geistman.  S&C Ex. 49 (RX 63 at 1); *see also* S&C Ex. 55 (Berger Dep. Tr. 172:16-173:15).  Additionally, Petitioner argues that Stephanie Biegel's testimony should be discounted because of purported credibility issues, but her alleged inability to answer at her deposition a technical, compound question about her representation has nothing to do with how Respondent dealt with her complaints at the time.  *See* S&C Ex. 56 (Biegel Tr. 9:2-7); S&C Reply Decl. ¶ 16.  Finally, as to Aly Gossman, there is no dispute as to the substance of a damning five-page email she wrote describing Petitioner's abusive conduct.  Rather, Petitioner vaguely notes that the arbitrator "allowed examination regarding" the email.  Pet. Reply at 29.  But Petitioner does not dispute that *Respondent* was restricted in its examination with respect to the email.  S&C Decl. ¶ 24.  Petitioner's evidentiary objections are further addressed in Respondent's accompanying response.

colleagues came close to approaching the level of the abusive behavior by Petitioner.  And that one claim by Petitioner is supported only by her own testimony — and more to the point — there is a total absence of *any* evidence that it was ever called to the attention of Human Resources or management at the time.  Thus, Respondent could hardly be accused of disparate treatment.  The bottom line is that, even from the face of the Award, the male conduct described and known to the Company did not nearly rise to the level of Petitioner's misconduct in creating a hostile work environment resulting in subordinates threatening to, or actually, resigning.  Resp. Br. at 35-36.

The arbitrator ignored this and other critical evidence, making decisions that "effectively exclud[ed]" evidence that was "central and decisive to the Company's position."[*] *Hoteles Condado Beach* v. *Union de Tronquistas Local 901*, 763 F.2d 34, 40 (1st Cir. 1985). Even putting aside the arbitrator's manifest disregard of law, the Award resulted from a fundamentally unfair proceeding and must be vacated.

## POINT III

### THE ARBITRATOR SHOULD NEVER HAVE BEEN SEATED IN THE FIRST INSTANCE AND HER SUBSEQUENT CONDUCT DEMONSTRATES HER EVIDENT PARTIALITY.

It cannot be disputed that a respected Justice of the New York Supreme Court[**] sharply chastised this arbitrator for having submitted a sworn, misleading affidavit as a plaintiff in a personal litigation.  Resp. Br. at 38-39.  Further, there is no dispute that the arbitrator, in presenting her virtues in a résumé provided to the parties, "omitted to disclose" this New York Supreme Court opinion.  S&C Reply Decl. at ¶ 6; S&C Ex. 1.  It is incontrovertible — and Petitioner's counsel concedes — that it was open to either party under the AAA procedures to

---

[*] *See* Resp. Br. at 2-10, 26-36; S&C Decl. ¶¶ 11-31.  Moreover, in arriving at a supposed valuation of some $9 million for Petitioner's options — to be then quadrupled to $36 million — the arbitrator accepted Petitioner's valuation expert's testimony despite his express statement that he was "not qualified to say what Kargo was worth," S&C Decl. ¶ 20.

[**] Justice Barbara R. Kapnick, subsequently appointed to the Appellate Division.

have unilaterally rejected the arbitrator if either had known about this circumstance and accordingly deemed her *persona non grata*.  Rafkin Decl. at ¶ 2; S&C Reply Decl. at ¶¶ 7, 11. Finally, Respondent's arbitration counsel, Tracy High of Sullivan & Cromwell, unequivocally attests that she, indeed, would have rejected the arbitrator had she known of this Supreme Court Justice's opinion casting severe doubt on the arbitrator's integrity.  S&C Decl. ¶ 5; S&C Reply Decl. ¶ 11.  Respondent submits that it inexorably follows that the arbitrator should never have presided over the arbitration in the first place, *see* 9 U.S.C. § 10(a)(4); *Avis Rent A Car Sys., Inc.* v. *Garage Emps. Union, Local 272*, 791 F.2d 22, 25 (2d Cir. 1986), and her "misbehavior" in having not disclosed the Supreme Court Justice's opinion compels vacatur, 9 U.S.C. § 10(a)(3).

Petitioner claims that the arbitrator's presentation to the Supreme Court was not a sworn affidavit but rather merely "initial papers" that were ruled upon in a "routine motion." Pet. Reply at 39.  Not so.  The action — upon a supposedly viable $250,000 promissory note — was commenced by this arbitrator, pursuant to CPLR § 3213, by way of an application for summary judgment and was supported by her sworn affidavit.  Szczerban Ex. 8 at 1.  And, far from being a "routine motion," the affidavit went to the very heart of whether that $250,000 suit could proceed, and the Court's opinion was accordingly sharply critical, finding:  "It is troubling to this Court that the initial papers submitted by plaintiff, who is 'a member of the Bar and a former member of the judiciary' make no mention of the Baltic project to which she made a capital contribution of $250,000 apparently prior to March 2008, for which she received a 9.10% membership interest, and which mailed her K-1's for several years."  *Colombaro* v. *Gilad*, Index No. 650609/11, No. 17, at 7 (Sup. Ct. N.Y. Aug. 31, 2012) (Kapnick, J.) (Szczerban Ex. 6).

Petitioner argues that Respondent should have conducted a more exhaustive investigation into the arbitrator's background at the outset and raised objection then.  Pet. Reply at 39.  This contention is unfounded.  As set forth in the Reply Declaration of Tracy High, the parties were provided by the AAA with a list and résumés of ten potential arbitrators, and, per AAA rules, were allowed to strike unacceptable arbitrators and rank the rest.  *See* S&C Reply Decl. at ¶¶ 4, 7.  At that time, Respondent was dealing with a $3 million claim and was entitled to rely upon the arbitrator's résumé and the AAA's assertion that all of its arbitrators met its "Qualification Criteria."  *See id.* at ¶¶ 9-10.  Moreover, the specific searches that were conducted by Respondent's counsel did not turn up the New York Supreme Court Justice's opinion, and a search of Lexis, Westlaw, or Google would not have.  *See id.* at ¶ 8.  There was simply no warrant at the outset of this proceeding for Respondent to have been required to conduct more intensive research as to ten different potential arbitrators.  *See id* at ¶¶ 9-10.  And Petitioner herself never purports to have conducted any investigation of the potential arbitrators.

But, once this $3 million claim had metamorphosed into a bizarre $41 million Award — totally disregarding facts and law — Respondent indeed undertook to research further who this arbitrator actually was, and the Supreme Court opinion came to light.[*]  Having discovered the arbitrator's wrongful nondisclosure, there is no bar to Respondent seeking vacatur of the Award on this basis.  Indeed, a district court may only "entertain an attack upon the qualifications or partiality of arbitrators . . . after the conclusion of the arbitration and the rendition of an award."  *Aviall, Inc.* v. *Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997).

Petitioner argues that, because the AAA post-Award did not disqualify the arbitrator, this misconduct should be swept under the rug.  Pet. Reply at 34.  But the AAA did

---

[*]    This research included, among other things, searching actual state court dockets, such as the New York State Courts Electronic Filing system, which turned up the opinion.  S&C Reply Decl. ¶ 10.

not give any reason for not disqualifying the arbitrator from any further role, and the AAA itself may be deemed to have a vested interest in not acknowledging that one of its arbitrators did not meet its own "Qualification Criteria," which require that its arbitrators be "*[h]eld in the highest regard by peers for integrity*, fairness and good judgment," *see* Szczerban Decl. ¶ 11 & Ex. 12 (emphasis added).  But the issue here is one for this Court — not the AAA — and Justice Kapnick's opinion puts paid to any claim that this arbitrator meets such "Qualification Criteria." Vacatur is thus required.  *See* Resp. Br. 38-39.  Nevertheless, ultimately, the issue is *not* even whether that *opinion* itself requires such *per se* "disqualification," but rather that — on the unchallenged record — had the arbitrator made proper *disclosure* of the Supreme Court's opinion indisputably *material* as to her "integrity," the arbitrator would not have been permitted by Respondent to preside over this arbitration *ab initio*.

Turning to "evident partiality," it is now apparent that the arbitrator had a motive for her bias against Respondent from the outset.  Petitioner concedes that "there was no mystery" about Respondent's attempt to disqualify the arbitrator prior to the start of the hearing, citing to an email that the arbitrator received from the AAA notifying her of the request.  Rafkin Reply Decl. ¶ 5 & Ex. A.  But that email did not indicate *which* party objected to the arbitrator's sitting: that only came to pass when Petitioner's counsel wrongfully elected to advise the arbitrator that it had been "Respondent's fault."  S&C Decl. ¶ 10; S&C Reply Decl. ¶ 14.

It is thus now obvious that the arbitrator had an incentive from the outset to punish Respondent for seeking disqualification.  And then, at every turn of the proceeding, the arbitrator ignored settled law; copied and pasted the Award in substantial extent from Petitioner's briefing; made consistent evidentiary decisions and conclusions adverse to Respondent; and then rendered a $41 million Award on what commenced as a $3 million claim.

Moreover — even post-Award — the arbitrator further demonstrated her "evident partiality" by gratuitously intervening to demand that Petitioner present a claim for "interest." Szczerban Ex. 4 at 2.  The Award — by its own terms — was "in full settlement of all claims . . . except for attorney fees and costs" and "*denied with prejudice*" all claims and counterclaims not expressly granted in the Award.  Award at 83 (emphasis added).  As the Award makes no mention of interest — and in the post-hearing briefing Respondent made no request for interest — it was thus precluded.  But that did not stop the arbitrator from out of the blue inviting Petitioner to request "interest" in contravention of express AAA Rules prohibiting an arbitrator from reopening proceedings or modifying an award.  *See* Szczerban Ex. 11 (Rules 34 and 40).

Petitioner argues that an arbitrator can unilaterally raise issues in "legitimate efforts to move the case along."  Pet. Reply at 38 (quoting *Cellu-Beep, Inc.* v. *TeleCorp Commc'ns, Inc.*, 2014 WL 3585515, at *3 (S.D.N.Y. July 18, 2014)).  But here, the arbitrator's actions were not about "clos[ing] out her work on this matter" as Petitioner contends.  *See id.*  The arbitration hearing was over.  The Award had issued.  The only open matter was a ministerial award of attorneys' fees and costs, to which the parties had already agreed.  There was no case to "move along."  This was simply a strange, unilateral, unwarranted and impermissible intervention by the arbitrator on behalf of Petitioner, graphically confirming the fact of the arbitrator's "evident partiality."

Evident partiality may be found "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."  *Scandinavian Reinsurance Co. Ltd.* v. *Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 64 (2d Cir. 2012).  Respondent submits that this standard is met here.

## CONCLUSION

For the foregoing reasons, the petition to confirm should be denied and the Award vacated in its entirety or, alternatively, modified to eliminate any grant of multiple damages.

Dated:  New York, New York
        September 8, 2017

Respectfully submitted,

WACHTELL, LIPTON, ROSEN & KATZ

By:    /s/ Herbert M. Wachtell
        Herbert M. Wachtell

Herbert M. Wachtell
S. Christopher Szczerban[*]
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
HMWachtell@wlrk.com
SCSzczerban@wlrk.com
(212) 403-1000

*Attorneys for Respondent Kargo Global, Inc.*

---

[*]    Adam Sowlati, a newly admitted member of the New York Bar, but not yet a member of this Court, participated in the preparation of this memorandum.